

## PROPERTY DAMAGE APPRAISERS
### INCORPORATED

# FRANCHISE LICENSE AGREEMENT

*Version: 2011*

**PROPERTY DAMAGE APPRAISERS, INC.**

**FRANCHISE LICENSE AGREEMENT**

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## TABLE OF CONTENTS

1. GRANT OF FRANCHISE ......................................................................................................... 2

2. TERM AND RENEWAL ......................................................................................................... 2

3. PDA ASSISTANCE ................................................................................................................ 4

4. ROYALTY FEES .................................................................................................................... 5

5. FRANCHISEE ORGANIZATION ........................................................................................... 6

6. OBLIGATIONS OF FRANCHISEE ........................................................................................ 8

7. PROPRIETARY MARKS ...................................................................................................... 14

8. CONFIDENTIAL OPERATIONS MANUAL ........................................................................ 16

9. CONFIDENTIAL INFORMATION ....................................................................................... 17

10. ACCOUNTING AND RECORDS ......................................................................................... 19

11. TRANSFER OF INTERESTS AND ASSIGNMENT OF THIS AGREEMENT ..................... 20

12. DEFAULT AND TERMINATION ........................................................................................ 23

13. RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION .................................... 27

14. COVENANTS ....................................................................................................................... 29

15. TAXES, PERMITS, AND INDEBTEDNESS ........................................................................ 31

16. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ............................................ 31

17. MISCELLANEOUS .............................................................................................................. 34

18. DISPUTE RESOLUTION ..................................................................................................... 37


**EXHIBIT A** -- FRANCHISEE'S OFFICE LOCATION AND MARKETING AREA

**EXHIBIT B** – GENERAL RELEASE AND WAIVER

**EXHIBIT C** – ACKNOWLEDGMENT OF RECEIPT OF OPERATIONS MANUAL

**EXHIBIT D** – FACTORING AGREEMENT

**EXHIBIT E** – ACKNOWLEDGMENT OF RECEIPT OF PDA INFRACTION/COMPLAINT
REVIEW SYSTEM

**EXHIBIT F** – STATEMENT OF OWNERSHIP INTERESTS

**EXHIBIT G** – GUARANTY AND ASSUMPTION OF OBLIGATIONS

**EXHIBIT H** – SOFTWARE LICENSE AGREEMENT

**EXHIBIT I** – FORM OF MONTHLY REPORT

**EXHIBIT J** – LIMITED POWER OF ATTORNEY FOR CONTACT INFORMATION

**EXHIBIT K** – REQUIRED INSURANCE COVERAGE

**EXHIBIT L** – CONFIDENTIALITY AGREEMENT

**EXHIBIT M –** CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

**EXHIBIT N –** STATE LAW ADDENDA

## PROPERTY DAMAGE APPRAISERS, INC.

## FRANCHISE LICENSE AGREEMENT

THIS FRANCHISE LICENSE AGREEMENT (this "Agreement") is entered into between Property Damage Appraisers, Inc., a Texas corporation ("PDA"), and ___Brian K. Nygaard___ ("Franchisee") on this ___15th___ day of ___September___, ___2011___ (the "Effective Date").

## RECITALS:

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of such appraisal businesses. The Franchisee acknowledges that Franchisee, but for its relationship with PDA under this Agreement or a prior similar agreement with PDA, does not independently know these procedures, techniques, business methods or business policies, or have these business forms or access to PDA's body of knowledge.

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time;

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks");

WHEREAS, Franchisee understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a franchised appraisal business under the PDA System (the "Franchised Business") using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance (however communicated to Franchisee), know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (as amended from time to time in PDA's sole discretion, the "Manual");

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **GRANT OF FRANCHISE**

    A.      PDA hereby grants to Franchisee the non-exclusive license and right, and Franchisee undertakes the obligation, for the Term (as defined below) and on the terms and conditions hereinafter set forth, to operate the Franchised Business solely within the non-exclusive marketing area set forth in Exhibit A (the "Marketing Area") and to use, solely in connection therewith, the Proprietary Marks, the PDA Software (as defined below), the PDA System, the Documentation, and any other confidential information or correspondence provided by PDA to Franchisee, as such may be changed, improved or discontinued by PDA from time to time.

    B.      Franchisee shall devote its full time to the Franchised Business and shall use its best efforts to solicit and provide appraisal services in the Marketing Area and shall market the Franchised Business as required by this Agreement.

    C.      Franchisee assumes all cost, liability, expense and responsibility for locating and obtaining a site for the Franchised Business solely within the Marketing Area. The location and premises for such site (the "Office") shall meet PDA's then-current criteria as set forth in the Manual or otherwise provided to Franchisee in writing, and must be approved by PDA prior to commencing business. The street address of the Office shall be set forth in Exhibit A. Franchisee shall not relocate the Office without the express prior written consent of PDA, and without first completing an Office Change Form in the form provided by PDA. This Agreement does not grant to Franchisee the right or franchise to operate the Franchised Business or to offer to sell any products or services described hereunder at or from any fixed location other than the Office.

    D.      PDA and any other authorized person or entity may, at any time, advertise and promote the PDA System in the Marketing Area and solicit and service any clients for appraisal services, including clients located in the Marketing Area. PDA may itself establish or grant franchises to others to establish a Property Damage Appraisers office using the PDA System and the Proprietary Marks both within and outside the Marketing Area. In addition, PDA may offer and sell (and may authorize others to offer and sell) products and services in the Marketing Area which may be similar to those offered by the Franchised Business under names and marks other than the Proprietary Marks, as well as under the Proprietary Marks.

2.  **TERM AND RENEWAL**

    A.      The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue for the duration of the initial term and any renewal terms, unless earlier terminated as provided herein. The initial term of this Agreement shall be five (5) years, commencing on the Effective Date.

    B.      Franchisee may, at its option, renew the franchise granted under this Agreement for three (3) additional consecutive five (5)-year terms subject to the following conditions, all of which must be met prior to and at the time of renewal of each such term, and subject to the other provisions in this Section 2:

    1.      Franchisee must give PDA written notice of Franchisee's election to renew no less than one hundred and eighty (180) days and no more than two hundred and forty (240) days prior to the expiration of the then-current term. Franchisee expressly acknowledges and agrees that giving such notice to PDA does not entitle Franchisee to renewal of the franchise granted hereunder.

2. Franchisee shall, at Franchisee's sole cost and expense, renovate and modernize to the satisfaction of PDA, the Office and equipment and computer software used in the Office, pursuant to PDA's then-current standards as stated in the Manual.

3. At the expiration of the then-current term, neither Franchisee nor any subsidiary or affiliate shall be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and PDA or any of its subsidiaries or affiliates; and Franchisee and any subsidiary or affiliate shall have substantially and timely complied with all terms and conditions of such agreements throughout the Term hereof.

4. Franchisee and its subsidiaries and affiliates shall have satisfied all monetary obligations owed to PDA and its subsidiaries and affiliates and shall have timely met those obligations throughout the Term hereof.

5. Franchisee shall execute PDA's then-current form of franchise agreement for any renewal term prescribed herein, which agreement shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher royalty fee. Any Designated Person(s) (as defined below), as determined by PDA, shall execute the then-current form of guaranty attached to such franchise agreement.

6. Franchisee shall comply with PDA's then-current qualification and training requirements as stated in the Manual.

7. Franchisee shall present appropriate documentation (including but not limited to any leases or ownership documents) satisfactory to PDA that Franchisee has the right to remain in possession of the Office or has found a new location for the operation of the Franchised Business acceptable to PDA for the duration of any renewal term.

8. Franchisee and all Designated Person(s) shall execute a General Release and Wavier, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders. A copy of PDA's current form of General Release and Waiver is attached hereto as Exhibit B.

C. Notwithstanding the provisions of Section 2.B above, Franchisee shall have no right to renew this Agreement if PDA, at such time or prior to the expiration of the then-current term, elects, in its sole discretion, to cease offering new or additional Property Damage Appraisers franchises in the Marketing Area or the region or other geographic area reasonably adjacent thereto (and without regard to whether PDA has permitted any other franchisee to renew its franchise). In such event, PDA shall give Franchisee written notice of such determination upon receipt of Franchisee's election to renew.

D. If Franchisee fails to provide notice as required by Section 2.B above or otherwise fails to satisfy any of the conditions precedent to renewing the franchise, then this Agreement shall, at PDA's sole discretion, (1) continue in full force and effect on a month-to-month basis at the end of the then-applicable term, or (2) expire at the end of the then-applicable term, which shall automatically terminate all of the rights granted hereby without further action by any party, unless applicable law requires that either party give notice to the other prior to the expiration of this Agreement, in which case this Agreement shall remain in effect on a month-to-month basis until such notice requirement has been met.

3. **PDA ASSISTANCE**

    A.    PDA will provide Franchisee with an initial training program in connection with the opening of the Franchised Business, and may provide such other training programs as it deems appropriate.

    B.    PDA will provide to Franchisee one (1) hard copy of the Manual, as more fully described in Section 8 hereof, and may provide Franchisee access to an electronic version of the Manual on PDA's password-protected website. PDA may amend the Manual from time to time, and it will be Franchisee's responsibility to stay apprised of any such amendments, by accessing the electronic version of the Manual or otherwise. PDA may, in its sole discretion, provide to Franchisee a hard copy of any such amendment or of a restated copy of the Manual (in which case Franchisee shall immediately return the prior version of the Manual to PDA). Upon receipt of the Manual and any hard copies of amendments thereto or restatements thereof, Franchisee agrees to sign and return an Acknowledgement of Receipt substantially in the form attached hereto as <u>Exhibit C</u>.

    C.    PDA may, but will have no obligation to refer (or to continue to refer) clients to Franchisee. Franchisee shall strictly comply with the requirements and special arrangements prescribed by PDA in rendering services to accounts originated by PDA, including the handling and billing of such accounts.

    D.    Upon Franchisee's request, PDA may, in its sole discretion, purchase the accounts receivable of Franchisee attributable to the Franchised Business pursuant to the terms and following the parties' execution of a Factoring Agreement substantially in the form attached hereto as <u>Exhibit D</u>.

    E.    PDA may, in its sole discretion, provide ongoing assistance to the Franchisee from time to time through its field representatives (subject to availability of personnel). Such assistance may include, at PDA's discretion, regional conference calls, regional meetings, site visits and other meetings or phone calls. Franchisee agrees to fully cooperate and make itself available for any phone calls, meetings or site visits that PDA deems necessary.

    F.    PDA may, in its sole discretion, provide certain advertising and promotional materials, subject to availability, for Franchisee's use in marketing the Franchised Business, and written materials concerning techniques for managing, marketing and operating the Franchised Business.

    G.    PDA expects uniformity and high quality services from all franchisees operating under the PDA System and may conduct audits and/or inspections of the Franchised Business in furtherance thereof and to protect the PDA brand, which audits and/or inspections Franchisee shall permit pursuant to Section 6.L. Franchisee shall comply with any and all uniform standards that may, in PDA's sole discretion, be established by PDA from time to time for operation of the Franchised Business. To ensure compliance with such uniform standards, PDA has established a PDA Infraction/Complaint Review System (as amended from time to time in PDA's sole discretion, the "Infraction System"), the current version of which is attached at <u>Exhibit E</u>, together with a form of Acknowledgement of Receipt to be executed by Franchisee in connection with the execution of this Agreement. Amendments to the Infraction System will be provided and acknowledged as amendments to the Manual as set forth in Section 3.B. Franchisee acknowledges and agrees that Franchisee is subject to the terms and conditions of the Infraction System for any violations of the uniform standards.

## 4. **ROYALTY FEES**

A.    In partial consideration for the rights granted herein, Franchisee shall pay to PDA a royalty fee in an amount equal to fifteen percent (15%) of Franchisee's Gross Invoice Fees (as defined below). During the Term of this Agreement, Franchisee shall submit to PDA a weekly report in a form prescribed by PDA setting forth (i) the Gross Invoice Fees for the prior week's operations and (ii) the amount of the royalty fee to be paid based on the amount of Gross Invoice Fees for such prior week. If no Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee in the manner provided in Section 4.B. If a Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee in the manner provided in Section 4.C.

B.    For the duration of all periods within the Term of this Agreement during which no Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee due hereunder (based on the prior week's Gross Invoice Fees) on or before the fifth business day after Franchisee submits its weekly report to PDA. A business day for the purpose of this Agreement means any day other than Saturday, Sunday or a United States bank holiday. Royalty fees shall be paid by personal delivery, regular mail or expedited delivery to PDA at its corporate offices in Fort Worth, Texas or to such other location as PDA may direct, or in the form of an automated clearing house or wire transfer to PDA, or in such other form as PDA may reasonably request from time to time. However, PDA reserves the right, if any payment is overdue more than once within any three (3) consecutive weeks, to require Franchisee to pay all future royalty fees by automated clearing house, wire transfer, certified check, or in such other manner as PDA deems appropriate, and to require that Franchisee enter into a Factoring Agreement with PDA. Franchisee shall promptly execute and cause to be executed all documents requested by PDA to authorize and facilitate such automated clearing house or wire transfers and to authorize the initiation of such automated clearing house or wire transfers by PDA. Franchisee shall not be entitled to withhold any payments due to PDA for any reason. Any payment not actually received by PDA on or before its due date and any payment made by a check that is returned by the bank upon which it is drawn for insufficient funds or for any other reason, shall be deemed overdue.

C.    For the duration of all periods within the Term of this Agreement during which a Factoring Agreement is in effect between Franchisee and PDA, PDA may, in its sole discretion, (i) require Franchisee to pay the weekly royalty fee due hereunder in the manner provided in Section 4.B, or (ii) offset the amount of such payment owed by Franchisee against any sum then or in the future owed by PDA to Franchisee, including, but not limited to, any sums received by PDA for the benefit of Franchisee.

D.    If any payment or fee due under this Agreement is not paid by Franchisee when the payment or fee is due, Franchisee shall pay PDA, in addition to the overdue amount, interest on such amount from the date it was due until paid at a rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. If any interest in excess of the maximum rate allowed by applicable law is provided for, or shall be adjudicated to be so provided in this Agreement, Franchisee shall not be obligated to pay the excess amount of such interest. If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts which may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid to the party that paid such interest. Entitlement to such interest shall be in addition to any other remedies PDA may have at law or in equity, arising under this Agreement or otherwise.

E.    The term "Gross Invoice Fees" as used herein shall mean the sum of all invoice amounts and billings of the Franchised Business from appraisal services of whatever kind or nature, and the sale of all other services or goods, and income of any other kind and nature related to the Franchised Business or

the PDA System generally, whether for cash or credit and regardless of collection in case of credit. Gross Invoice Fees shall include, without limitation, proceeds from business interruption insurance. Gross Invoice Fees shall not include applicable state sales taxes or other taxes collected from clients of the Franchised Business which are transmitted to the appropriate taxing authority. Franchisee shall diligently and vigorously collect all of its accounts receivables relating to the Gross Invoice Fees.

5. **FRANCHISEE ORGANIZATION**

A. If Franchisee is a corporation, limited liability company (LLC), or a partnership, Franchisee and each Designated Person(s), as applicable, represents, warrants, and covenants that, as of the Effective Date of this Agreement and at all times during the Term of this Agreement:

1. Franchisee is duly organized and validly existing under the state law of its formation;

2. Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

3. Franchisee's corporate charter, operating agreement, or written partnership agreement shall at all times provide that the activities of Franchisee are confined exclusively to the development and operation of a property damage appraisal business unless otherwise expressly consented to, in advance, by PDA in writing;

4. The execution of this Agreement and the transactions contemplated hereby are within Franchisee's corporate power if Franchisee is a corporation, or if Franchisee is a LLC or partnership, are permitted under Franchisee's operating agreement or written partnership agreement, respectively;

5. If Franchisee is a corporation, true, correct, and complete copies of the Franchisee's Articles of Incorporation, Bylaws, other governing documents, any amendments to the foregoing, resolutions of the Board of Directors authorizing entry into and performance of this Agreement, and any certificates or other documents as may be reasonably required by PDA shall be furnished to PDA prior to the execution of this Agreement; or, if Franchisee is a partnership, true, correct, and complete copies of the written partnership agreement, other governing documents, and any amendments to the foregoing, shall be furnished to PDA prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by Franchisee's written partnership agreement; or, if Franchisee is a LLC, true, correct, and complete copies of the Articles of Organization, regulations or operating agreement, other governing documents, and any amendments to the foregoing, shall be furnished to PDA, prior to execution of this Agreement;

6. If Franchisee is a corporation, LLC, or partnership, the ownership interests in Franchisee are accurately and completely described in the Statement of Ownership Interests attached hereto as Exhibit F. Further, if Franchisee is a corporation, Franchisee shall maintain at all times a current list of all owners of record and all beneficial owners of any class of equity securities in Franchisee or, if Franchisee is a partnership, Franchisee shall maintain at all times a current list of all owners of an interest in the partnership, or, if Franchisee is a LLC, Franchisee shall maintain at all times a current list of all members, managers and/or officers with an interest in the company. If there is a change in the information contained in Exhibit F, Franchisee shall execute any documents deemed necessary by PDA to amend such exhibit in order to reflect such changes. In consideration for PDA's grant of a franchise to Franchisee hereunder, which grant will inure to the economic benefit of each of the following parties, as

applicable, the spouse of Franchisee (in the case Franchisee is an individual), each officer, director (in case of a corporation or partnership) and member or manager (in the case of a limited liability company) of Franchisee, each holder or owner of a beneficial interest (excluding limited partners) of any class of securities of Franchisee, and any corporation, partnership or limited liability company directly or indirectly controlling Franchisee, if Franchisee is a corporation, partnership or limited liability company, and the general partners of Franchisee and the officers, directors (in the case of a corporation or partnership) and members or managers (in the case of a limited liability company) of, and the holders or owners of a beneficial interest of any class of securities of a general partner that is a corporation, partnership or limited liability company and any corporation, partnership or limited liability company which directly or indirectly controls a general partner of Franchisee, if Franchisee is a partnership, at the discretion of PDA, shall execute a Guaranty substantially in the form attached hereto as Exhibit G and shall be individually bound by all obligations hereunder pursuant to the Guaranty. Each person subsequently elected as officer, director or manager of Franchisee that is approved by PDA shall additionally execute the Guaranty. Such persons, individually and collectively, shall be referred to herein as "Designated Person(s)."

       7.     If any officer, director, member or manager of Franchisee shall cease to serve as such or any individual shall be elected as an officer, director, member or manager of Franchisee after the Effective Date, Franchisee shall provide PDA with written notice thereof within seven (7) days subsequent to any such change and any newly elected officer or director shall execute the Guaranty and shall be individually bound by all obligations hereunder pursuant to the Guaranty.

If Franchisee is a corporation, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to and that further assignment or transfer thereof is subject to all restrictions imposed upon assignments by this Agreement. Such statement shall read "Any transfer, sale or other disposition of the stock represented by this certificate is subject to the restrictions contained in that certain Franchise License Agreement dated _____September 15_____, 2011____, by and between Property Damage Appraisers, Inc. and the Company." If Franchisee is a partnership, its written partnership agreement shall provide that ownership of an interest in the partnership is held subject to and that further assignment or transfer of such interest is subject to all restrictions imposed upon assignments by this Agreement. If Franchisee is a LLC, its operating agreement shall provide that ownership of an interest in the company is held subject to and that further assignment or transfer of such interest is subject to all restrictions imposed upon assignments by this Agreement.

       8.     If requested by PDA, Franchisee has provided PDA with the most recent financial statements of Franchisee and if required by PDA, the most recent financial statement of any Designated Person(s). Such financial statements present fairly the financial position of Franchisee and such Designated Person(s) at such dates indicated therein and with respect to Franchisee, the results of operations, and its cash flow for the years then ended. Franchisee agrees that it shall maintain at all times, during the Term of this Agreement, sufficient working capital to fulfill its obligations under this Agreement. Each of the financial statements mentioned above has been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the notes thereto, applied on a consistent basis. Franchisee and each Designated Person(s) have no material liabilities, adverse claims, commitments or obligations of any nature as of the Effective Date of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise, which are not reflected as liabilities on the financial statements of Franchisee or such person(s).

       B.     Franchisee acknowledges and agrees that the representations, warranties, and covenants set forth above in Sections 5.A.1 through 5.A.9 are continuing obligations of Franchisee during the Term of this Agreement.

## 6.  **OBLIGATIONS OF FRANCHISEE**

A.  Upon execution of this Agreement, Franchisee shall designate an individual to serve as the "Operating Principal." The Operating Principal shall, at all times during which he serves as Operating Principal, meet any and all of PDA's standards and criteria for this position, as set forth in this Agreement, in the Manual or otherwise in writing by PDA. Without limiting the foregoing, the Operating Principal shall meet the following qualifications:

1.  a.  If Franchisee is an individual, Franchisee shall perform the obligations of the Operating Principal.

b.  If Franchisee is a corporation, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) directly or indirectly beneficially own at least fifty-one percent (51%) of the shares of each class of Franchisee's issued and outstanding capital stock and (ii) be entitled, under its governing documents and under any agreements among the shareholders, to cast a sufficient number of votes to require the corporation to take or omit to take any action which the corporation is required to take or omit to take under this Agreement.

c.  If Franchisee is a partnership, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) own at least a fifty-one percent (51%) interest in the operating profits and operating losses of the partnership as well as at least a fifty-one percent (51%) ownership interest in the partnership (and at least a fifty-one percent (51%) interest in the shares of each class of capital stock of any corporate general partner) and (ii) be entitled under its partnership agreement or applicable law to act on behalf of the partnership without the approval or consent of any other partner or be able to cast a sufficient number of votes to require the partnership to take or omit to take any action which the partnership is required to take or omit to take under this Agreement.

d.  If Franchisee is a LLC, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) own at least fifty-one percent (51%) interest in the operating profits and operating losses of the company, as well as at least fifty-one percent (51%) ownership interest in the company and (ii) be entitled under its operating agreement or applicable law to act on behalf of the company without the approval or consent of any other member or be able to cast a sufficient number of votes to require the company to take or omit to take any action which the company is required to take or omit to take under this Agreement.

e.  Except as may otherwise be provided in this Agreement, the Operating Principal's interest in the Franchised Business shall be and shall remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options.

2.  The Operating Principal shall be involved in the management and the day-to-day operations of the Franchised Business, shall devote full time and best efforts to the management and operation of the Franchised Business and shall be individually, jointly and severally bound by all obligations of Franchisee, the Operating Principal and Designated Person(s) hereunder.

3.  If, during the Term of this Agreement, the Operating Principal is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section 6, Franchisee shall promptly notify PDA and designate a replacement within thirty (30) days after the Operating Principal ceases to serve, such replacement being subject to the same qualifications listed above and subject to PDA's prior written approval in its sole discretion. Any failure to comply with this Section 6.A shall constitute an Event of Default (as defined below).

B. Franchisee acknowledges that it is important to the operation of the PDA System and the Franchised Business that Franchisee and Franchisee's employees receive such training as specified in the Manual or as PDA may require, and to that end agrees as follows:

1. Franchisee (including the Operating Principal) shall complete, to PDA's sole satisfaction, an initial training program. Training shall be conducted at PDA's corporate offices, the Office or at another location designated by PDA. PDA shall determine, in its sole discretion, whether the Operating Principal has satisfactorily completed the initial training program. If the initial training program is not satisfactorily completed by the Operating Principal, Franchisee shall not commence operation of the Franchised Business until PDA so approves.

2. Franchisee (including the Operating Principal) shall complete, to PDA's satisfaction, such additional training as PDA may require from time to time, at such times and places as PDA may determine in its sole discretion. For all such programs, PDA will provide the instructors and training materials; provided, however, PDA reserves the right to impose a fee for such additional training programs.

3. Franchisee (including the Operating Principal) may also attend such optional training programs that PDA may from time to time offer at its sole discretion.

4. Franchisee shall be solely responsible for and shall pay all of the expenses incurred by Franchisee in connection with any and all training programs, including without limitation, the cost of travel, lodging, meals and wages.

C. Prior to opening the Office, Franchisee shall, at its sole expense, complete to PDA's satisfaction, all preparations of the Office, including acquisition by purchase or lease and installation of fixtures, furnishings, equipment and supplies as specified in the Manual or other Documentation. Among other items, Franchisee shall acquire by purchase or lease a computer that is compatible with the PDA System and, unless otherwise approved in writing by PDA, certain computer software prescribed by PDA for conducting the Franchised Business. In addition, as a condition to PDA providing to Franchisee certain computer software for the management of the Franchised Business, Franchisee shall execute the Software License Agreement in the form attached hereto as Exhibit H. As used herein, the term "PDA Software" shall mean and refer to the computer software provided by PDA that is identified in the Software License Agreement, as it may be amended from time to time. Within thirty (30) days following completion, to PDA's satisfaction, of pre-opening training as set forth in Section 6.B and such other pre-opening requirements stated above, Franchisee shall open the Franchised Business to the public and commence operations. However, if Franchisee has not commenced operation of the Franchised Business within forty-five (45) days after the Effective Date of this Agreement, for whatever reason, then PDA may terminate this Agreement immediately upon written notice to Franchisee. Time is of the essence.

D. Franchisee agrees to utilize competent, ethical, conscientious, trained and fully licensed (if applicable) employees or independent contractors to perform appraisal services under the PDA System as required by this Agreement and in the Manual or other written directives of PDA. Franchisee shall not permit appraisal services to be performed by any individual other than Franchisee, the Operating Principal or an employee or independent contractor fully satisfying the uniform standards of the PDA System. Franchisee shall preserve good customer relations and comply with such customer relation policies as PDA may prescribe in the Manual or otherwise. To ensure that the highest degree of quality and service is maintained, Franchisee and, where applicable, each Designated Person(s) shall operate the Franchised Business in conformity with such uniform standards, techniques, and procedures as PDA may from time to time prescribe in the Manual or otherwise in writing, and shall refrain from deviating therefrom without PDA's prior written consent. PDA shall have the right to audit and/or inspect Franchisee's

operations to determine Franchisee's compliance with PDA's standards, techniques, and procedures, and Franchisee acknowledges and agrees that Franchisee shall be subject to the Infraction System. In order to ensure compliance with all applicable requirements of the PDA System, Franchisee and each Designated Person(s) further agree:

1.  To perform all types of appraisal services and related services authorized by PDA as part of the PDA System, and to refrain from performing any services which are not expressly authorized by PDA as part of the System or for which personnel of Franchisee are not qualified, as determined by PDA, in its sole discretion.

2.  To maintain the Office in a clean, orderly condition and in good repair and in conformity with the standards, specifications and requirements of the PDA System, as may be designated by PDA from time to time.

3.  Except as otherwise approved in writing by PDA, to keep the Franchised Business open and in operation for such minimum number of days and hours as prescribed in the Manual or as PDA may specify from time to time in writing.

4.  To keep PDA currently advised on such information concerning Franchisee's personnel as PDA may request.

5.  To use only the forms and procedures approved by PDA from time to time in its sole discretion.

6.  To assure that all appraisers of Franchisee execute and deliver to PDA a Confidentiality Agreement substantially in the form set forth in <u>Exhibit L</u> attached hereto. Failure by Franchisee to assure such execution and delivery will be deemed a breach of Franchisee's confidentiality obligations hereunder.

7.  To not accept, directly or indirectly, any bribe or kickback regardless of monetary value, nor to accept any gift, favor or gratuity which may affect, or appear to influence, Franchisee's business judgment, except tokens of appreciation having an aggregate monetary value of $25 or less per occurrence.

8.  To not use body shop or contract estimates without making its own independent estimates and investigations.

9.  To not purchase or sell any type of salvage unless expressly approved by PDA in writing.

10. To not be involved in any activity that may create a conflict of interest unless any such conflict is fully disclosed to PDA and PDA expressly waives any such conflict in writing.

E.  Franchisee shall repair or replace, at Franchisee's cost and expense, any computer hardware, software other than the PDA Software (which shall be repaired or replaced pursuant to the terms of the Software License Agreement), supplies and other products and materials required for the operation of the Franchised Business as necessary, desirable or required by PDA and shall obtain, at Franchisee's cost and expense, any new or additional computer hardware, software or PDA Software, supplies and other products and materials which may be reasonably required by PDA to comply with the then-current standards of the PDA System.

F.    1.    Franchisee acknowledges the importance of its involvement in the promotion of the Franchised Business and specifically, promotion of Franchised Business' services in the Marketing Area. Franchisee shall actively promote the sale of appraisal services under the PDA System in the Marketing Area during the Term of this Agreement. Without limiting the foregoing, unless otherwise approved in writing by PDA, Franchisee shall devote not less than ten (10) hours per calendar month to promoting and marketing the sale of appraisal services under the PDA System. Franchisee shall maintain a written monthly report in the form specified in Exhibit I, detailing the promotional activities undertaken in the previous month, including time spent on each activity and an up-to-date mailing list and client contact list with names, addresses and telephone numbers; upon PDA's request, Franchisee shall furnish any and all such reports to PDA within seven (7) days of such request.

2.    Franchisee shall only use advertising and promotional materials furnished by PDA or approved in advance by PDA in writing, and shall cease using any material, including previously approved material, immediately upon notice from PDA. All advertising and promotional materials shall comply with PDA's advertising standards and shall indicate that Franchisee is a franchisee of the Franchised Business. Franchisee shall not advertise or use in advertising or any other form of promotion, the trademarks or service marks of PDA without appropriate ©, ®, ™, or ˢᵐ designations as are appropriate. Franchisee agrees to comply with PDA's trademark usage policy contained in Section 7 of this Agreement, as amended by PDA from time to time notwithstanding the provisions of Section 17.I.

3.    Franchisee shall not issue any statements to the media whatsoever, including but not limited to any opinions on the potential effect of natural disasters on the damage appraisal industry in general or on the Franchised Business in particular, without the prior written consent of the Vice President of Franchise Relations for PDA.

G.    Franchisee agrees to maintain a telephone line acceptable to PDA and, if Franchisee does not maintain commercial space in the city or other geographic area in which the Office is located as described in Exhibit A, then Franchisee also shall maintain a post office box in such city or geographic area. Franchisee understands and agrees that the telephone number(s) and any post office box(es) for the Franchised Business constitute a part of and the use and maintenance thereof are essential to, the PDA System. Accordingly, Franchisee agrees:

1.    To provide the applicable local telephone company and post office with notice, in a form satisfactory to PDA, stating that PDA will be entitled to all telephone number(s) and post office box(es) utilized by Franchisee in the conduct of the Franchised Business for the duration of this Agreement and following expiration or termination of this Agreement. Accordingly, upon execution of this Agreement and at any time during the Term hereof, Franchisee shall execute such forms and documents as PDA deems necessary, including but not limited to a Limited Power of Attorney substantially in the form attached hereto as Exhibit J, to irrevocably appoint PDA its true and lawful agent and attorney-in-fact with full power and authority for the sole purpose of assigning to PDA all rights to the telephone number(s), post office box(es) and any business listings upon expiration or termination of this Agreement.

2.    Franchisee shall not at any time during the Term of this Agreement change or allow to be changed the telephone number(s) or post office box(es) for the Franchised Business without the prior written consent of PDA.

3.    Except as may be required in connection with any express written assignment to PDA, nothing contained herein shall obligate PDA to pay any charges incurred by Franchisee for telephone services, or any form of advertising, including, but not limited to, telephone advertising and listings or for Franchisee's post office box(es).

H.  1.  Franchisee shall procure upon execution of this Agreement, and maintain in full force and effect during the entire Term of this Agreement, at Franchisee's sole expense, insurance policies protecting Franchisee, PDA and PDA's subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, agents and independent contractors, against any demand or claim with respect to personal injury, death or property damage or any loss, liability or expense whatsoever arising out of or occurring upon or in connection with the operation of the Franchised Business (the "Required Insurance"). To the extent any Required Insurance policies are offered through a national insurance program administered by PDA (the "Required National Program"), Franchisee shall participate in and purchase such applicable Required Insurance policies through the Required National Program. Franchisee shall purchase all other Required Insurance only from insurance companies having a Bests Key Rating Guide of A-VIII or better and approved by PDA. Any and all deductibles and/or self insured retentions are the sole responsibility of Franchisee. No such Required Insurance policy may have a deductible that exceeds $5,000, which such deductible shall be the responsibility of Franchisee. The Required Insurance policies shall include, at a minimum, the coverages specified on Exhibit K, which exhibit identifies the policies offered as of the Effective Date by, and which must be purchased through, the Required National Program.

2.  Franchisee's obligation to obtain and maintain the Required Insurance set forth in Exhibit K shall not be limited in any way by reason of any insurance which may be maintained by PDA, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 16. Each of the policies shall contain a contractual coverage endorsement specifically insuring the performance by Franchisee of the applicable indemnity provision(s) set forth in Section 16.

3.  All Required Insurance policies shall contain a provision that Franchisee's insurance coverage shall be primary to any coverage maintained by PDA, and that PDA shall be entitled to recover under Franchisee's policies for any loss occasioned to PDA, its subsidiaries, affiliates, successors and assigns, and their respective officers, directors, shareholders, employees, agents and independent contractors, for whatever reason. All Required Insurance policies also shall contain a waiver of Franchisee's right of subrogation, and Franchisee's workers compensation policies shall contain an alternate employer endorsement in favor of PDA.

4.  Upon execution of this Agreement and, thereafter, at least thirty (30) days prior to the expiration of any such Required Insurance policy, Franchisee shall deliver to PDA certificates of insurance and, if requested by PDA, true, correct, and complete copies of the applicable insurance policies evidencing the proper coverage with limits not less than those required hereunder. All Required Insurance policies and certificates required hereunder, with the exception of Workers' Compensation (or any legally appropriate alternative approved by PDA), shall name PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, agents, and independent contractors as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions. Further, all Required Insurance policies and certificates shall expressly provide that not less than thirty (30) days' prior written notice shall be given to PDA in the event of a material alteration to or cancellation of the policies.

5.  All of Franchisee's personal property, equipment, furniture, supplies and tangible items in, on or around the Office shall be at the risk of Franchisee only, and PDA shall not be liable for any damage thereto or theft thereof, even if due in whole or in part to the negligence of PDA. No party will have any right or claim against any of the Indemnitees (as hereafter defined) for any property damage (whether caused by negligence or the condition of the Office or any part thereof) by way of subrogation or assignment, such parties hereby waiving and relinquishing any such right. To the extent any such property is insured, Franchisee shall request the insurance carrier to endorse all applicable policies

waiving the carrier's right of recovery under subrogation or otherwise in favor of any of the Indemnitees and provide a certificate of insurance to PDA verifying this waiver.

6. Should Franchisee, for any reason, not procure and maintain the Required Insurance, PDA shall have the right, but not the obligation, to procure such insurance, and upon notice Franchisee will immediately pay and reimburse PDA for all costs of same. The foregoing remedies shall be in addition to any other remedies at law or in equity or under this Agreement that PDA may have.

I. Franchisee shall immediately notify PDA in writing of the receipt of any complaint or claim of any nature relating, directly or indirectly, to the operation of the Franchised Business or of the commencement of any action, suit, or proceeding against Franchisee, or any Designated Person(s), and of the issuance of any inquiry, subpoena, order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which arises out of, concerns, or may affect the operation or financial condition of the Franchised Business, including, without limitation, any action or proceeding brought by Franchisee against employees, clients, or other persons. Without limiting the foregoing, Franchisee shall notify PDA of its intent to initiate any civil or criminal action against a client or employee relating to the operation of the Franchised Business at least (30) days before initiating such action.

J. Franchisee understands and agrees that due to changes in competitive circumstances or presently unforeseen changes in the needs of clients, the PDA System is subject to change, in order that it best serve the interests of PDA, Franchisee and the PDA System. Accordingly, Franchisee expressly acknowledges and agrees that PDA may from time to time change the PDA System including, but not limited to, altering the programs, services, methods, uniform standards, forms, policies and procedures of the PDA System; adding to, deleting from or modifying those programs and services which the Franchised Business is authorized to offer; and changing, improving or modifying the Proprietary Marks. Franchisee expressly agrees to abide by any such modifications, changes, additions, deletions and alterations and expressly acknowledges and agrees that Franchisee is subject to the Infraction System to ensure compliance with all of the standards of the PDA System.

K. Franchisee, at its sole cost and expense, shall comply with all federal, state and local laws, ordinances and regulations, as applicable, and shall timely obtain and maintain any and all permits, certificates or licenses necessary for the operation of the Franchised Business. Franchisee shall submit copies of all such permits, certificates and licenses to PDA upon its request.

L. Franchisee shall permit, or shall secure permission for, PDA and its agents to enter the Office at any time during normal business hours, without notice, for the purpose of conducting audits or inspections or rendering such assistance as PDA deems reasonably necessary. Upon notice from PDA, and without limiting PDA's other rights under this Agreement or applicable law, Franchisee shall take such steps as may be necessary to immediately correct any deficiencies detected during any such audit or inspection. Should Franchisee, for any reason, fail to immediately correct such deficiencies , PDA shall have the right, but not the obligation, in addition to any of PDA's other rights under this Agreement or applicable law, to correct any deficiencies which may be susceptible to correction by PDA and to charge Franchisee a fee for PDA's expenses in so acting, such fee to be payable by Franchisee upon demand.

M. PDA may approve exceptions or changes from the uniform standards of the PDA System, which PDA, in its sole discretion, believes necessary or desirable under any particular circumstances. Franchisee understands that it has no right to object to or to obtain such variances, and that any exception or change from the uniform standards for Franchisee's operation of the Franchised Business must be approved in advance by PDA in writing. Franchisee acknowledges that certain variances may be granted to a franchisee or some franchisees and not others. The granting of such variances shall not entitle Franchisee to like or similar variances. Franchisee also recognizes that some franchisees may operate

under different forms of agreements, and their rights and obligations under those agreement may differ materially from the rights and obligations of Franchisee hereunder.

N.    Franchisee shall properly and timely perform all other obligations of Franchisee as stated herein.

7.    **PROPRIETARY MARKS**

A.    It is understood and agreed that the franchise granted herein provides Franchisee the non-exclusive license to use only in the Marketing Area in connection with the Franchised Business the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ as well as any trademarks, services marks, or trade names as PDA may develop and designate for use in connection with the PDA System. With respect to Franchisee's authorized use of such Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

1.    Franchisee shall use only those Proprietary Marks designated by PDA in writing, and shall use them only in the manner authorized and permitted by PDA pursuant to this Agreement;

2.    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of PDA's rights;

3.    Franchisee shall not use any Proprietary Marks as part of any corporate or trade name or with any prefix, suffix or other modifying or extraneous words, terms, designs or symbols (including but not limited to any religious symbols), or in any modified form, nor may Franchisee use any Proprietary Marks in connection with the sale of any unauthorized service or product or in any other manner not expressly authorized in writing by PDA. Franchisee agrees to display the Proprietary Marks prominently and in the manner prescribed by PDA on or in connection with signs, posters, displays, service contracts, stationery and other forms PDA designates. Further, Franchisee agrees to give such notices of trademark or service mark registrations and copyrights as PDA specifies and to obtain such fictitious or assumed name registrations as may be required under applicable law;

4.    All bank accounts, licenses, permits or other similar documents shall contain the actual name of the person or entity owning the Franchised Business. Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of PDA;

5.    Franchisee shall not use the Proprietary Marks as part of any corporate or other legal name and Franchisee shall not license, register or purchase vehicles, fixtures, products, supplies or equipment, or perform any other activity or incur any obligation or indebtedness except in its individual, corporate or other business name;

6.    Franchisee shall comply with PDA's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by PDA or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability;

7.    Franchisee's corporate or legal name must be displayed conspicuously on all licenses and permits required for the operation of the Franchised Business, on all tax returns, on all stationery and business cards, and on all contractual agreements entered into by Franchisee with respect to the Franchised Business. The format for the display of Franchisee's own name in conjunction with the Proprietary Marks must be approved in advance in writing by PDA.

B.     Franchisee acknowledges PDA's sole ownership of the Proprietary Marks and the goodwill associated with and symbolized by them and that Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or any other interest in or to the Proprietary Marks, except the non-exclusive license granted by this Agreement. Franchisee shall not directly or indirectly contest the validity of PDA's ownership or validity of the Proprietary Marks. Any and all goodwill arising from Franchisee's use of the Proprietary Marks in its operations under the PDA System shall inure solely and exclusively to PDA's benefit and upon the expiration or earlier termination of this Agreement and the non-exclusive license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the PDA System or the Proprietary Marks.

C.     Franchisee shall immediately notify PDA in writing of any apparent infringement of or challenge to Franchisee's use of any Proprietary Marks, or claim by any person of any rights in any Proprietary Marks or any similar trade name, trademark or service mark of which Franchisee becomes aware.  Franchisee shall not communicate with any person other than PDA and its counsel and Franchisee's legal counsel in connection with any such infringement, challenge or claim.  PDA and its affiliates shall have sole discretion to take such action as they deem appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Proprietary Marks.  Franchisee agrees to execute any and all instruments and documents, render such assistance and do such acts and things as may, in the reasonable opinion of PDA's counsel, or the counsel of PDA's affiliates, be necessary or advisable to protect and maintain the interests of PDA and its affiliates in any such litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding or to otherwise protect and maintain the interests of PDA and its affiliates in the Proprietary Marks.

D.     Franchisee acknowledges and agrees that the right to use the Proprietary Marks is not exclusive to Franchisee, and that PDA has the right to grant other licenses for use of the Proprietary Marks, to develop and license other marks in conjunction with other business systems on any terms and conditions as PDA deems advisable and to engage, directly or indirectly, in the license and sale of products and services, and the use in connection with such license and sale, of the Proprietary Marks and any other trademarks, trade names, service marks, logos and other identifying characteristics as may be developed from time to time by PDA.

E.     PDA reserves the right to add or substitute different trade names, service marks, trademarks, logos, emblems and indicia of origin for the Proprietary Marks for use in identifying the PDA System and the business operating thereunder if PDA's currently used Proprietary Marks no longer can be used, or if PDA, in its sole discretion, determines that the addition or substitution of different trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin will be beneficial to the PDA System.  In such event, Franchisee shall, at Franchisee's expense, discontinue or modify Franchisee's use of any of the Proprietary Marks or use one or more additional or substitute trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin as required by PDA.

F.     If it becomes advisable at any time, in PDA's sole discretion, for PDA and/or Franchisee to modify or discontinue use of any Proprietary Marks, and/or use one or more additional or substitute trademarks or service marks, Franchisee agrees to comply therewith a reasonable time after notice thereof by PDA.

G.     Franchisee acknowledges PDA's prior rights in and to the Proprietary Marks and that Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of Franchisee's business pursuant to and in compliance with this Agreement and all applicable

specifications, standards and operating procedures prescribed by PDA from time to time during the term of this Agreement. Any unauthorized use of the Proprietary Marks by Franchisee shall constitute an infringement of the rights of PDA in and to the Proprietary Marks. Franchisee agrees that all usage of the Proprietary Marks by Franchisee and any goodwill established thereby shall inure to the exclusive benefit of PDA, and Franchisee acknowledges that this Agreement does not confer any goodwill or other interest in the Proprietary Marks upon Franchisee. All provisions of this Agreement applicable to the Proprietary Marks shall apply to any additional trademarks, service marks, logo forms and commercial symbols hereafter authorized for use by and licensed to Franchisee pursuant to this Agreement. All products, services, and any sales, marketing or promotional programs concerning same, which are developed presently or in the future by or on behalf of Franchisee in conjunction with, for use in, or arising from or related to the Franchised Business are irrevocably and permanently licensed to PDA for no additional charge to become part of PROPERTY DAMAGE APPRAISERS System and for subsequent use by PDA and its affiliates and, if PDA determines, other PROPERTY DAMAGE APPRAISERS franchisees.

8.    **CONFIDENTIAL OPERATIONS MANUAL**

A.    Franchisee shall retain its hard copy of the Manual provided by PDA, and any hard copies of amendments thereto or restatements thereof, for so long as this Agreement remains in effect. Franchisee acknowledges and agrees that the Manual is at all times to be kept confidential and is to be returned upon PDA's request or upon the termination of this Agreement for any reason.

B.    Franchisee understands and acknowledges that every detail of the PDA System and each franchised business operated by a PDA franchisee is important to Franchisee, PDA, and the other franchisees of PDA in order to develop and maintain high operating standards, to increase the demand for the products and services offered by all facilities operating under the PDA System, and to protect PDA's reputation and goodwill. Accordingly, Franchisee will operate the Franchised Business in strict accordance with the provisions, standards and procedures as may be set forth in the Manual, the Documentation, the other written directives which PDA may issue from time to time, and any other manuals and materials created or approved for use in the operations of the Franchised Business, and will not operate the Franchised Business in such a manner as to damage the goodwill and trade reputation of PDA, other PDA franchisees and/or the Proprietary Marks. Franchisee shall maintain PDA's high standards with respect to facilities, services, products and operations. Franchisee shall keep the Franchised Business open and in normal operation for such minimum hours and days as PDA may specify in the Documentation from time to time.

C.    Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Franchised Business, the Documentation and the information contained therein as confidential, and shall not at any time, without the prior written consent of PDA, disclose, copy, duplicate, record, or otherwise reproduce, in whole or in part, or otherwise make available to any unauthorized person or source, the contents of the foregoing materials, and shall maintain such information as secret and confidential. Any disclosure of any of the contents of the Manual by Franchisee to any third party constitutes an Event of Default under this Agreement.

D.    The Manual shall at all times remain the sole property of PDA, and shall be kept in a secure place in the Office.

E.    PDA may, from time to time, revise the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed provision thereof.

F. Franchisee shall at all times ensure that its copy of the Manual is kept current and up to date; and in the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by PDA at PDA's corporate office shall be controlling.

9. **CONFIDENTIAL INFORMATION**

A. For purposes of this Agreement, "Trade Secrets" means any confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA Software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee or Franchisee's Operating Principals or employees containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business.

B. Franchisee agrees that both during the Term of this Agreement and after the Term of this Agreement:

1. Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents (together "Franchisee Parties"), use or duplicate in any way for their own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of this Agreement;

2. Franchisee shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Franchisee may disclose to its employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of this Agreement, and Franchisee may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3. Franchisee shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Franchisee uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Franchisee shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Franchisee shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Franchisee shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

C.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Franchisee's possession. No license to the Franchisee of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Franchisee shall ensure that Franchisee's copy of any Trade Secrets are kept current at all times and are kept in a secure place at the Office. Franchisee agrees that any goodwill that may arise from Franchisee's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

D.     At the request of PDA, Franchisee shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Franchisee agrees to notify and instruct Franchisee's employees and Operating Principals regarding the confidential nature of the Trade Secrets. Franchisee agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Franchisee shall be liable for any loss or damage arising from a breach of this Section 9 by Franchisee, Franchisee's Operating Principals, or Franchisee's employees or agents.

E.     Franchisee shall require all Franchisee's independent contractors performing appraisal services on Franchisee's behalf or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute and deliver to PDA a Confidentiality Agreement substantially in the form attached hereto as <u>Exhibit L</u>. Failure by Franchisee to assure such execution and delivery will be deemed a breach of Franchisee's confidentiality obligations hereunder. Franchisee shall sign and shall ensure that any of its employees, Designated Persons, and Operating Principals who have access to Trade Secrets sign a Confidentiality Agreement and Ancillary Covenants Not to Compete substantially in the form attached hereto as <u>Exhibit M</u>, prior to any disclosure of Trade Secrets to such employees. Franchisee shall ensure that any parties who execute such agreements act as required by such agreements.

F.     Franchisee acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Franchisee or any of its Designated Persons or employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Franchisee hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Franchisee or any Designated Person or employee of Franchisee jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Franchisee agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its Designated Persons and employees, Franchisee (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Franchisee now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Franchisee or such Designated Persons or employees.

G.     Franchisee acknowledges that any failure to comply with the requirements of this Section 9 shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee or any Designated Person(s) in violation of the terms of this Section 9. Franchisee agrees to pay all court costs and  attorneys' fees incurred by PDA in

obtaining specific performance of, or an injunction against a violation of, the requirements of this Section 9. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

H.     All appraisals, data, and other information prepared by Franchisee, its Designated Persons, employees or independent contractors in connection with the performance of appraisal services on behalf of the Franchised Business (1) shall constitute confidential information subject to the confidentiality restrictions and protections for Trade Secrets hereunder, and (2) shall not be used or disclosed by Franchisee, its Designated Persons, employees, or independent contractors in violation of any provision of this Section or the Confidentiality Agreements at <u>Exhibit L</u> and <u>Exhibit M</u>, nor for any purpose other than to carry on the ordinary course of the Franchised Business.

10.    **ACCOUNTING AND RECORDS**

A.     Franchisee shall maintain during the Term of this Agreement, and shall preserve for the time period specified in the Manual, full, complete, and accurate books, records, and accounts in accordance with the accounting system prescribed by PDA in the Manual or otherwise. Franchisee shall keep current and accurate financial records for the operation of the Franchised Business in accordance with generally accepted accounting principals on a consistent basis, and upon PDA's request shall provide PDA with complete and accurate weekly reports (as prescribed in Section 4.A), and balance sheets, income statements and other financial statements of Franchisee as may be prescribed in the Manual or otherwise by PDA for each calendar quarter and calendar year. If required by PDA, each such statement shall be delivered to PDA within sixty (60) days after the last day of the applicable calendar quarter or year, as the case may be. Franchisee shall additionally provide PDA with a copy of any other financial reports and operating statements prepared for Franchisee with respect to the Franchised Business. If at any time Franchisee is required to furnish any lender, lessor, government agency or other person(s) audited financial statements with respect to Franchisee or the Franchised Business, Franchisee shall concurrently furnish PDA with a copy of such audited financial statements.

B.     Franchisee acknowledges that any failure to comply with the requirements of this Section 10 shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee or any Designated Person(s) in violation of the terms of this Section 10. Franchisee agrees to pay all court costs and attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Section 10. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise including but not limited to the termination of this Agreement.

C.     PDA or its designees shall have the right at any time during normal business hours, without notice, to examine and copy, at PDA's expense, the books, records and tax returns of Franchisee and the Franchised Business. PDA shall also have the right, at any time, to have an independent audit made of the books of Franchisee. If any audit reveals that Franchisee had understated Gross Invoice Fees in any report or statement, then Franchisee shall immediately pay PDA the additional amount of fees owing as a result of such understatement, together with interest as provided in Section 4.D. If an audit reveals that Gross Invoice Fees have been understated in any report or statement by two percent (2%) or more, Franchisee shall additionally pay and reimburse PDA for all costs of the audit, including without limitation, travel, lodging, meals and wage expenses and accounting and legal fees. These remedies shall be in addition to any other remedies PDA may have at law or in equity. If, however, any audit reveals that Franchisee has overstated Gross Invoice Fees and that Franchisee has therefore overpaid any fees, the

amount of the overpayment, without interest, shall be credited toward Franchisee's future fees or payment on future invoices.

11. **TRANSFER OF INTERESTS AND ASSIGNMENT OF THIS AGREEMENT**

A. PDA has the right to effect any corporate transaction during the Term of this Agreement, including without limitation, to sell its assets, the Proprietary Marks or the PDA System to a third party; to merge, acquire other corporations or partnerships or be acquired by another corporation or partnership; to undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and to cease operating, and to cease operating franchises, at any time for any reason. With regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of the Proprietary Marks or the PDA System against PDA hereunder. Nothing contained in this Agreement shall require PDA to remain in the business of operating or licensing Property Damage Appraisers' businesses or to offer any services or products, whether or not bearing the Proprietary Marks, to Franchisee, if PDA exercises its rights hereunder to assign its rights in this Agreement. PDA shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity without Franchisee's consent.

B. Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that PDA has granted this franchise in reliance on the business skill, financial capacity, business reputation and personal character of Franchisee. Accordingly, neither Franchisee nor any successor or assign to any part of Franchisee's interest in this Agreement or the Franchised Business, nor any individual, partner, partnership, corporation, or other legal entity (including any Designated Person(s)) which directly or indirectly owns any interest in this Agreement, the Franchised Business or in Franchisee (if Franchisee is a partnership, corporation or other legal entity) shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement (including any of Franchisee's rights or obligations hereunder), the Franchised Business or Franchisee without the prior written consent of PDA, and only upon the following conditions in this Section 11.B. Any purported assignment or transfer, by operation of law or otherwise, not having the prior written consent of PDA required by this Section 11.B shall be null and void.

1. All of Franchisee's and any affiliate's or subsidiary's accrued monetary obligations and all other outstanding obligations to PDA and any affiliate or subsidiary of PDA shall have been satisfied in a timely manner and Franchisee and any subsidiary or affiliate shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner.

2. Neither Franchisee nor any subsidiary or affiliate shall be in default of any provision of this Agreement, any amendment hereof or successor hereto, any other agreement between Franchisee and PDA or its subsidiaries and affiliates, or any lease, license, loan or other agreement which relates to the Franchised Business.

3. The transferor and any subsidiary or affiliate shall have executed a general release and waiver, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective offices, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances.

4. The transferee shall enter into a written agreement, in a form prescribed by PDA, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement and any related

agreements with any subsidiary or affiliate of PDA; and, if the obligations of Franchisee were guaranteed by Designated Person(s), the designated person(s) of the transferee shall guarantee the performance of all such obligations in writing in a form prescribed by PDA.

5.     The transferee shall demonstrate to PDA's sole satisfaction that it meets PDA's education, managerial, and business standards; has obtained all permits and licenses required to operate the Franchised Business and is in good standing with any governmental agency or instrumentality responsible for regulating same; possesses a good moral character, business reputation, and credit rating; has the aptitude, technical knowledge and ability to conduct the business franchised herein (as may be evidenced by prior related business experience or otherwise); has adequate financial resources and capital to operate the Franchised Business; and the appropriateness of the geographic proximity of other areas in which the transferee operates other Property Damage Appraisers appraisal businesses, in relation to the Marketing Area.

6.     The transferee shall execute, for a term ending on the expiration of the then-current initial or renewal term of this Agreement, the standard form Franchise License Agreement then being offered to new franchisees under the PDA System and other ancillary agreements as PDA may require for the Franchised Business, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher royalty fee; and if the obligations of Franchisee were guaranteed by Designated Person(s), the transferee's designated person(s) shall guarantee the performance of all such obligations pursuant to the then current form of guaranty attached to the Franchise License Agreement.

7.     The transferee shall, at its sole cost and expense, renovate and modernize to the satisfaction of PDA, the Office and the equipment and computer software used in the Office, pursuant to PDA's then-current standards as stated in the Manual, and shall complete the upgrading and other requirements within the time specified by PDA.

8.     The transferor shall remain liable for all obligations to PDA in connection with the Franchised Business incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by PDA to evidence such liability.

9.     At the transferee's expense, the transferee and the transferee's Operating Principal, if any, shall complete any training programs then in effect for PDA System franchisees as then specified in the Manual or otherwise upon such terms and conditions as PDA may reasonably require.

10.     Franchisee shall pay a transfer fee of Two Thousand Dollars ($2,000.00), or such greater amount as PDA may require from time to time in its sole discretion, including but not limited to such additional amounts as may be necessary to reimburse PDA for its costs and expenses associated with reviewing the applicant for transfer, including, without limitation, legal and accounting fees.

11.     If the transferee is a corporation, Limited Liability Company, or a partnership, transferee shall be made and will be bound by any or all of the representations, warranties and covenants in Section 5, as PDA requests.  The transferee shall provide to PDA evidence satisfactory to PDA that such representations, warranties and covenants have been satisfied and are true and correct on the date of transfer.

12.     No part of any interest of Franchisee under the provisions of this Agreement will be subject to attachment, garnishment, levy, or seizure by any creditor or any other person claiming against or in the right of Franchisee under any proceeding or writ at law or in equity.  Except with the

prior written consent of PDA, Franchisee agrees not to pledge or encumber this Agreement or any rights created hereunder.

13.     Franchisee acknowledges and agrees that each condition which must be met by the transferee is necessary to assure such transferee's full performance of the obligations hereunder.

C.     1.     Any party holding any interest in Franchisee or in the Franchised Business who desires to accept any bona fide offer from a third party to purchase such interest shall promptly notify PDA in writing of such offer, with such notice including the name and address of the proposed purchaser, the amount of the proposed purchase price, a copy of the proposed purchase contract, all of the terms and conditions of such offer and all other information requested by PDA. PDA shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that PDA intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event PDA elects to purchase the seller's interest, the closing on such purchase shall occur within sixty (60) days of the date of notice to the seller of the election to purchase by PDA, or as may be extended by the parties. Failure of PDA to exercise the option provided for by this Section 11.C shall not constitute a waiver of any other provision in this Agreement, including all of the requirements of Section 11.B, with respect to a proposed transfer.

2.     If the offer from the third party provides for payment of consideration other than cash or involves certain intangible benefits, PDA may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash consideration offered by a third party, an independent appraiser shall be designated by PDA to determine such amount, and his determination shall be binding. PDA shall have the right to set off the cost of any such appraisal against any payment made hereunder.

3.     In the event PDA waives its right of first refusal and approves the transfer in accordance with Section 11.B above, then, subject to the other terms and provisions of the Agreement, including, but not limited to, PDA's approval requirements set forth in Section 11.B hereof, Franchisee shall be free to consummate the sale between it and the third party indicated in the notice to PDA on the same terms and conditions indicated in said notice. If such sale is not consummated within sixty (60) days, or if there is a material variance in the terms and conditions of sale, Franchisee's right to consummate such sale to the third party shall terminate and Franchisee shall be required to comply with all the provisions of this Section 11 with respect to any further proposed transfer.

D.     1.     Upon the death of any person with an interest in the Franchised Business or in Franchisee (the "Deceased"), the executor, administrator, or other personal representative of the Deceased shall transfer such interest to a third party approved by PDA within twelve (12) months after the death. If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by PDA. If the distributee is not approved by PDA, then the distributee shall transfer such interest to a third party approved by PDA within twelve (12) months after the death of the Deceased.

2.     Upon the permanent disability of any person with an interest in the Franchised Business or in Franchisee, PDA may, in its sole discretion, require such interest to be transferred to a third party approved by PDA within six (6) months after notice to Franchisee. "Permanent disability" of a person shall mean that person's failure, refusal or inability, whether for physical, emotional, or mental reasons, or the determination of a licensed practicing physician selected by PDA that the person is unable, to perform the person's obligations to the Franchised Business or as otherwise set forth in this Agreement for a period of ninety (90) or more consecutive days. If the person refuses to submit to an examination, then PDA will automatically deem the person permanently disabled as of the date of such refusal for the

purpose of this Section 11.D.2. The costs of any examination required by this Section 11.D.2 shall be paid by PDA.

3.        In the event of the death or permanent disability of any person with a twenty-five percent (25%) or more interest the Franchised Business or in Franchisee, or any person with an interest less than twenty-five percent (25%) if PDA determines, in its sole discretion, that such person had substantial control over the operation of the Franchised Business, PDA, at its option, may elect to operate the Franchised Business during the interim twelve (12) months following such death or the interim six (6) months following such permanent disability, as applicable, until the interest of such person is transferred in accordance with this Section 11 or until the applicable interim period expires, whichever comes first. As compensation for managing the Franchised Business, PDA will charge a management fee of two percent (2%) of the Gross Invoice Fees of the Franchised Business for each calendar week, which will be in addition to the royalty fee and any other fees or payments due and owing to PDA. In addition, if PDA provides one of its employees to manage the Franchised Business, PDA will also be entitled to payment of the employee's then current salary for the time of such interim management. Franchisee will execute any agreements or other documents required by PDA to effect the foregoing and shall remain responsible for payment of employee salaries, taxes, rent, utilities, supplies and all other costs and expenses associated with the operation of the Franchised Business. PDA shall exercise its best efforts in managing the Franchised Business, but shall not be liable for any losses incurred by the Franchised Business during the time of such management and thereafter.

4.        Upon the death or claim of permanent disability of any person with an interest in the Franchised Business or in Franchisee, Franchisee or a representative of Franchisee must promptly notify PDA of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Section 11 for any inter vivos transfer. If an interest is not transferred upon death or permanent disability as required in this Section 11.D and in accordance with the terms and conditions of this Section 11, PDA may terminate this Agreement immediately upon notice to Franchisee.

E.        In the event the proposed transfer is to a corporation formed solely for the convenience of ownership, PDA's consent may be conditioned upon any of the requirements set forth in Section 11.B, except the requirements in Sections 11.B.8 through 11.B.10 shall not apply. Franchisee shall be the owner of all the voting stock or interest of the corporation and if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

F.        PDA's consent to a transfer of any interest in Franchisee, the Franchised Business or this Agreement shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of PDA's rights to demand exact compliance with any of the terms of this Agreement by the transferee.

## 12.        **DEFAULT AND TERMINATION**

A.        If PDA materially breaches any of its obligations under this Agreement, then Franchisee may terminate this Agreement upon ninety (90) days prior written notice to PDA of such breach, but only if PDA fails to cure or to commence a cure of the breach within thirty (30) days after receipt of such notice. To constitute effective written notice under this section, any such notice of a breach must specifically state the precise nature of the alleged breach by PDA. Failure of Franchisee to provide such detailed notice of default shall preclude Franchisee from terminating this Agreement until such time as such notice has been received by PDA and the applicable cure period has expired without a cure of the default.

B.     Franchisee shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default"):

1.     Franchisee relocates the Office without the prior written consent of PDA or fails to properly complete the required Office Change Form;

2.     Franchisee or any Designated Person(s) is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of PDA, to adversely affect the PDA System, the Proprietary Marks, the goodwill associated therewith or PDA's interest therein;

3.     Franchisee, any Designated Person(s) or any partner or shareholder of Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee, the Franchised Business or this Agreement to any third party without PDA's prior written consent or without offering PDA a right of first refusal with respect to such transfer, contrary to the terms of Section 11 of this Agreement;

4.     Franchisee or any Designated Person(s) breaches or is in default under any of the representations, warranties and covenants in Section 5;

5.     Franchisee, Operating Principal, or any Designated Person(s) discloses or divulges to unauthorized persons the contents of the Manual, Documentation or other confidential information provided to Franchisee by PDA or Franchisee fails to obtain the covenants on confidentiality as required by Section 9.E;

6.     An approved transfer is not effected within the time prescribed by Section 11.D of this Agreement, following Franchisee's or any other applicable person's death or permanent disability;

7.     Franchisee knowingly maintains false books or records, or submits any false reports or financial statements to PDA;

8.     Franchisee fails to timely provide PDA with a written record of its marketing and promotional activities, if such record is requested by PDA, under Section 6.F.1, and does not cure the default within seven (7) days following notice thereof from PDA;

9.     Franchisee or any Designated Person(s) misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs, in the sole opinion of PDA, the goodwill associated therewith or with the PDA System or PDA's rights therein and does not cure such default within twenty-four (24) hours following notice thereof from PDA;

10.     Franchisee or any Designated Person(s) uses body shop or contractor estimates without making its own independent estimates and investigations unless the use of any such estimates is approved in writing by PDA;

11.     Franchisee or any Designated Person(s) purchases or sells any type of salvage without the express written consent of PDA;

12.     Franchisee, its employees, independent contractors or any Designated Person directs or "steers" business to any facilities such as body shops, towing companies, repair shops or similar service providers;

13.     Franchisee or any Designated Person(s) accepts, directly or indirectly, any bribe or kickback regardless of monetary value, or any gift, favor or gratuity which may affect, or appear to influence, Franchisee's business judgment, except tokens of appreciation having an aggregate monetary value of $25 or less per occurrence;

14.     Franchisee fails to procure and maintain such insurance policies as required by Section 6.H and Franchisee fails to cure such default within seven (7) days following notice from PDA;

15.     Franchisee fails, refuses, or neglects promptly to pay any monies owing to PDA or its subsidiaries or affiliates when due under this Agreement or any other agreement between Franchisee and PDA or its subsidiaries or affiliates, or to submit the financial or other information required by PDA under or pursuant to this Agreement and does not cure such default within seven (7) days following notice thereof from PDA;

16.     Franchisee is in default with respect to the payment of any monetary obligation due to PDA hereunder more than one time during any three (3) consecutive weeks, whether or not cured by Franchisee after notice by PDA;

17.     Franchisee or any Designated Person(s) fails to comply with the covenants of Section 14.A or obtain execution of the covenants required under Section 14.J within seven (7) days after being requested by PDA to do so;

18.     Franchisee fails to obtain, loses or forfeits any permit, certificate or license necessary for the operation of the Franchised Business;

19.     The Factoring Agreement is terminated by PDA as a result of Franchisee's submission of false or fraudulent invoices or the Software License Agreement is terminated by PDA;

20.     The Franchised Business incurs any additional "Infraction" (as determined by PDA pursuant to the Infraction System) within the 90-day period following notice from PDA that Franchised Business has incurred the threshold number of Infractions applicable to the Franchised Business under the Infraction System;

21.     Franchisee fails to commence operations of the Franchised Business within the time limits specified in this Agreement, or if Franchisee at any time ceases to operate or otherwise abandons the Franchised Business or loses or is otherwise denied the right to operate at the location stated in Exhibit A;

22.     Franchisee or any Designated Person fails, refuses, or neglects to obtain PDA's prior written approval or consent as required by this Agreement;

23.     Franchisee or any Designated Person or any partner or shareholder of Franchisee engages in any business or markets any service or product under a name or mark which, in PDA's opinion, is confusingly similar to the Proprietary Marks;

24.     Franchisee becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Franchisee applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Franchisee or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Franchisee or for a substantial part of the property thereof;

25. A petition in bankruptcy is filed by Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state or such a petition is filed against and not opposed by Franchisee or dismissed within 30 days after the filing date;

26. Franchisee is adjudicated bankrupt or insolvent under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state or admits in writing its inability to pays its debts when due;

27. A bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed or consented to by Franchisee;

28. A receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction;

29. Proceedings for a composition of creditors under any law are instituted by or against Franchisee;

30. The real or personal property of Franchisee's Office sold after levy thereupon by any sheriff, marshal, constable or other officer acting on behalf of a court;

31. Franchisee is dissolved or ceases doing business;

32. Suit to foreclose any lien or mortgage against Franchisee's Office premises or its improvements or inventory is instituted against Franchisee and not dismissed or contested by litigation within thirty (30) days of such institution; or a final judgment against Franchisee remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or Franchisee surrenders all or a substantial portion of its property to a creditor; the effect of any of which PDA believes, in the exercise of its sole discretion, is to substantially impair Franchisee's ability to perform its obligations under this Agreement;

33. Execution is levied against Franchisee's business or property, the effect of which, in the sole opinion of PDA, is to substantially impair Franchisee's ability to perform hereunder and such levy is not released within thirty (30) days of execution;

34. Franchisee or any Designated Person fails to comply with any other agreement, term, or condition contained herein or with any other standard, procedure, term or condition contained in the Documentation, including the Manual, or fails to carry out the terms of this Agreement in good faith.

C. Except as otherwise provided herein with respect to particular Events of Default, Franchisee shall have thirty (30) days after written notice from PDA of an Event of Default, to cure the Event of Default and to provide evidence thereof satisfactory to PDA. If any Event of Default is not cured within its respective cure period, then PDA may terminate this Agreement without further notice to Franchisee effective immediately upon the expiration of such cure period. No cure period will be permitted with respect to the Events of Default listed in Sections 12.B.1 thru 12.B.3, 12.B.5, 12.B.7, 12.B.16, 12.B.20, 12.B.21, and 12.B.24 thru 12.B.31, and PDA may terminate this Agreement immediately upon notice to Franchisee after the occurrence of any such Event of Default. Furthermore, if any Event of Default occurs within any twelve (12) month period during which two (2) or more Events of Default have already occurred, regardless of whether such Events of Default are of the same or different types or whether such defaults have been cured after notice, then no cure period will be permitted with respect to any such third (or subsequent) Event of Default in that period, and PDA may terminate this Agreement immediately upon notice to Franchisee.

D. During the period of time beginning at the occurrence of an Event of Default and ending on the earlier of (i) the date on which this Agreement terminates or expires, or (ii) the date on which all the Event of Default has been cured in the manner required by this Agreement (collectively, the "Interim Period"), PDA shall have the right, but not the obligation, (1) to manage and operate the Franchised Business or (2) to appoint a third-party to manage and operate the Franchised Business, as Franchisee's agent and on Franchisee's behalf and at Franchisee's sole expense, and Franchisee hereby irrevocably appoints PDA as its agent and its attorney-in-fact to so manage and operate the Franchised Business or appoint a third-party to manage and operate the Franchised Business on Franchisee's behalf. All such management and operational activities conducted by PDA or the third-party manager pursuant to this Section may be conducted by such party in a manner determined by such party to be appropriate with such party acting in its sole and absolute discretion; provided, however, such managing party will use reasonable efforts to manage and operate the Franchised Business pursuant to this Section in a manner that is similar to how such party conducts, or would conduct, the management and operation activities of its facilities that are similar in size, scope, and location to the Franchised Business. This Agreement constitutes conclusive evidence of PDA's (or the designated third-party's) right to operate the Franchised Business on Franchisee's behalf. PDA (or the designated third-party) shall be entitled to reimbursement from Franchisee of all expenses PDA (or designated third-party) incurs in operating the Franchised Business on Franchisee's behalf, plus a fee for any such operation of the Franchised Business by PDA (or the designated third-party) during the Interim Period, such expenses and fee to be payable by Franchisee upon PDA's written demand therefor. Franchisee shall be fully liable for, and neither PDA nor the designated third-party shall be responsible for, any claims that arise in connection with the ownership or operation of the Franchised Business during the Interim Period, unless such claims are directly attributable to the gross negligence or willful misconduct of PDA (or the designated third-party). If PDA elects to exercise its rights under this Section 12.D with respect to the Franchised Business, PDA shall have no duty to continue to operate (or allow the operation of) the Franchised Business and PDA may at any time thereafter, in PDA's sole and absolute discretion, elect to cease operating the Franchised Business pursuant to this Section 12.D and, upon such election, PDA may pursue any other rights or remedies available to PDA under this Agreement.

13. **RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION**

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

A. Franchisee shall immediately cease to operate the Franchised Business and shall not thereafter, directly or indirectly, represent itself to the public or hold itself out as a present or former franchisee of PDA.

B. Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any confidential methods, procedures, techniques and any other Trade Secrets associated with the PDA System; the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and any other Proprietary Marks and distinctive forms, slogans, signs, symbols, logos, or devices associated with the PDA System. In particular, Franchisee shall cease to use, without limitation, all signs (whether on the Office or otherwise), advertising materials, stationery, forms (regardless of whether such forms display the Proprietary Marks), PDA Software, and any other articles comprising a part of the Franchised Business, and shall immediately return to PDA any such items that were provided to Franchisee by PDA. Franchisee shall furnish PDA evidence satisfactory to PDA of compliance with this obligation within thirty (30) days after such termination or expiration.

C. Franchisee shall immediately cease to use any telephone number(s), post office box(es), street, email, and internet addresses, and any other business listings used by Franchisee in the Franchised

Business, and shall comply with Section 6.G of this Agreement regarding the transfer of Franchisee's telephone listing(s) and post office box(es) to PDA or its designee. Notwithstanding any forms and documents which may have been executed by Franchisee under Section 6.G.1, PDA does hereby appoint PDA its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. Such power of attorney shall be irrevocable and coupled with an interest and shall survive the expiration or termination of this Agreement. Franchisee shall thereafter use different telephone numbers, post office boxes and business listings at or in connection with any subsequent business conducted by Franchisee.

D. Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name PROPERTY DAMAGE APPRAISERS™ or any other service mark, trademark, or other Proprietary Mark of PDA, and Franchisee shall furnish PDA with evidence satisfactory to PDA of compliance with this obligation within seven (7) days after the termination or expiration of the Agreement.

E. Franchisee and its subsidiaries and affiliates shall promptly pay all sums owing to PDA and its subsidiaries and affiliates. Such sums shall include interest on any past due amounts as prescribed herein and, in the event of termination for any Event of Default by Franchisee, such sums shall include all damages, costs, and expenses, including attorneys' fees, incurred by PDA as a result of the Event of Default, which obligation shall give rise to and remain, until paid in full, a lien in favor of PDA against any and all of the personal property, equipment, inventory, and fixtures owned by Franchisee at the time of the Event of Default. Franchisee agrees to execute all documents reasonably required by PDA to perfect such security interests under applicable law.

F. Franchisee shall make such modifications or alterations to the Office operated hereunder immediately upon termination or expiration of the Agreement as may be necessary to distinguish the appearance of such premises from that of other offices operating under the PDA System, and shall make such specific additional changes thereto as PDA may reasonably request for that purpose.

G. Franchisee shall pay to PDA all damages, costs, and expenses, including attorneys' fees, incurred by PDA subsequent to the termination or expiration of the franchise herein granted in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement.

H. Franchisee shall immediately deliver to PDA the Manual, the Documentation, all other manuals, client lists, records, files, computer software licensed or provided by PDA, databases, instructions, correspondence and brochures, and any and all other confidential and proprietary materials related to the operation of the Franchise Business in Franchisee's possession, custody, or control, and all copies thereof (all of which are acknowledged to be PDA's property) and shall retain no copy of record of the foregoing, except only Franchisee's copy of this Agreement and of any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

I. Franchisee and each Designated Person(s) shall comply with all provisions of this Agreement which explicitly or implicitly concern Franchisee's obligations after termination, expiration, or the transfer of all of Franchisee's interest in, this Agreement, including, without limitation, the covenants contained in Sections 8, 9 and 14 of this Agreement.

14. **COVENANTS**

Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee and Franchisee's employees will receive valuable training and other Trade Secrets which are beyond the

present skills and experience possessed by Franchisee and Franchisee's managers and employees. Franchisee acknowledges that such training and other Trade Secrets provide a competitive advantage and will be valuable to them in the development and operation of the Franchised Business and that gaining access to such training and other Trade Secrets are, therefore, a primary reason why it is entering into this Agreement. In consideration for access to such training and other Trade Secrets, Franchisee covenants as follows:

A.      Franchisee covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of this Agreement, neither Franchisee nor any other Franchisee Party shall, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

1.      Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

2.      Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA's Franchised Business, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

3.      Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services to customers that is (i) located in the Marketing Area; or (ii) located or provides such services to customers or within a twenty-five (25) mile radius of the perimeter of any marketing area of any PDA franchisee operating under the PDA System.

B.      Without limiting any term or condition of the Guaranty , any Designated Person(s) shall comply with and adhere to the restrictions contained in the covenants set forth in Section 14.A; provided that the two-year period non-compete period shall commence with respect to any Designated Person, and shall continue for an uninterrupted period, upon the earlier of (i) the expiration of the Term of this Agreement, (ii) the transfer of all of the Franchisee's interest in the Franchised Business, or (iii) the time such person ceases to hold or own any direct or indirect interest in Franchisee or be a director or officer of Franchisee.

C.      With regard to Section 14.A.3, such provisions shall not apply to ownership by Franchisee of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly-held corporation. A publicly-held corporation is a corporation having its securities registered pursuant to Section 12 under the Securities Exchange Act of 1934, as amended, or a corporation subject to the reporting requirements of Section 15(d) of the Securities Exchange Act of 1934, as amended.

D.      Franchisee and each Designated Person(s) acknowledge that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee or any Designated Person(s).

E.    Franchisee understands and acknowledges that PDA shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 14, or any portion thereof, without Franchisee's consent, effective immediately upon written notice to Franchisee, and Franchisee agrees to comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 17.I hereof.

F.    Franchisee expressly agrees that the existence of any claim that Franchisee has or may have against PDA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by PDA of the covenants in this Section 14.  Franchisee agrees to pay all costs and expenses (including attorneys' fees) incurred by PDA in connection with the enforcement of this Section 14.

G.    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section 14 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 14.  The two-year period referred to in Section 14 A above shall be tolled during any period of Franchisee's noncompliance with the terms of this Agreement.

H.    Franchisee acknowledges that any failure to comply with the requirements of this Section 14 would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 14.  PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

I.    Franchisee understands and acknowledges that compliance by all franchisees operating under the PDA System in accordance with PDA's training and operational requirements and the covenants described in this Section 14 are essential and material elements of the PDA System and that PDA expends substantial time, effort and expense in developing and improving the PDA System for the benefit of all franchisees.  The parties agree that such expenditures incurred by PDA may be uncertain and difficult to ascertain and therefore agree that the compensation specified herein reasonably represents such expenditures and is not a penalty.  Accordingly, and in addition to any other relief that PDA may be entitled to receive, if Franchisee shall violate the terms and provisions of this Section 14, in addition to all rights and remedies available to PDA, Franchisee shall pay to PDA for each violation a sum of money equal to ten (10) times the total of the payments made to PDA pursuant to Section 4 for the most recent twelve (12) months during which Franchisee operated the Franchised Business (or such period of time Franchisee operates the Franchised Business, if less than twelve (12) months) preceding such violation.

J.    Franchisee shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in Section 14 (including covenants applicable upon the termination of a person's relationship with Franchisee) from all Designated Persons, spouse of Franchisee, if such spouse is not otherwise a Designated Person(s) and participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Franchisee.  Each covenant required by this Section 14.J shall be substantially in the form set forth in Exhibit M. Failure by Franchisee to obtain execution of an agreement required by this Section 14.J shall constitute an Event of Default. If by virtue of the community property laws of any state, Franchisee's spouse is deemed to have any property interest in this Agreement, Franchisee's ownership interest, or the Franchised Business, PDA will have the right to require Franchisee's spouse to consent and join in all of the terms and conditions of this Agreement, any related agreements and any amendments thereto.

## 15. TAXES, PERMITS, AND INDEBTEDNESS

A.     Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, all liens or encumbrances of every kind or character created or placed upon or against any of Franchisee's property used in connection with the Franchised Business, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the Franchised Business. Franchisee shall pay to PDA an amount equal to any sales tax, gross receipts tax, or similar tax imposed on PDA with respect to any payments to PDA required under this Agreement, unless the tax is credited against income tax otherwise payable by PDA.

B.     In the event of a bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business, or any improvements thereon.

C.     Franchisee shall, at Franchisee's sole expense, comply with all federal, state, and local laws, rules, and regulations and shall timely obtain, and shall keep in force as required throughout the Term of this Agreement, all permits, certificates, and licenses necessary for the full and proper conduct of the Franchised Business, including, without limitation, any required permits, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

D.     Franchisee shall immediately notify PDA in writing of the commencement of any action, suit or proceeding against Franchisee, of the issuance of any inquiry, subpoena, order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which arises out of, concerns, or may affect the operation or financial condition of the Franchised Business, including, without limitation, any criminal action or proceeding brought by Franchisee's employees, customers or other persons.

## 16. INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.     This Agreement does not create a fiduciary relationship between PDA and Franchisee. Franchisee is not and shall not represent itself to be the agent, joint venturer, partner, servant, representative or employee of PDA, or to be related to PDA other than as its independent franchisee. No representations shall be made or acts taken by Franchisee which could establish any apparent relationship of agency, joint venture, partnership or employment, and PDA shall not be bound in any manner whatsoever by any agreements, warranties or representations made by Franchisee to any other person nor with respect to any other action of Franchisee. No employee, agent or independent contractor of Franchisee shall be deemed to be an employee of PDA for any purpose whatsoever. PDA shall not have the power to hire or retain or fire or discharge Franchisee's employees, agents or independent contractors and, except as herein expressly provided, PDA may not control or have access to Franchisee's funds or the expenditure thereof, or in any other way exercise dominion or control over Franchisee's business, employees, agents, or independent contractors.

B.     It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on PDA's behalf, or to incur any debt or other obligation in PDA's name, and that PDA shall in no event assume liability for, or be deemed liable hereunder as a result of any such action, or by reason of any act or omission of Franchisee in its conduct of the Franchised Business, or any claim or judgment arising there from against PDA.

C.    During the Term of this Agreement and any extension hereof, Franchisee shall hold itself out to the public as an independent contractor operating its business pursuant to a franchise license agreement from PDA. Franchisee shall conspicuously identify itself in all dealings with Franchisee's clients, contractors, suppliers, and public officials as an independent franchisee of PDA, and shall place such notice of the franchise relationship on all forms, business cards, stationery, advertising, signs and other materials in such fashion as PDA may, in its sole and exclusive discretion, specify and require from time to time, in its manual, as the same may be amended from time to time, or otherwise.

D.    Except as otherwise expressly authorized by this Agreement, neither party hereto shall make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between PDA and Franchisee is other than that of PDA and Franchisee. Except as expressly provided herein, PDA does not assume any liability, and will not be deemed liable for any agreements, representations, or warranties by Franchisee which are not expressly authorized under this Agreement, nor will PDA be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the business franchised hereby.

E.    1.    Franchisee and all Designated Persons agree at all times to defend at Franchisee's sole cost and expense, and to indemnify and hold harmless to the fullest extent permitted by law, PDA, its subsidiaries, affiliates, successors, assigns and designees and their respective current or former directors, officers, shareholders, partners, servants, employees, agents, independent contractors and representatives of each (PDA and all others hereinafter referred to collectively as "Indemnitees") from all "losses and expenses" (as hereinafter defined) incurred in connection with any actual or threatened action, suit, proceeding, arbitration, claim, demand, investigation or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following: (i) Franchisee's alleged infringement or any other violation or any other alleged violation of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such relates to the authorized use of the Proprietary Marks as described in Section 7); (ii) Franchisee's alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive or of any industry standard; (iii) libel, slander or any other form of defamation of Indemnitees or the PDA System by Franchisee; (iv) Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement; (v) any acts, errors or omissions of Franchisee or any of its current or former agents, servants, employees, independent contractors, partners, proprietors, affiliates or representatives including, without limitation, any negligent or intentional misconduct, and any acts, errors or omissions in the operation of any motor vehicle; (vi) any services or goods provided by any affiliated or non-affiliated participating entities; (vii) any action by any client of the Franchised Business; (viii) any damage to the property of Franchisee or Indemnitees, their agents, or employees, or any third person, firm or corporation, whether or not such losses, claims, costs, expenses, damages, liabilities were actually or allegedly caused in part through the active or passive negligence of Indemnitees or any of its agents or employees, or resulted from any strict liability imposed on Indemnitees; and (ix) PDA's enforcement of any of the provisions of this Agreement or any ancillary agreements, including but not limited to the agreements in the forms attached hereto as exhibits. The parties understand and agree that PDA cannot and does not exercise control over the manner of operation of any motor vehicle used by, or on behalf of, Franchisee or any employee, agent or independent contractor of Franchisee and that the safe operation of any vehicle therefore, is Franchisee's sole responsibility.

2.    Franchisee shall immediately notify PDA in writing of any such action, suit, proceeding, claim, demand, inquiry or investigation. At the expense and risk of Franchisee, PDA may assume (but under no circumstances is obligated to undertake) and associate counsel of its own choosing, or may approve any counsel of Franchisee, with respect to the defense and/or settlement of any such

action, suit, proceeding, claim, demand, inquiry or investigation, provided that PDA will seek the advice and counsel of Franchisee, and shall keep Franchisee informed, with regard to any such proposed or contemplated settlement(s). Such an undertaking by PDA shall in no manner or form diminish Franchisee's obligation to indemnify PDA and to hold it harmless.

3. For purposes of this Section 16.E the term "losses and expenses" shall be deemed to include all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorneys' fees, experts' fees, court costs, settlement amounts, judgments, compensation for damages to PDA's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space and costs of changing, substituting or replacing same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

4. In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, PDA may, at any time and without notice as in its judgment it deems appropriate, offer, order, consent or agree to settlements or take such other remedial or corrective actions as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in PDA's sole judgment, there are reasonable grounds to believe that: (1) any of the acts or circumstances enumerated in Section 16.E.1 have occurred, or (2) any act, error or omission of Franchisee may result directly or indirectly in damage, injury or harm to any person or any property.

5. All losses and expenses incurred under this Section 16.E shall be chargeable to and paid by Franchisee pursuant to Franchisee's obligations of indemnity under this Section, regardless of any actions, activity or defense undertaken by PDA or the subsequent success or failure of such actions, activity or defense.

6. Indemnitees do not assume any liability whatsoever for acts, errors or omissions of those with whom Franchisee or its subsidiaries and affiliates may contract, regardless of the purpose. Franchisee shall defend (with counsel of PDA's choice and/or approval), hold harmless and indemnify Indemnitees for all losses and expenses which may arise out of any acts, errors or omissions of Franchisee, Franchisee's subsidiaries and affiliates, the officers, directors, shareholders, partners, agents, independent contractors, servants, employees, and representatives of Franchisee and its subsidiaries and affiliates, and any such third parties without limitation and without regard to the cause or causes thereof or the negligence of PDA or any other party or parties arising in connection therewith, and whether such negligence be sole, joint or concurrent, or active or passive. **THE PARTIES HERETO EXPRESSLY INTEND THAT FRANCHISEE INDEMNIFY PDA AND INDEMNITEES FROM THE CONSEQUENCES OF THEIR OWN NEGLIGENCE.**

7. Under no circumstances shall Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by Indemnitees from Franchisee. It is understood and agreed by Franchisee that the terms of this Section 16.E shall survive the termination, expiration, or transfer of this Agreement or any interest therein.

17. **MISCELLANEOUS**

A. Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right

thereafter to insist upon strict adherence to that term or any other term in this Agreement. Any waiver must be in writing and authorized by an officer of the waiving party.

B.    Any notice required or permitted by any party to this Agreement shall be in writing and may be delivered personally to the party being given notice or to the person in charge of the office of the party being given notice or by expedited delivery service or certified mail, return receipt requested, or sent by prepaid facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy thereof by expedited delivery service or certified mail, return receipt requested, within three (3) business days after transmission thereof) at the party's address indicated below, and any notice will be effective upon delivery in the case of personal delivery, upon transmission in the case of facsimile or telegram (provided confirmation is sent as described above) and upon deposit in the mail, postage prepaid, in the case of delivery by expedited delivery service or mail. The addresses of the parties are as follows:

PDA:             Property Damage Appraisers, Inc.
                 P.O. Box 471909
                 Fort Worth, Texas 76147
                 Facsimile: 817-731-5550

Franchisee:      Brian K. Nygaard
                 Property Damage Appraisers
                 9175 Kiefer Boulevard, Suite 204
                 Sacramento, California 95826
                 Facsimile: 916-949-7011

The names and addresses of persons to receive notice as stated in this Section may be changed by notice given in accordance with this Section.

C.    This Agreement, the exhibits hereto and the documents referred to herein constitute the entire, full and complete agreement between PDA and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement. No representations, inducements, promises, or agreements, oral or otherwise, not embodied herein, attached hereto or referred to herein were made by any party, and none shall be of any force or effect with reference to this Agreement or otherwise. Notwithstanding the immediately preceding sentences, nothing in this Agreement is intended to disclaim the representations PDA made in the Franchise Disclosure Document that was furnished to Franchisee pursuant to the Federal Trade Commission's Franchise Trade Regulation Rule identified below.

D.    1.    Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, this shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and provisions of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; the invalid portions, sections, parts, terms and provisions shall be deemed not to be a part of this Agreement; and there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any law or regulation.

2. Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, PDA, PDA's officers, directors and personnel and such of Franchisee's and PDA's respective successors and assigns as may be contemplated (and, as to Franchisee, authorized) by Section 11, any rights or remedies under or as a result of this Agreement.

3. Franchisee and the Designated Person(s) expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately stated in and made a part of this Agreement, that may result from striking from any of the provisions of this Agreement any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which PDA is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

E. **THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES) OR APPLICATION OF THE PRINCIPLE OF FORUM NON CONVENIENS.**

F. 1. Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee or Operating Principal, as applicable, as an independent business person. PDA EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS, OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT. NO REPRESENTATION OR STATEMENT HAS BEEN MADE BY PDA (OR ANY EMPLOYEE, AGENT OR SALESPERSON THEREOF) AND RELIED UPON BY FRANCHISEE REGARDING THE ANTICIPATED INCOME, EARNINGS AND GROWTH OF PDA OR OF THE PDA SYSTEM, OR THE VIABILITY OF THE FRANCHISE BEING GRANTED HEREUNDER.

2. Franchisee acknowledges having received, read, and understood this Agreement, including the exhibits hereto and the documents referred to herein; and Franchisee acknowledges that PDA has accorded Franchisee ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement and that Franchisee has entered into this Agreement after making an independent investigation of PDA's operations.

3. Franchisee acknowledges that it has received a complete copy of this Agreement, the exhibits referred to herein, and agreements relating hereto, if any, at least fourteen (14) calendar days prior to the date on which this Agreement is executed or any payments by Franchisee to PDA of any consideration in connection with the sale or proposed sale of the franchise granted hereby. Franchisee further acknowledges that it has received the Franchise Disclosure Document required by the Franchise Trade Regulation Rule of the Federal Trade Commission (16 C.F.R. Part 436), entitled "Disclosure – Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," and as required by applicable state law at least fourteen (14) calendar days prior to the date on which this Agreement is executed or any payments by Franchisee to PDA of any consideration in connection with the sale or proposed sale of the franchise granted hereby. Franchisee acknowledges that it has read and understands PDA's Franchise Disclosure Document, and that no representations have been made to it which are inconsistent with information presented in PDA's disclosure document, and that Franchisee has not relied upon any representations inconsistent with or not contained in PDA's Franchise Disclosure Document.

4.     Franchisee affirms that all information set forth in any and all applications, financial statements and submissions to PDA is true, complete and accurate in all respects, with Franchisee expressly acknowledging that PDA is relying upon the truthfulness, completeness and accuracy of such information.

5.     No representation or statement has been made by PDA (or any employee, agent or salesperson thereof) and relied upon by Franchisee regarding Franchisee's ability to procure any required license or permit that may be necessary to the offering of one or more of the services contemplated to be offered by the Franchised Business.

G.     All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any section, paragraph or clause herein may require, as if such word had been fully and properly written in the appropriate number and gender. The headings in this Agreement are solely for the convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

H.     This Agreement shall not be binding until it is executed by an authorized officer of PDA at PDA's principal place of business in Tarrant County, Texas.

I.     Except as otherwise expressly provided herein, this Agreement shall not be modified or amended except by written agreement executed by both parties.

J.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

K.     At any time and from time to time, each party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

L.     The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits attached hereto.

M.     Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to organizational documents, equity owners, directors and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

N.     A Designated Person(s) who is the spouse of Franchisee is fully aware of, understands and fully consents and agrees to the provisions of this Agreement and its binding effect upon any community property interest it may now or hereafter own, and agrees that the termination of the marital relationship with any party to this Agreement for any reason shall not have the effect of creating any right

for such spouse in any property or transactions the subject of this Agreement and that its understanding, consent and agreement is evidenced by the execution of the Guaranty .

O.     PDA and Franchisee acknowledge that certain state franchise statutes have been enacted that may supersede various provisions of this Agreement. The State Law Addenda attached as Exhibit N describe the provisions of certain state franchise laws, as such laws exist on the Effective Date of this Agreement.  To the extent such laws are applicable to this Agreement and differ from the terms of this Agreement, as of the dates on which compliance with such any such law is sought (referred to herein as the "then-current laws"), the then-current laws shall prevail, but only if and to the extent that the jurisdictional scope provisions of such referenced laws independently apply to this Agreement.  For purposes of determining the applicability of such state franchise laws, Franchisee shall be conclusively presumed to be a resident and domiciliary of the state in which the Office is located, unless at the time that this Agreement is executed, Franchisee notifies PDA in writing that Franchisee is a resident and/or domiciliary of another state.

P.     Franchisee recognizes that the nature of the Property Damage Appraisers businesses may change over time, that an investment in the Franchised Business involves business risks and that the success of the venture is largely dependent on Franchisee's own business abilities, efforts and financial resources.  Franchisee acknowledges that it has conducted an independent investigation of the business contemplated by this Agreement and recognizes that the appraisal industry is highly competitive. Franchisee acknowledges that it has not received from PDA or PDA's representatives or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement, nor has Franchisee received from PDA or PDA's representatives any information from which Franchisee may easily ascertain a specific level or range of actual or potential sales, income, costs, gross or net profits from franchised or non-franchised Property Damage Appraisers businesses.  Franchisee acknowledges that it has had the opportunity to seek independent counsel concerning the execution of this Agreement and operation of the Franchised Business.

Q.     No approval of any matter requiring PDA's approval hereunder will be effective unless in writing.  Wherever PDA has the right to take action or make a decision as described herein, any such action may be taken (or omitted) and any such decision may be made in PDA's sole discretion.

18.    **DISPUTE RESOLUTION**

A.     **THE PARTIES AGREE TO FIRST SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND EXHIBITS) OR THE RELATIONSHIP CREATED BY SUCH AGREEMENT TO NON-BINDING MEDIATION PRIOR TO SEEKING ARBITRATION OR FILING SUCH CLAIM, CONTROVERSY OR DISPUTE, IF APPLICABLE, IN A COURT.  THE MEDIATION SHALL BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATION SERVICES ORGANIZATION OR BODY AGREED UPON BY THE PARTIES AND FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION (NOT TO EXCEED FIFTEEN (15) DAYS), THROUGH THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA") IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION.    THE MEDIATION SHALL TAKE PLACE AT PDA'S CORPORATE HEADQUARTERS IN TARRANT COUNTY, TEXAS OR AT SUCH OTHER PLACE AS PDA DESIGNATES.  THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE MEDIATION, ALL EVENTS LEADING UP TO THE MEDIATION, AND THE OUTCOME OF THE MEDIATION CONFIDENTIAL. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT**

HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.

B.     WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH ARE NOT FINALLY RESOLVED THROUGH MEDIATION OR AS OTHERWISE PROVIDED ABOVE, THE PARTIES AGREE TO SUBMIT THEIR DISPUTE TO ARBITRATION IN ACCORDANCE WITH THE COMMERCIAL RULES OF THE AAA THEN IN EFFECT. THE ARBITRATION SHALL BE HELD IN FORT WORTH, TEXAS AT PDA'S CORPORATE HEADQUARTERS, BEFORE A SOLE ARBITRATOR AGREED TO BY THE PARTIES AND SELECTED FROM THE PANEL OF ARBITRATORS OF THE AAA. THE PARTIES SHALL ATTEMPT TO IN GOOD FAITH TO AGREE UPON AN ARBITRATOR, AND IF THERE IS NO AGREEMENT, THEN THE SELECTION OF THE ARBITRATOR SHALL BE MADE BY THE AAA. THE ARBITRATOR SHALL AWARD THE PREVAILING PARTY ITS  ATTORNEYS' FEES AND COSTS. THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE ARBITRATION, ALL EVENTS LEADING UP TO THE ARBITRATION, AND THE OUTCOME OF THE ARBITRATION CONFIDENTIAL. IT IS THE INTENT OF THE PARTIES THAT THIS SECTION 18.B PROVIDE A BROAD ARBITRATION CLAUSE AND IS INTENDED TO INCLUDE CLAIMS AND CAUSES OF ACTION REGARDING, ARISING OUT OF, OR RELATING TO THIS AGREEMENT, WHETHER ARISING IN CONTRACT, TORT, STATUTE, REGULATION, COMMON LAW, OR OTHERWISE. THE PARTIES' SUBMISSION AND AGREEMENT TI ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE AND, SUBJECT TO SECTION 18.C, THE JUDGMENT OF THE ARBITRATOR GRANTING AN AWARD TO A PARTY (THE "ARBITRATION AWARD") MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.   DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS, WITH THERE BEING NO RIGHT OR AUTHORITY FOR ANY DISPUTES TO BE ARBITRATED ON A CLASS ACTION BASIS OR IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OTHER PDA FRANCHISEES OR OTHER ENTITIES SIMILARLY SITUATED.

C.     NOTWITHSTANDING THE PROVISIONS OF THIS SECTION 18 THE PARTIES ACKNOWLEDGE AND AGREE THAT ANY ACTIONS OF THE FRANCHISEE WHICH VIOLATE THE RIGHTS OF PDA UNDER SECTIONS 7, 9, 10, AND 14 OF THIS AGREEMENT OR WHICH IN PDA'S   DETERMINATION, THREATEN, PDA'S INTELLECTUAL PROPERTY RIGHTS, MAY CAUSE IRREPARABLE HARM AND SIGNIFICANT INJURY TO AN EXTENT THAT (i) MAY BE EXTREMELY DIFFICULT TO ASCERTAIN AND (ii) AN IMMEDIATE REMEDY MAY BE NECESSARY YET CANNOT BE ADEQUATELY ADDRESSED WITHIN THE DISPUTE MEDIATION TIMEFRAME SET FORTH IN THIS SECTION 18.  ACCORDINGLY FRANCHISEE AGREES THAT WITH REGARD TO ANY BREACH OR THREATENED BREACH BY FRANCHISEE OF SECTIONS 7, 9, 10, AND 14 OR VIOLATION OR THREATENED VIOLATION OF PDA'S INTELLECTUAL PROPERTY RIGHTS, PDA WILL HAVE THE RIGHT TO OBTAIN INJUNCTIVE RELIEF TO ENJOIN ANY SUCH BREACH OR VIOLATION WITHOUT THE PRIOR NECESSITY OF POSTING BOND OR OTHER SECURITY OR PROVING THE LIKELIHOOD THAT SUBSTANTIAL DAMAGES WILL ACCRUE TO PDA IN THE ABSENCE OF SUCH INJUNCTIVE RELIEF.

D.    THE PARTIES HEREBY IRREVOCABLY SUBMIT THEMSELVES, WHERE APPLICABLE UNDER THE TERMS OF THIS AGREEMENT, TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION.  THE PARTIES HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION.  THE PARTIES HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW.  THE PARTIES FURTHER AGREE THAT THE EXCLUSIVE VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.

E.    FRANCHISEE AND PDA ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH IN SECTIONS 17.E AND 18.D PROVIDE EACH OF THE PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT.  EACH OF FRANCHISEE AND PDA FURTHER ACKNOWLEDGE THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT.  THE OBLIGATIONS UNDER THE TERMS OF THIS AGREEMENT ARE PERFORMABLE IN TARRANT COUNTY, TEXAS, AND ANY AND ALL PAYMENTS UNDER THE TERMS OF THIS AGREEMENT ARE TO BE MADE IN TARRANT COUNTY, TEXAS.

F.    To the extent permitted by applicable law, PDA and Franchisee irrevocably waive trial by jury in any applicable action, proceeding, or counterclaim, whether at law or in equity, brought by any of them against any of the others, whether or not there are other parties in such action or proceeding.  To the extent permitted by applicable law, any and all claims and actions arising out of or relating to this Agreement brought by any party hereto against the other, shall be commenced within two (2) years (provided, however, that tort claims and actions shall be commenced within one (1) year) from the occurrence of the facts giving rise to such claim or action, whether the occurrence of such facts is known or unknown, or such claim or action shall be barred.  PDA and Franchisee hereby waive, to the fullest extent permitted by law, any right to or claim of any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

G.    FRANCHISEE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS IT MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, OR ARISING BY OPERATION OF LAW, RELATING TO THIS AGREEMENT, ANY OFFICE THE SYSTEM, OR THE DOCUMENTATION, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

H.    IN NO EVENT SHALL PDA BE LIABLE TO FRANCHISEE FOR LOSS OF PROFIT OR OTHER ECONOMIC LOSS, INDIRECT, SPECIAL, CONSEQUENTIAL, OR

**OTHER SIMILAR DAMAGES, ARISING OUT OF ANY BREACH OF THIS AGREEMENT OR ANY OBLIGATION UNDER THIS AGREEMENT OR FOR ANY CLAIM MADE AGAINST FRANCHISEE BY ANY OTHER PARTY, EVEN IF PDA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIM.**

I.      No right or remedy conferred upon or reserved to PDA or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

J.      Nothing herein contained shall bar PDA's right to obtain injunctive relief against threatened conduct that will cause it loss or damage, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

K.      Franchisee shall reimburse PDA, due on demand, for all fees, costs and expenses, including, without limitation, attorneys' fees and costs incurred by PDA in connection with enforcing this Agreement and the obligations of Franchisee hereunder.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Agreement on the day and year first above written in this Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

Witness: _Elizabeth chapman_

By: _Katherine Slate_
Name: _Katherine Slate_
Title: _VP of Franchise Relations_

FRANCHISEE:
BRIAN K. NYGAARD

Witness: _Dan M Southal_

By: _B. K. Nygaard_
Name: _Brian K. Nygaard_
Title: _Owner_

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

### EXHIBIT A
### FRANCHISEE'S OFFICE LOCATION AND MARKETING AREA
### OFFICE NAME:   SACRAMENTO, CA    PDA # 883

Location for Office, Post Office Box (if applicable) and Telephone Number:

Physical:     9175 Kiefer Boulevard, Suite 204, Sacramento, California 95826

P.O. Box:     (To Maintain a Commercial Location)

Telephone:    916-635-2575       Fax:     916-949-7011

Marketing Area:
Counties of :       Colusa, Sutter, Yuba, Yolo, Sacramento, El Dorado – Western ½,

         Nevada – Western ½ & Placer – Western ½

[See also the map attached to this Exhibit A]

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _Katherine Slate_

Name:    Katherine Slate

Title:    VP of Franchise Relations

FRANCHISEE:
BRIAN K. NYGAARD

By: _Brian K. Nygaard_

Name:   Brian K. Nygaard

Title:    Owner

Dated:    September 15, 2011



**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

## EXHIBIT B

### GENERAL RELEASE AND WAIVER

This General Release and Waiver (this "Release") is entered into as of ____September 15 ,__ 2011 between _____Brian K. Nygaard_____ ("Franchisee") and Property Damage Appraisers, Inc. ("PDA").

WHEREAS, PDA and Franchisee are parties to that certain Franchise Agreement dated _____June 22_____ ,_____ 2006__ (the "Agreement"), and certain related documents;

WHEREAS, Franchisee desires to renew the Agreement and PDA has determined that, at this time, the Franchisee has met the requirements for said renewal;

WHEREAS, as a condition to renew the Agreement, Franchisee and all other Designated Person(s), as that term is defined by the Agreement, have agreed to execute a general release as to PDA and various PDA related parties;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties to this Release, PDA and Franchisee and all Designated Persons hereby agree as follows:

**1.** **Continuing Effect.** Franchisee and all Designated Persons understand, acknowledge and agree that the execution of this Release shall not in and of itself be the final determining factor in PDA's decision process regarding renewal, and should PDA determine, in its sole discretion, that it is not going to renew the Agreement for reasons that arise or may become known after this Release is executed by Franchisee and all Designated Persons, this Release shall not be impacted and shall remain in full force and effect.

**2.** **Release of All Claims.** Franchisee, and each Designated Person, each individually and on behalf of themselves, their predecessors, and each of their present and former officers, employees, directors, shareholders, parents, subsidiaries, alter egos, affiliates, partners, agents, attorneys, accountants, heirs, executors, administrators, conservators, successors and assigns ("Releasing Parties"), hereby fully and forever releases and discharges PDA, and any predecessor, and each of their respective former and present officers, employees, directors, shareholders, parents, subsidiaries, alter egos, affiliates, partners, representatives, agents, attorneys, successors and assigns (collectively, "PDA Parties"), from any and all claims, demands, liens, actions, agreements, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or suspected which have existed or may have existed, or which do exist or which hereafter can, shall or may exist, based on any facts, events or omissions occurring from any time on or prior to the execution of this Release which arise out of, concern, pertain or relate in any way to the Agreement, and any rights or claims the Releasing Parties may have against PDA Parties arising thereunder, and any claims based on any federal, state or local laws, rules, regulations or orders.

**3.** **Waiver of Other Claims.** Releasing Parties acknowledge that there is a possibility that subsequent to the execution of this Release, they will discover facts or incur or suffer claims which were unknown or unsuspected at the time this Release was executed, and which if known by it at that time may have materially affected its decision to execute this Release. Releasing Parties acknowledge and agree

that by reason of the release contained in Paragraph 2 above, they are assuming any risk of such unknown facts and such unknown and unsuspected claims.

4. **Representations and Warranties.** Franchisee represents and warrants as follows:

(a) no other party, nor any agent or attorney of any other party, has made any promise, representation or warranty whatever, express or implied, not contained herein concerning the subject matter hereof, to induce it to execute this document;

(b) the person executing this Release on behalf of Franchisee is authorized and empowered to do so;

(c) it has read this Release and understands the contents thereof, and it has made such an investigation of the facts pertinent to this Release and of all the matters pertaining thereto as it deemed necessary;

(d) it has had the opportunity to be represented by legal counsel or is represented by legal counsel of its own choice related to this Release; and

(e) These representations and warranties are deemed to survive the date of the execution of this Release.

5. **Disclaimer.** Nothing in this Release or any related document shall be construed as an express or implied admission or acknowledgement by PDA of any liability to Releasing Parties or to any other person, all such liability being expressly denied.

6. **No Assignment of Claims.** Releasing Parties hereby represent to PDA that they have not assigned or transferred any claim covered by this Release that it has or may have against the PDA Parties, and agrees to indemnify and hold the PDA Parties harmless from any liabilities, claims, demands, damages, costs, expenses and attorneys' fees incurred by the PDA Parties as a result of any person asserting any such assignment or transfer.

7. **Forbearance of Suit.** Releasing Parties agree that they will forever refrain and forbear from commencing, instituting or prosecuting any lawsuit, arbitration, action or other proceeding of any kind whatsoever, by way of action, defense, set-off, cross-complaint or counterclaim, against the PDA Parties based on, arising out of, or in connection with any claim, debt, liability, demand, obligation, cost, expense, action or cause of action which is released and discharged by reason of the execution and delivery of this Release.

8. **Integration.** This document constitutes the entire agreement and understanding between the parties concerning the subject matter hereof, and supersedes and replaces all prior negotiations, proposed agreements and agreements, written and oral, relating thereto. No covenants, agreements, representations and warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Release.

9. **Additional Documentation and Cooperation.** The Releasing Parties agree to execute such additional documentation as PDA may request and cooperate in further proceedings necessary to effectuate the terms of this Release without charge or other consideration.

**10.    Governing Law and Venue.**  The dispute resolution provisions of the Agreement shall apply and are incorporated herein by reference.

**11.    Confidentiality.**  The Releasing Parties and their attorneys each agree to keep confidential the terms of this Release except to the extent such disclosure is otherwise required by federal or state law, including pursuant to any discovery procedures authorized by such laws, and then only to such persons and/or agencies authorized to receive such information.

**12.    Counterparts/Amendment/Waiver.**  This Release may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of this Release electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Release.  This Release may be amended, modified, canceled, or waived only by written instrument executed by each of the parties.  A waiver of any term or condition of this Release will not be deemed to be, and may not be construed as, a waiver of any other term or condition hereof.

**13.    Severability.**  In the event that any covenant, condition or other provision of this Release is held to be invalid, void or illegal by any court of competent jurisdiction, it shall be deemed severable from the remainder of the Release and shall in no way affect, impair or invalidate any other covenant, condition or provision of this Release.

**14.    Successors and Assigns.**  This Release shall bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, administrators, executors and conservators.

**15.    Attorneys' Fees.**  Should any action or other proceeding be necessary to enforce any of the provisions of this Release, the prevailing party will be entitled to recover its actual attorneys' fees incurred in each and every action or proceeding, including any and all appeals or petitions therefrom.

IN WITNESS WHEREOF, the undersigned have executed this Release as of the date first set forth above in this Release.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _____
Name: _____Katherine Slate_____
Title: _____VP of Franchise Relations_____

_____
Notary Public                    Date

TERESA K. KANTZOS
Notary Public, State of Texas
My Commission Expires
April 20, 2016

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____

_____
Notary Public                    Date

See attached for Notary Public

DESIGNATED PERSON:

By: _____
Name: _____

_____
Notary Public                    Date

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of El Dorado }

On 12-21-11 before me, Melba Henderson , Notary Public
Date                                                          Here Insert Name and Title of the Officer

personally appeared Brian K. Nygaard
                                                          Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**MELBA HENDERSON**
COMM. #1933065
Notary Public • California
El Dorado County
Comm. Expires May 15, 2015

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _Melba Henderson_
                        Signature of Notary Public

Place Notary Seal and/or Stamp Above

—————————— OPTIONAL ——————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: General Release & Waiver
Document Date: 12-21-11 _____ Number of Pages: 4
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: Brian K. Nygaard
☒ Corporate Officer — Title(s): President
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

## EXHIBIT C

**ACKNOWLEDGMENT OF RECEIPT OF**
**OPERATIONS MANUAL**

Pursuant to Section 3.B of the Franchise License Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby acknowledges that it has received and reviewed a copy of PDA's confidential Operations Manual (the "Manual"). Capitalized terms used but not defined in this Exhibit C have the meanings set forth in the Franchise Agreement.

Franchisee further acknowledges and agrees that it shall keep the Manual in accordance with all applicable provisions of the Franchise Agreement. Without limiting the foregoing, Franchisee expressly reaffirms its agreement under Sections 8 and 9 of the Franchise Agreement to treat the Manual, the Documentation and any other manuals created for or approved for use in the operation of the Franchised Business, and the information contained therein as confidential. Franchisee further reaffirms its agreement under Section 8.A of the Franchise Agreement that upon request or upon the expiration or termination of the Franchise Agreement, Franchisee shall return the Manual to PDA.

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____
Dated: _____ September 15, 2011 _____

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

### EXHIBIT D
### FACTORING AGREEMENT

This Factoring Agreement (the "Agreement") is entered between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"), and _____Brian K. Nygaard_____ ("Franchisee") on this___15th___day of ____September, 2011_____.

### W I T N E S S E T H:

WHEREAS, PDA and Franchisee are parties to that certain Franchise Agreement dated _____September 15__,_____2011___, (the "Franchise Agreement");

WHEREAS, the Franchise Agreement provides that if Franchisee requests and PDA elects to do so, PDA will purchase Franchisee's accounts receivables attributable to the Franchised Business which are approved by PDA (the "Receivables") pursuant to the terms of this Agreement;

WHEREAS, Franchisee desires that PDA purchase the Receivables and PDA agrees to do so pursuant to the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions. Capitalized terms not otherwise defined herein shall have the meaning given them in the Franchise Agreement.

2. Assignment. This is an account purchase transaction. Franchisee does hereby sell and assign to PDA, and PDA does hereby purchase all of Franchisee's right, title and interest in and to the Receivables, with the exception of those Receivables rejected by PDA due to failure of those Receivables to satisfy the criteria specified in Section 5 below. PDA will have no obligation to approve or purchase any accounts receivable that PDA determines to be uncollectible, invalid, fraudulent, or for appraisal work not performed by the Franchised Business.

3. Payment for Receivables. Upon receipt from Franchisee of the report required by Section 4.A of the Franchise Agreement (including all applicable invoices), PDA shall pay for the Receivables by submitting to Franchisee a check in an amount equal to the total Gross Invoice Fees reflected on the report (and confirmed by the invoices) less (i) the fifteen percent (15%) royalty fee due with respect to such Gross Invoice Fees and (ii) the two percent (2%) factoring fee due with respect to such Gross Invoice Fees submitted with report. PDA may from time to time modify the factoring fee described in clause (ii) of the immediately preceding sentence upon thirty (30) days prior written notice to Franchisee. Furthermore, PDA may deduct from any payment due to Franchisee hereunder any and all amounts due from Franchisee to PDA in connection with Franchisee's purchase of insurance policies and software licenses from PDA under the Franchise Agreement and the documents related thereto.

4. Notification to Account Debtors. With respect to Receivables assigned to PDA hereunder, Franchisee shall notify the account debtor of the assignment and direct it to submit payment thereon to PDA.

5.    <u>Franchisee's Warranties</u>. Franchisee represents and warrants to PDA with respect to every Receivable sold and assigned to PDA that (i) Franchisee is the owner of the Receivable with the legal right to sell and assign it; (ii) the amount shown on the invoice representing the Receivable is the correct amount and is not disputed; (iii) Franchisee has fulfilled all its obligations to the customer identified on the invoice as of the invoice date and is entitled to payment; (iv) the invoice is based on services rendered, is not past due or in default, has not been previously sold, assigned, transferred, or pledged, and is free of any liens, security interests and encumbrances; (v) there are no defenses, offsets, counterclaims or agreements for which the customer identified on the invoice may claim any deduction or discount; and (vi) the customer identified on the invoice has not objected to payment or to the quality of the services rendered.

6.    <u>Uncollected Receivables</u>. If PDA does not collect payment in full from the account debtor on any particular purchased Receivable within one hundred twenty (120) days of the date of the invoice relating to such Receivable, Franchisee shall immediately repurchase the Receivable from PDA upon notice for the full invoice amount underlying the Receivable (less any partial payments received by PDA). PDA may, in its sole discretion, offset the amount owed by Franchisee with respect to the uncollected Receivable against any future Receivables purchased by PDA hereunder, any other sums that may be owed by PDA to Franchisee, or any other property of Franchisee which may come into the possession of PDA. Franchisee shall thereafter have all rights to payment on the repurchased Receivable.

7.    <u>Sale of Account</u>. This is a sale of an account under the Texas Uniform Commercial Code with respect to each Receivable purchased by PDA under this Agreement. Franchisee agrees to execute and deliver such instruments and documents, including, without limitation, financing statements as PDA may request from time to time. Franchisee authorizes PDA to file such initial financing statements and amendments as PDA deems necessary to perfect its interest in the Receivables.

8.    <u>Term and Termination</u>.

(a)    This Agreement shall run conterminously with the Franchise Agreement and, unless earlier terminated as provided in Section 8(b) below, shall terminate, without notice to Franchisee, immediately upon the expiration or termination of the Franchise Agreement.

(b)    PDA may, in its sole discretion, terminate this Agreement and all rights granted hereunder effective upon thirty (30) days written notice to Franchisee; provided, however, if Franchisee shall at any time submit any false or fraudulent invoice, termination shall be effective immediately upon written notice to Franchisee.

(c)    Franchisee may terminate this Agreement upon thirty (30) days written notice to PDA in the event PDA increases the factoring fee as provided by Section 3 above.

9.    <u>Miscellaneous</u>.

(a)    Franchisee shall not assign this Agreement or otherwise transfer its rights or obligations hereunder without the express prior written consent of PDA, provided that any assignment shall be subject to the terms of Section 11 of the Franchise Agreement.

(b)    Notice under this Agreement shall be in writing addressed to the parties as indicated in Section 17.B of the Franchise Agreement.

(c)     Any dispute relating to the interpretation or performance of this Agreement shall be resolved through non-binding mediation and binding arbitration conducted in Tarrant County, Texas in accordance with Sections 17.E, 18.A and 18.B of the Franchise Agreement.

(d)     In the event that either party commences litigation or arbitration to enforce the provisions of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs.

(e)     If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provision shall remain in full force and effect and in no way shall be affected, impaired or invalidated.

(f)     **THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES).**

(g)     The terms of the Franchise Agreement are incorporated into this Agreement by reference, including but not limited to the provisions of the Franchise Agreement relating to jurisdiction and exclusive venue. This Agreement and related provisions of the Franchise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede all related prior and contemporaneous agreements between the parties.

(h)     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written in this Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _____
Name: _____Katherine Slate_____
Title: _____VP Franchise Relations_____

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT E**

**ACKNOWLEDGMENT OF RECEIPT OF**
**PDA INFRACTION/COMPLAINT REVIEW SYSTEM**

Pursuant to Section 3.G of the Franchise License Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby acknowledges that it has received and has reviewed a copy of the PDA Infraction/Complaint Review System (the "Infraction System"), attached hereto.

Franchisee further acknowledges and agrees that Franchisee is subject to the terms and conditions of the Infraction System, including but not limited to the threshold numbers of Infractions set forth therein, for any violation of the uniform standards that PDA may establish from time to time for operation of the Franchised Business (as defined in the Franchise Agreement). Franchisee agrees to comply with the terms and conditions of the Infraction System, and acknowledges that failure to comply with the Infraction System shall constitute an Event of Default as provided in the Franchise Agreement.

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____
Date: _____September 15, 2011_____

[INFRACTION SYSTEM FOLLOWS]



# PDA Infraction/Complaint Review System
### Effective 7-1-10
### Revisions as of 2/22/11

## PDA Infraction/Complaint Review System
## Effective 7-1-10

I.   To ensure uniform compliance with operational standards and high quality service by all franchisees operating under the PDA System, PDA has established the following PDA Infraction/Complaint Review System (the "Infraction System").

II.  Infractions may include, but are not limited to:

- Failure to answer the office telephone during operating hours
- Failure of an office to be open for operation Monday–Friday 8:00 a.m. – 5:00 p.m. except for designated holidays
- Failure to respond to communications
- Failure to provide status on an assignment
- Failure to upload an assignment properly to a client
- Failure to follow Client Procedure Agreements, client instructions, and/or any mutually agreed upon directive issued by the client
- Failure to provide coverage in your marketing area without providing written documentation to the Regional Manager
- Failure to exhibit professional behavior
- Failure to handle supplements properly
- Improper invoicing – e.g., invoicing an assignment prior to proper completion of the assignment
- Failure to participate in mandatory training and/or meetings

III. When a complaint is received from any party with respect to a franchise office's performance, PDA will investigate the complaint and will determine whether the franchise office's conduct constitutes an Infraction. If an Infraction has occurred, PDA will send written notice of the Infraction to the applicable franchisee. If the conduct forming the basis of the complaint does not constitute an Infraction, the complaint will be used as a training opportunity for the subject franchise office and applicable franchisee.

IV. All complaints from clients must be documented in an email and forwarded to the PDA Client Service Center ("CSC") at csc@pdaorg.net. The franchisee whose - franchise office is the subject of the client complaint shall work with the CSC, Operations Manager, Regional Manager, Marketing Manager and/or any other Corporate Personnel to resolve the complaint.

V. If a franchise office incurs, within any consecutive 12-month period, the number of Infractions set forth below with respect to that franchise office's applicable appraisal tier, then PDA will send the applicable franchisee written notice to that effect.

| Appraisal Tier for Prior Calendar Year | Infraction Threshold |
|---|---|
| 765 or Less | (6) Infractions of same nature |
| | (10) Infractions of any nature |
| 766 – 2,525 | (8) Infractions of same nature |
| | (12) Infractions of any nature |
| 2,526 or Greater | (10) Infractions of same nature |
| | (14) Infractions of any nature |

Receipt of such notice by the franchisee will commence a 90-day probationary period. If at any time during that 90-day probationary period the subject franchise office incurs an additional Infraction, then an uncurable Event of Default will exist under the applicable franchisee's PDA Franchise License Agreement relating to the subject franchise office, and PDA may terminate that Franchise License Agreement and the licenses granted thereunder immediately upon notice to the applicable franchisee. If, on the other hand, the subject franchise office does not incur any additional Infractions during the 90-day probationary period, then at the end of that period, no previous Infractions will be counted toward that franchise office's threshold for any subsequent consecutive 12-month period.

A franchise office's very first Infraction, regardless of its nature, will not be counted toward that franchise office's threshold, if (a) the applicable franchisee requests a training session by PDA no later than five business days after receiving notice of the Infraction from PDA, (b) PDA, in its sole discretion, agrees to provide such training for the subject franchise office, and (c) the subject franchise office successfully completes the training, to the satisfaction of PDA in its sole discretion, no later than 30 calendar days after receiving the Infraction notice. No subsequent Infractions by that franchise office, regardless of their nature, will be eligible for such an exemption from being counted toward the franchise office's threshold in any subsequent consecutive 12-month period.

**Management reserves the right to revise, amend or modify this policy at any time and in any manner.*

**PROPERTY DAMAGE APPRAISERS, INC.**

**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT F**

**STATEMENT OF OWNERSHIP INTERESTS**


Articles of Incorporation, Articles of Organization, or their equivalent were filed on
___December 17___ , ___2011___ , in the state of ___California___ for ___BKN Appraisals Inc.___


Shareholders: ___Brian K. Nygaard – 100% of shares___

_____   _____

_____   _____


PDA:
PROPERTY DAMAGE APPRAISERS, INC.
By: _Katherine Slate_
Name: ___Katherine Slate___
Title: ___VP Franchise Relations___

FRANCHISEE:
BRIAN K. NYGAARD
By: _Brian K. Nygaard_
Name: ___Brian K. Nygaard___
Title: ___Owner___

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## EXHIBIT G
## GUARANTY AND ASSUMPTION OF
## OBLIGATIONS

In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and _____Brian K. Nygaard_____ ("Franchisee") dated as of _____September 15___,___2011_____, and any and all additional agreements concurrently being, or hereafter to be, executed on behalf of PDA and Franchisee, (collectively the "Agreements") each of the undersigned (being a Designated Person as defined in the Franchise Agreement), hereby individually, personally, jointly, severally and unconditionally:

1.      acknowledge that he has read all of the terms and conditions of the Franchise Agreement that PDA would not have granted the franchise described therein without the execution of this Guaranty and the undertakings of each of the undersigned, and that the grant of said franchise will inure to the economic benefit of the undersigned;

2.      make all of the covenants, representations and agreements of Designated Persons set forth in the Franchise Agreement, including, without limitation, those in Sections 5, 6, 9, 11 and 14, and is obligated to perform thereunder as if the undersigned had been a party to the Franchise Agreement;

3.      agree to be personally bound by, personally liable for and obligated to perform in the event of the breach of, each and every provision in the Agreements; and

4.      irrevocably guarantee to PDA and its successors and assigns, for the Term of the Franchise Agreement and thereafter as provided in the Franchise Agreement, that all of Franchisee's obligations under the Agreements shall be paid and performed when due and upon default by Franchisee and notice thereof by PDA, each shall immediately make each payment and perform each obligation required of Franchisee under the Agreements.

In addition to the foregoing, the Designated Person serving as a replacement Franchisee's Operating Principal under Section 6.A.3 of the Franchise Agreement, hereby individually, personally, and unconditionally makes all of the covenants, representations and agreements of Operating Principal set forth in the Franchise Agreement including, without limitation, those in Sections 5, 6, 9, 11 and 14, and is obligated to perform thereunder as if the undersigned had been a party to the Franchise Agreement.

Each of the undersigned waives:

1.      acceptance and notice of acceptance by PDA of the foregoing undertakings;

2.      notice of presentment or demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

3.      protest and notice of default to Franchisee, any Designated Person(s) or other guarantor with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

4.      any right he may have to require that an action be brought against Franchisee, any Designated Person or any other person as a condition of liability;

5.      notice of any release of any guarantor or other security given for the obligations of Franchisee; and

6.      any and all other notices to which he might otherwise be entitled.

Without limiting the foregoing, each of the undersigned consents and agrees that:

1.      his direct and immediate liability under this Guaranty shall be joint and several;

2.      he shall render any payment or performance required under the Agreements upon demand if Franchisee fails or refuses punctually to do so upon notice from PDA;

3.      such liability shall not be contingent or conditioned upon pursuit by PDA of any remedies against Franchisee, any Designated Person or any other person;

4.      such liability shall not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which PDA may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable;

5.      such liability of each of the undersigned under this Guaranty is irrevocable, continuing, absolute and unconditional, and the obligations of each of the undersigned shall not be discharged or impaired or otherwise affected by, and each of the undersigned hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)      any illegality or lack of validity or enforceability of any obligation or any provision of the Franchise Agreement or any of the other Agreements;

(b)      any change in the time, place or manner of payment of, or in any other term of, the obligations of any party under the Franchise Agreement, or any rescission, waiver, amendment or other modification of the Franchise Agreement or any of the other Agreements, including any increase in the obligations;

(c)      any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the obligations of the undersigned;

(d)      any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the obligations;

(e)      the failure of any other person to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of any guarantor or surety with respect to the obligations of Designated Persons set forth in the Franchise Agreement.

If any provision of this Guaranty is deemed to be invalid or inoperative for any reason, that part shall be deemed modified to the extent necessary to make it valid and operative or if it cannot be so modified, then severed, and the remainder of this Guaranty shall continue in force and effect as if it had been signed with the invalid portion so modified or eliminated.

Upon receipt by PDA of notice of the death of any Designated Person(s) executing this Guaranty, the estate of the deceased will be bound by the foregoing provisions, but only for defaults and obligations under the Franchise Agreement existing at the time of death and in such event, the obligations of Franchisee and the remaining Designated Person(s) shall continue in full force and effect.

A Designated Person who is the spouse of Franchisee agrees that the termination of the marital relationship with Franchisee for any reason shall not have the effect of creating any right for such spouse in any property or transactions the subject of the Agreement.

**THE UNDERSIGNED HEREBY IRREVOCABLY SUBMIT THEMSELVES, WHERE APPLICABLE UNDER THE TERMS OF THIS AGREEMENT, TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. THE PARTIES HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. THE PARTIES HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. THE PARTIES FURTHER AGREE THAT THE EXCLUSIVE VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.**

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his/her signature on the same day and year as the Franchise Agreement was executed, unless otherwise dated below with respect to a replacement Operating principal or new Designated Person.

Attest:

_____
Witness

Designated Persons:

_____
*Name: _____ Brian K. Nygaard _____

_____
Witness

_____
Name: _____

_____
Witness

_____
Name: _____

\* Denotes individual who is the Franchised Business's Operating Principal

## EXHIBIT H
## SOFTWARE LICENSE AGREEMENT

This Software License Agreement ("Software License") is entered into as of __September 15__, __2011__, between Property Damage Appraisers, Inc. ("PDA") and __Brian K. Nygaard__ ("Franchisee") pursuant to a Franchise Agreement dated _____ September 15 __, 2011 __, ("Franchise Agreement") under which Franchisee will operate a Property Damage Appraisers appraisal business (the "Franchised Business").

1.　　PDA hereby grants to Franchisee a non-exclusive, non-transferable, non-assignable license to use the computer programs ("Software") listed in Schedule I to this Software License. The schedule may be updated from time to time by PDA to include enhancements, upgrades or replacements ("Enhancements") to the Software which, in the sole discretion of PDA, may be made from time to time at no additional cost.

2.　　In consideration of the software license granted hereby, Franchisee shall make payments to PDA as provided in Schedule II attached hereto; provided, however, that if Franchisee and PDA are parties to a Factoring Agreement that is then currently in effect, PDA may offset any amounts owed to Franchisee under such Factoring Agreement by the amounts due to PDA from Franchisee hereunder. PDA may from time to time modify the fee schedule described in the immediately preceding sentence upon thirty (30) days prior written notice to Franchisee.

3.　　Franchisee shall use the Software only in the operation of the Franchised Business. Franchisee may not modify, copy or reproduce in any form all or any part of the Software without the prior written consent of PDA, and in such event solely to the extent required for use of the Software in the operation of the Franchised Business. Franchisee shall not make available the Software or any copy thereof to any party except as described below in paragraph 5.

4.　　All copies of the Software, including any produced by Franchisee with PDA's consent, are and shall be the sole and exclusive property of PDA during and after the term of this Software License.

5.　　Franchisee understands and acknowledges that the Software contains PDA's trade secrets and agrees, during the term of this Software License and thereafter, not to communicate, divulge or use the Software other than in the operation of the Franchised Business. Franchisee shall divulge and allow access to the Software only to its employees who must have access to it in connection with their employment in the Franchised Business. At PDA's request, Franchisee shall require and obtain execution of covenants concerning the confidentiality of the Software from any persons employed by Franchisee or who otherwise have access to the Software. These covenants shall be in a form substantially similar to the confidential covenants contained herein.

6.　　Franchisee agrees to notify PDA immediately of the existence of any unauthorized knowledge, possession or use of the Software or of any part thereof.

7.　　The term of this Software License shall be co-extensive with the Term of the Franchise Agreement, including any renewal of the Franchise Agreement.

8.　　Expiration or termination of the Franchise Agreement for whatever reason shall automatically terminate this Software License and the right granted by it to use the Software, without notice to Franchisee. In addition, PDA may terminate this Software License upon the failure by

Franchisee to comply with any of the terms and conditions herein, by giving Franchisee written notice of termination stating the nature of the breach at least thirty (30) days prior to the effective date of termination; provided that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to PDA's satisfaction within the thirty (30)-day period and by promptly providing proof thereof to PDA. If any such default is not cured within that time (or, if appropriate, substantial and continuing action to cure the default is not initiated within that time), or such longer period as applicable law may require, this Software License shall terminate without further notice to Franchisee effective immediately upon expiration of the thirty (30)-day period or such longer period as applicable law may require.

Upon the expiration or termination of this Software License or upon the expiration or termination of the Franchise Agreement, whichever shall occur earlier, Franchisee shall immediately deliver to PDA all copies of the Software then in Franchisee's possession or control and shall immediately cease to use the Software.

9.     PDA will, in its sole discretion, repair or replace without charge to Franchisee any copies of the Software provided under this Software License which have defects in materials and workmanship, except that this limited warranty does not cover any Software that has been damaged, while in transit to Franchisee or in Franchisee's possession, by accident (including an act of God), misuse (including improper storage), abuse, unauthorized modification or unauthorized repair of the Software. This limited warranty shall be Franchisee's sole and exclusive remedy as to any defects in the Software.

10.     **EXCEPT FOR THE LIMITED WARRANTY DESCRIBED ABOVE, PDA MAKES NO WARRANTIES WITH RESPECT TO THE SOFTWARE TO FRANCHISEE OR ANY OTHER PERSON(S) OR ENTITY WITH RESPECT TO THE SOFTWARE, , WHETHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE; AND ALL SUCH WARRANTIES ARE EXPRESSLY AND SPECIFICALLY DISCLAIMED.**

11.     **FRANCHISEE IS SOLELY RESPONSIBLE FOR DETERMINING ITS DESIRED RESULTS FROM THE USE OF THE SOFTWARE, FOR EVALUATING THE SOFTWARE'S CAPABILITIES AND FOR SUCCESSFULLY OPERATING THE SOFTWARE. IN NO EVENT SHALL PDA BE RESPONSIBLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES, OR FOR LOST DATA OR LOST PROFITS TO FRANCHISEE OR ANY OTHER PERSON(S) OR ENTITY, WHETHER OR NOT DUE TO PDA'S NEGLIGENCE, ARISING OUT OF THE USE OR INABILITY TO USE THE SOFTWARE, EVEN IF PDA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OCCURRING. IN THE EVENT THAT ANY OTHER TERM OF THIS SOFTWARE LICENSE IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISION OF WAIVER BY AGREEMENT OF DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OR FOR LOST DATA OR LOST PROFITS SHALL CONTINUE IN FULL FORCE AND EFFECT.**

12.     **THIS SOFTWARE LICENSE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

13.     If any term herein is declared to be void or unenforceable by a court of competent jurisdiction, such declaration shall have no effect on the other terms of this Software License, which will remain in effect and fully enforceable.

14.    Franchisee agrees to pay any sales, use, ad valorem, personal property and general intangibles tax and any registration fees arising out of this Software License and the transactions contemplated herein, except for any taxes imposed upon the gross income of PDA.

15.    Franchisee may not assign, sublicense or otherwise transfer any of its rights or obligations under this Software License without the prior written consent of PDA.

16.    Notice under this Software License shall be provided as indicated in Section 17 of the Franchise Agreement.

17.    The terms of the Franchise Agreement  are incorporated into this Software License by reference, including but not limited to the provisions of the Franchise Agreement relating to jurisdiction and exclusive venue.  This Software License and related provisions of the Franchise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede all related prior and contemporaneous agreements between the parties.

18.    This Software License may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Software License shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto.  Delivery of an executed counterpart of this Software License electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Software License.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Software License on the date first set forth above in this Software License.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _____
Name: _____Katherine Slate_____
Title: _____VP of Franchise Relations_____

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____

**Schedule I**
**Licensed Software**

**Name of Licensed Software Programs**

Roadmap – PDA's proprietary Franchise Management System software.

**Additional Right to Use Third-Party Software**

      1. Pursuant to the terms of a certain Product License Agreement between PDA and Mitchell, International, Inc., PDA also hereby grants Franchisee a non-exclusive, limited right to use the following software programs (the "Mitchell Software"):

      **Mitchell Estimating and Workflow Product bundle, which includes: UltraMate, MAPP, QRP, Tire Database, Paintless Dent Removal, NADA/Redbook Online Valuation Tool (WorkCenter Total Loss), Refinishing Materials Calculator, TruckEst, eClaim Manager, AIM Online, WorkCenter Review and WorkCenter Compliance.**

      **Optional A la Carte Products include: Motorcycle Database.**

The right to use the Mitchell Software is not a license or sublicense of such software. Franchisee agrees to use the Mitchell Software strictly in accordance with instructions provided by PDA from time to time, and to reimburse PDA for the cost of Franchisee's user rights granted hereby.

      2. Pursuant to the terms of a certain Product License Agreement between PDA and Marshall & Swift/Boeckh LLC, PDA also hereby grants Franchisee a non-exclusive, limited right to use the following software programs ("MSB IntegriClaim"):

      **MSB IntegriClaim with Administrator and ComCentral, which is the property estimating software, including the management reporting and workflow software, and the connectivity software providing unlimited communications and file upload/download capabilities to Administrator (respectively).** (Will be phased out beginning Q1 2011, at which point you will have the limited right to continue using IntegriClaim in connection with completing claims processing for any claims pending in IntegriClaim on the day you are switched over to EyeQ.)

      **MSB IntegriClaim EyeQ Edition property estimating software ("EyeQ"), the IntegriClaim EyeQ Web-Based Administrator browser based administrative tool for claims management ("Web Admin") and the IntegriClaim EyeQ Claim Management Client claims examining and editing tool ("Examiner").** (Effective the day you are switched over from MSB IntegriClaim, beginning Q1 2011.)

The right to use the MSB software is not a license or sublicense of such software. Franchisee agrees to use the MSB software strictly in accordance with instructions provided by PDA from time to time, and to reimburse PDA for the cost of Franchisee's user rights granted hereby.

**Schedule II**
**Licensing Fees**

**Name of Licensed Software Programs**

Roadmap – No Charge

**Additional Right to Use Third-Party Software\***

Mitchell - $136.00 weekly

Mitchell Motorcycle Database - $7.55 weekly

MSB IntegriClaim or EyeQ (whichever is applicable) - $16.00 weekly

TOTAL - $159.55

\*PDA Inc., reserves the right to change or adjust these fees as necessary from time to time, to cover increased vendor rates.

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT I**

**FORM OF MONTHLY REPORT**

Pursuant to Section 6.F of the Franchise License Agreement between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby certifies that it has performed the following marketing activities during the following monthly period, to promote the sale of appraisal services under PDA's proprietary appraisal system:

PERIOD: _____ to _____

MARKETING ACTIVITIES:

| Description of Activity | Approximate Time Spent | Analysis of Activity |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Franchisee certifies that the contact list attached to this Exhibit I is an up-to-date list of Franchisee's clients and prospects.

Date: __September 15, 2011_____

FRANCHISEE:
BRIAN K. NYGAARD

By: _~B~. ~K~. ~Nygaard~_____
Name: ___Brian K. Nygaard_____
Title: ___Owner_____

**Updated Contact List of Clients and Prospects**

## EXHIBIT J

## LIMITED POWER OF ATTORNEY

This limited power of attorney is made and entered into as of __September 15__, __2011__, between Property Damage Appraisers, Inc., a Texas corporation ("Assignee"), __Brian K. Nygaard__ ("Assignor").

WHEREAS, PDA has granted Franchisee a limited right to operate a business using unique system developed by PDA for the development and operation of appraisal businesses, for the period defined in the Franchise Agreement made and entered into __September 15__, __2011__, ("Franchise Agreement") between PDA and Franchisee;

WHEREAS, pursuant to Section 6.G.1 of the Franchise Agreement, Assignee is entitled to the use of all telephone numbers and post office boxes, if any, used by Assignor in the conduct of its business franchised under the Franchise Agreement (the "Franchised Business"), for the duration of said Franchise Agreement and following expiration or termination of the Franchise Agreement;

NOW, THEREFORE, Assignor hereby irrevocably appoints Assignee as its true and lawful agent and attorney-in-fact to act in the name, place and stead of Assignor for the purpose of assigning to PDA all rights to any telephone numbers, post office boxes and business listings used by Assignor in the conduct of the Franchised Business upon the expiration or termination of the Franchise Agreement, and for the purpose of taking any other actions necessary to enable Assignee to exercise the powers granted hereby.

Assignee may by written instrument delegate any or all of the powers granted hereby to any person or persons whom Assignee may select, but such delegation may be amended or revoked by Assignee at any time.

This limited power of attorney will commence and be in full force and effect on the date hereof and may not be revoked by Assignor at any time hereafter.

This limited power of attorney is governed by the laws of the State of Texas, without regard to conflict of laws principles. If any provision of this limited power of attorney is deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the remainder of this Agreement. Assignor acknowledges that it is fully informed as to the contents and understands the meaning of this limited power of attorney. Assignor acknowledges that a copy of this limited power of attorney executed by facsimile signature will have the same force and effect as a signed original.

ASSIGNOR:
BRIAN K. NYGAARD

By: _____
Name: ____Brian K. Nygaard_____
Title: ____Owner_____

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

## EXHIBIT K

**REQUIRED INSURANCE COVERAGE**

A.      **Hired and non-owned automobile liability and garagekeepers legal liability insurance in coverage amounts of not less than $1,000,000 per occurrence.

B.      Workers compensation, including employer's liability insurance for each employee in the amounts required or described under state law.

C.      Owned automobile liability insurance with coverage in an amount of not less than $500,000 as a combined single limit for bodily injury and property damage.

D.      **Errors and omission coverage in an amount not less than $1,000,000 per occurrence and $5,000,000 in the aggregate.

E.      Any insurance which may be required by statute or rule of the state or locality in which the Franchised Business will be located.

F.      **Commercial General and Commercial Umbrella Liability Insurance with independent contractor's coverage for claims involving bodily injury and/or property damage liability arising out of the acts of Franchisee and/or its employees, agents or independent contractors, with a minimum combined single coverage limit of $1,000,000 per occurrence and $2,000,000 in the aggregate.


        **Policies offered as of the Effective Date by, and which must be purchased through, the Required National Program.



## PROPERTY DAMAGE APPRAISERS, INC.
### FRANCHISE LICENSE AGREEMENT
### EXHIBIT L
### CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") is made and entered into _____ September 15 ___, ___ 2011 ___, between Property Damage Appraisers, Inc., a Texas corporation ("PDA"), _____ Brian K. Nygaard _____ ("Franchisee") and ___ Gary Howell ___ ("Promissor").

### RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of ___September 15___, 2011 , ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## Confidentiality Agreement

1.     Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.     Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.     Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.     At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.     Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.     Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.     Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.     Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.     Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**Miscellaneous**

1.     Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.     Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.     Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.    Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.    **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.    The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.    This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.    All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

Property Damage Appraisers, Inc.
P.O. Box 471909
Fort Worth, Texas 76147
Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Attn: Brian K. Nygaard
> Facsimile: 916-949-7011

If directed to the Promissor, the notice shall be addressed to:

> Gary Howell
> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Facsimile: 916-949-7011

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.    The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_

Name: _____Katherine Slate_____

Title: _____VP Franchise Relations_____

Executed: _12/28/11_

FRANCHISEE:
BRIAN K. NYGAARD

By: _____

Name: _____Brian K. Nygaard_____

Title: _____Owner_____

PROMISSOR:
GARY HOWELL

By: _Gary Howell_

Name: _____Gary Howell_____



## PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT
### EXHIBIT M
## CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into ___September 15___, ___2011___, between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"),___Brian K. Nygaard___("Franchisee") and ___Susan Osoria___ ("Promissor").

### RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of  September 15,  2011, ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.      Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.      Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.      Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.      PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.      At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.      Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.    Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.    Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.    Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**B. Covenants Not to Compete**

1.    Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.    Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.    Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.    Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.    Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.    Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.    Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.    Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

## C. Miscellaneous

1.    Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.    Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.      Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.      Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.      **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.      The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.      This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.      All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Attn: Brian K. Nygaard
> Facsimile: 916-949-7011

If directed to the Promissor, the notice shall be addressed to:

> Susan Osoria
> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Facsimile: 916-949-7011

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.      The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_

Name: _Katherine Slate_

Title: _VP of Franchise Relations_

Executed: _12/28/11_

FRANCHISEE:
BRIAN K. NYGAARD

By: _B. K. Nygaard_

Name: _Brian K. Nygaard_

Title: _Owner_

PROMISSOR:
SUSAN OSORIA

By: _____

Name: _Susan Osoria_



PROPERTY DAMAGE APPRAISERS, INC.
FRANCHISE LICENSE AGREEMENT

## EXHIBIT M

**CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE**

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into ___September 15___, ___2011___, between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"),___Brian K. Nygaard___("Franchisee") and ___Kimberly Osoria___ ("Promissor").

## RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of ___September 15, 2011,___ ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.      Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.      Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.      Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.      PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.      At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.      Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.     Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.     Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.     Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.     Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

## B. Covenants Not to Compete

1.     Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.     Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.      Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.      Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.      Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.      Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.      The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.      Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.      Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

## C. Miscellaneous

1.      Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.      Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3. Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4. Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5. **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6. The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7. This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8. All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Attn: Brian K. Nygaard
> Facsimile: 916-949-7011

If directed to the Promissor, the notice shall be addressed to:

> Kimberly Osoria
> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Facsimile: 916-949-7011

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.     The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _____
Name: _____Katherine Slate_____
Title: _____VP of Franchise Relations_____
Executed: ____12/28/11____

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____

PROMISSOR:
KIMBERLY OSORIA

By: _____
Name: _____Kimberly Osoria_____



**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

## EXHIBIT M

**CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE**

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into ___September 15___, ___2011___, between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"), ___Brian K. Nygaard___ ("Franchisee") and ___Janice Garvin___ ("Promissor").

## RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of __September 15, 2011,__ ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.     Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.     Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.     Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.     At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.     Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.    Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.    Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.    Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

## B. Covenants Not to Compete

1.    Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.    Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.    Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.    Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.    Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.    Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.    Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.    Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

## C. Miscellaneous

1.    Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.    Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.     Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.     Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.     **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.     The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.     This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.     All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Attn: Brian K. Nygaard
> Facsimile: 916-949-7011

If directed to the Promissor, the notice shall be addressed to:

> Janice Garrin
> Property Damage Appraisers
> 9175 Kiefer Boulevard, Suite 204
> Sacramento, California 95826
> Facsimile: 916-949-7011

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.     The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_
Name: _Katherine Slate_
Title: _VP of Franchise Relations_
Executed: _12 | 28 | 11_

FRANCHISEE:
BRIAN K. NYGAARD

By: _B. K. Nygaard_
Name: _Brian K. Nygaard_
Title: _Owner_

PROMISSOR:
JANICE GARRIN

By: _Janice Garvin_
Name: _Janice Garvin_

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

<u>**EXHIBIT N**</u>

**STATE LAW ADDENDA**

1. **CALIFORNIA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the California Franchise Investment Law, CAL. BUS. & PROF. CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq., the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____September 15_____ , _2011_ , (the "Agreement") agree as follows:

A.      Section 2 of the Agreement, "Term and Renewal," shall be supplemented with the following language which shall be considered an integral part of the Agreement:

> The Agreement requires you to sign a general release of claims upon renewal of the Agreement. California Corporations Code Section 31512 provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order is void. Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000-31516). Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code 20000-20043).

B.      Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the California Franchise Investment Law or the California Franchise Relations Act.

C.      Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

> California Business and Professions Code Sections 20000 through 20043 provide rights to the Franchisee concerning non-renewal of a franchise. If this Agreement contains a provision that is inconsistent with the law, the law will control.

D.      Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other

agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as the transferor may have that have arisen under the California Franchise Investment Law or the California Franchise Relations Act;

E.    Subsection B of Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

This Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C, Sec. 101 *et seq.*).

F.    Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

California Business and Professions Code Sections 20000 through 20043 provide rights to the Franchisee concerning termination of a franchise. If this Agreement contains a provision that is inconsistent with the law, the law will control.

G.    Section 14 of the Agreement, "Covenants," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

This Agreement contains a covenant not to compete which extends beyond expiration or termination of the franchise. This provision may not be enforceable under California law.

H.    Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

**THIS AGREEMENT REQUIRES APPLICATION OF THE LAWS OF TEXAS UNDER CERTAIN CIRCUMSTANCES. THIS PROVISION MAY NOT BE ENFORCEABLE UNDER CALIFORNIA LAW.**

I.    Section 18 of the Agreement, "Dispute Resolution," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

The Agreement requires binding arbitration. The arbitration will occur at the PDA's corporate headquarters in Fort Worth, Texas, before a sole arbitrator agreed to by the parties and selected from the panel of arbitrators of the American Arbitration Association, with the costs being borne by the losing party. This provision may not be enforceable under California law. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement restricting venue to a forum outside of the State of California.

J.    Sections 17 and 18 of the Agreement, "Miscellaneous" and "Dispute Resolution," shall be supplemented by the following paragraph which shall be considered an integral part of the Agreement:

To the extent this Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable under California law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-1 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By: _Katherine Slate_

Name: _Katherine Slate_

Witness

Title: _VP Franchise Relations_

FRANCHISEE:
BRIAN K. NYGAARD

ATTEST:

By: _B. K. Nygaard_

Name: _Brian K. Nygaard_

Witness

Title: _Owner_

**EXHIBIT N-2**

## 2. HAWAII ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Hawaii Franchise Investment Law, Section 482E *et seq.*, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____,_____, (the "Agreement") agree as follows:

A.     Under the Hawaii Franchise Investment Law, the following practices are prohibited, and to the extent the Agreement is inconsistent, Hawaii law shall control:

      1.     Restricting the right of the franchisee to join a franchisee association;

      2.     Imposing unreasonable requirements to purchase from the franchisor or other designated sources;

      3.     Unlawfully discriminating between franchisees;

      4.     Obtaining undisclosed benefits on account of franchisee purchases;

      5.     Requiring the franchisee to grant a prospective release from liability imposed by the Hawaii Franchise Investment Law, Section 482E.

      6.     Imposing any unreasonable and arbitrary standard of conduct;

      7.     Terminating or refusing to renew a franchise except for good cause, or unreasonably discriminating between franchisees in connection with termination or non-renewal. For purposes of this paragraph, good cause shall include, but not be limited to, the failure of the franchisee to comply with any lawful, material provision of the franchise agreement after having been given written notice thereof and an opportunity to cure the failure within a reasonable period of time;

      8.     Refusing to permit franchise transfers, except for good cause. For purposes of this paragraph, For purposes of this paragraph good cause shall include, but not be limited to:

(i) The failure of a proposed transferee to meet any of the franchisor's or subfranchisor's reasonable qualifications or standards then in effect for a franchisee or subfranchisor;

(ii) The fact that the proposed transferee or any affiliated person of the proposed transferee is a competitor of the franchisor or subfranchisor;

(iii) The inability or unwillingness of the proposed transferee to agree in writing to comply with and be bound by all lawful obligations imposed by the franchise, including without limitation all instruction and training obligations, and to sign the current form of franchise agreement used by the franchisor or subfranchisor; and

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor and to cure any default in the franchise agreement or other agreements with the franchisor existing at the time of the proposed transfer.

9.      Failing to compensate the franchisee for certain assets upon terminating or refusing to renew the franchise.

To the extent this Agreement is inconsistent with Hawaii law, such inconsistent provisions are superseded by Hawaii law and shall have no force or effect.

B.      Section 2.B.8 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Hawaii Franchise Investment Law, Section 482E.

C.      Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsections E and F which shall be considered integral parts of the Agreement:

1.      In the event PDA does not approve the renewal of this Agreement, PDA may be required to purchase for fair market value Franchisee's inventory, supplies, equipment and furnishings purchased from PDA or a supplier designated by PDA; provided that personalized materials which have no value to PDA need not be compensated for. If such non-renewal is for the purpose of converting the Franchisee's business to one owned and operated by PDA, PDA may be obligated to compensate the Franchisee for loss of goodwill. PDA may deduct all amounts due from Franchisee and any costs related to the transportation or disposition of items purchased against any payment therefor.

2.      To the extent that the above renewal provisions are inconsistent with the Hawaii Franchise Investment Law, Section 482E-6, such inconsistent provisions are superseded by the Law's requirements and shall have no force or effect.

D.      Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state,

and local laws, rules and ordinances; excluding only such claims as transferor may have that have arisen under the Hawaii Franchise Investment Law, Section 482E.

E.     Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be considered an integral part of the Agreement:

To the extent the above termination provisions are inconsistent with the Hawaii Franchise Investment Law, Section 482E-6, such inconsistent provisions are superseded by the Law's requirements and shall have no force or effect.

F.     Section 13.J of this Agreement, "Obligations Upon Termination or Expiration," shall be supplemented by the following Subsection J. which shall be considered an integral part of the Agreement:

PDA may be required under Section 482E-6 of the Hawaii Franchise Investment Law, to be exercised within thirty (30) days after termination or expiration, to purchase from Franchisee any or all of the furnishings, equipment, signs, fixtures, supplies or inventory of Franchisee related to the operation of the franchised business, at Franchisee's cost or fair market value, whichever is less or if required under Hawaii law, at fair market value. If PDA must exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee and any costs related to the transportation or disposition of items purchased against any payment therefor.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-2 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

_____     By:_____
Witness                Name:_____
                         Title:_____

FRANCHISEE:

ATTEST:

_____     By:_____
                         Name:_____
Witness                Title:_____

**3.    ILLINOIS ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987 (the "Act"), the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____,_____ , (the "Agreement") agree as follows:

The provisions of the Act shall supersede any provision of the Agreement which is in conflict with the Act.

A.    Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following paragraph which shall be considered an integral part of the Agreement:

> Notwithstanding anything to the contrary contained in this Agreement, if any of the provisions of this Section 2, concerning non-renewal, are inconsistent with Section 20 of the Illinois Franchise Disclosure Act of 1987, the provisions of the Act shall apply rather than the contrary provisions of this Section 2.  As provided under Subsection 17.D hereof, however, each provision of this Agreement shall be considered severable, and if, for any reason, any provision of this Section 2 is determined to be invalid and contrary to, or in conflict with, Section 20 of the Act, such shall not impair the operation of, or have any other effect upon, such other provisions of this Section 2 as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto.

B.    Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be inserted following Subsection 12.D and shall be considered an integral part of the Franchise Agreement:

> Notwithstanding anything to the contrary contained in this Agreement, if any of the provisions of this Section 12, governing termination, are inconsistent with Section 19 of the Illinois Franchise Disclosure Act of 1987, the provisions of the Act shall apply rather than the contrary provisions of this Section 12.  As provided under Subsection 17.D hereof, however, each provision of this Agreement shall be considered severable, and if, for any reason, any provision of this Section 12 is determined to be invalid and contrary to, or in conflict with, Section 19 of the Act, such shall not impair the operation of, or have any other effect upon, such other provisions of this Section 12 as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto.

C.    The first, second and fourth sentences of Section 18.D of the Agreement, "Dispute Resolution," shall be deleted in their entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

D.    Section 17 of the Franchise Agreement, "Miscellaneous," shall be supplemented by the following Subsection R which shall be inserted following Subsection Q and shall be considered an integral part of the Franchise Agreement:

> In accordance with Section 41 of the Act, no provision in this Agreement shall be construed as requiring Franchisee to waive compliance with any provision of the Act.

E.    Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD FOR TEXAS CHOICE OF LAW RULES); HOWEVER ILLINOIS LAW WILL GOVERN FRANCHISE AGREEMENT UNDER THE JURISDICTION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT.**

F.    The second and third sentences of Subsection F.1 of Section 17 of the Agreement, "Miscellaneous," shall be deleted in their entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

G.    Subsection F.3 of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

H.    Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of Illinois, the Agreement and this Addendum shall be governed and construed in accordance with the Act.


IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-3 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____    Name:_____
Witness    Title:_____


FRANCHISEE:

ATTEST:

By:_____

_____    Name:_____
Witness    Title:_____

**EXHIBIT N-4**

## 4. INDIANA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Indiana Franchise Disclosure Law and the Indiana Deceptive Franchise Practices Act, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE LICENSE AGREEMENT dated _____,_____, (the "Agreement") agree as follows:

A.     The laws of the State of Indiana shall supersede any provision of the Agreement which is in conflict with Indiana law.

B.     The prohibition by Indiana Code 23-2-2.7-1(7) against unilateral termination of the franchise without good cause or in bad faith, good cause being defined therein as a material breach of the Agreement, will supersede the provisions of the Agreement in the State of Indiana to the extent they may be inconsistent with such prohibition.

C.     No release, waiver, or estoppel language set forth in the Agreement will relieve PDA or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Indiana.

D.     Any provision in the Agreement which limits litigation brought for breach of the Agreement, including waiver of the right to a trial by jury or the right to collect punitive damages, in any manner whatsoever is deleted from any Agreement in the state of Indiana.

E.     Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Indiana Franchise Disclosure Law or the Indiana Deceptive Franchise Practices Act.

F.     Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsection E, which shall be considered an integral part of the Agreement:

> To the extent that any of the above provisions regarding renewal are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent renewal provisions will be superseded by the Act's requirements.

G.     Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as the transferor may have that have arisen under the Indiana Franchise Disclosure Law or the Indiana Deceptive Franchise Practices Act.

H.     The second sentence of Subsection C.2 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash consideration offered by a third party, an independent appraisal mutually agreed upon by PDA and Franchisee shall be designated to determine such amount, and his determination shall be binding.

I.     Section 11.D of the Agreement, shall be supplement by the following language which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding the death of a Franchisee, is inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Acts requirements.

J.     Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding termination are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent termination provisions will be superseded by the Act's requirements.

K.     Section 13.G of the Agreement, "Rights and Duties Upon Expiration or Termination," is deleted in its entirety.

L.     Subsection A.3 of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service which provides appraisal services to customers located within twenty-five (25) miles of the Marketing Area.

M.     Subsection H of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee acknowledges that a violation of the terms of this Section 14 would result in irreparable injury to PDA for which no adequate remedy at law may be available, and Franchisee agrees that PDA is entitled to apply for an injunction prohibiting any conduct

by Franchisee in violation of the terms of this Section 14. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement to otherwise.

N.     Section 14 of the Agreement, "Covenants," shall be supplemented by the following Subsection K which shall be considered an integral part of this Agreement:

To the extent that any of the above provisions regarding covenants not to compete upon expiration or termination of the Agreement are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

O.     Section 16 of the Agreement, "Independent Contractor and Indemnification," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding covenants not to compete upon expiration or termination of the Agreement are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

P.     Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

To the extent that any part of Section 17 of the Agreement is inconsistent with the requirements of the of Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

Q.     Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES); HOWEVER, TO THE EXTENT THAT TEXAS LAW IS INCONSISTENT WITH THE INDIANA FRANCHISE LAWS, INDIANA CODE 23-2-2.5 AND INDIANA CODE 23-2-2.7, THE INDIANA FRANCHISE LAWS WILL CONTROL.**

R.     Subsection A of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THE PARTIES AGREE TO FIRST SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND EXHIBITS) OR THE RELATIONSHIP CREATED BY SUCH AGREEMENT TO NON-BINDING MEDIATION PRIOR TO SEEKING ARBITRATION OR FILING SUCH CLAIM, CONTROVERSY OR DISPUTE, IF APPLICABLE, IN A COURT. THE MEDIATION SHALL BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATION SERVICES ORGANIZATION OR BODY AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION**

(NOT TO EXCEED FIFTEEN (15) DAYS), THROUGH THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA") IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION. THE MEDIATION SHALL TAKE PLACE AT SUCH PLACE AS MUTUALLY AGREED UPON BY THE PARTIES. THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE MEDIATION, ALL EVENTS LEADING UP TO THE MEDIATION, AND THE OUTCOME OF THE MEDIATION CONFIDENTIAL. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION (1) FOR MONIES OWED, OR (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.

S.      Subsection D of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect.

T.      Indiana law prohibits waiver of a jury trial. All references in the Agreement to waiver of a jury trial are deleted in their entirety.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-4 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____      Title:_____
Witness

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____      Title:_____
Witness

4

## 5. MARYLAND ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law, MD. CODE ANN., BUS. REG. §§14-201 to 14-233 (2010 Rep.Vol.), the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

Section 2.B.8 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect in the state of Maryland.

A.      Section 11.B.3 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect in the state of Maryland.

B.      In recognition of the requirements of Section 14-216(c)(25) of the Maryland Franchise Registration and Disclosure Law the parties agree to the following:

C.      Section 17.E of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

**THE FRANCHISE AGREEMENT REQUIRES APPLICATION OF THE LAWS OF TEXAS UNDER CERTAIN CIRCUMSTANCES. THESE PROVISIONS MAY NOT BE ENFORCEABLE UNDER MARYLAND LAW.  FRANCHISEE IS PERMITTED TO BRING A LAWSUIT IN MARYLAND FOR CLAIMS ARISING UNDER THE MARYLAND FRANCHISE REGISTRATION AND DISCLOSURE LAW.**

D.      Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

Section 14-226 of the Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise.  Any such representations in the Agreement are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

E.      **Maryland Law**.  The laws of the State of Maryland shall supersede any provision of the Agreement which is in conflict with Maryland law.  Additionally, the Agreement shall be supplemented by the following language which shall be considered an integral part of the Agreement:

1.      Any claims arising under the Maryland Franchise Registration and Disclosure Law, must be brought within three (3) years after the grant of the franchise.

2.      The limitation, in Section 18.F of the Agreement, on the period of time arbitration and/or litigation claims must be brought shall not act to reduce the 3-year statute of limitations afforded a franchisee for bringing a claim arising under the Maryland Franchise Registration and Disclosure Law.

3.     Under COMAR 02.02.02.16L, the general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

4.     Franchisees may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

5.     The Franchise Agreement requires prospective franchisees to disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Maryland Franchise Registration and Disclosure Law in order to purchase a franchise. Such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

F.     In recognition of the requirements of the federal bankruptcy law (11 U.S.C., Sec. 101 *et seq.*) the parties agree to the following:

G.     The provision in the Agreement which provides for termination upon bankruptcy of the franchisee may not be enforceable under federal bankruptcy law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-5 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____     Name: _____
Witness                                                              Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____     Name: _____
Witness                                                              Title:_____

**6.    MICHIGAN ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Michigan Franchise Investment Law, MCL 445.1501 *et seq.*, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

The State of Michigan prohibits certain unfair provisions that are sometimes in franchise documents. If any of the following provisions are in these franchise documents, the provisions are void and cannot be enforced against you.

A.    A prohibition on the right of a franchisee to join an association of franchisees.

B.    A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

C.    A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

D.    A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

E.    A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

F.    A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

G.    A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i) The failure of the proposed franchisee to meet the franchisor's then current reasonable qualifications or standards.

(ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

H.  A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

I.  A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services. If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee or subfranchisor until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

**ANY QUESTIONS REGARDING THIS NOTICE SHOULD BE DIRECTED TO THE OFFICE OF ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION, ATTN: FRANCHISE DEPARTMENT, 525 W. OTTAWA STREET, 670 LAW BLDG., LANSING, MICHIGAN 48933 (517) 272-7117.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-6 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

## 7.    MINNESOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Minnesota Franchise Act, Minn. Stat. Section 80.01 *et seq.*, and of the Rules and Regulations promulgated pursuant thereto by the Commissioner of Commerce, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

Section 1 of the Franchise Agreement, "Grant of Franchise," shall be supplemented with the addition of the following Subsection E, which shall be considered an integral part of the Franchise Agreement.

A.    The Minnesota Department of Commerce requires that PDA indemnify Minnesota franchisees against liability to third parties resulting from claims by third parties that the Franchisee's use of the Proprietary Marks infringes trademark rights of the third party. PDA does not indemnify against the consequences of Franchisee's use of the Proprietary Marks except in accordance with the requirements of this Agreement, and, as a condition to indemnification, Franchisee must provide notice to PDA of any such claim within ten (10) days after the earlier of (i) actual notice of the claim or (ii) receipt of written notice of the claim, and must therein tender the defense of the claim to PDA. If PDA accepts the tender of defense, has the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

B.    Subsection B.8 of Section 2 of the Franchise Agreement, "Term and Renewal," shall be deleted in its entirety and have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Minnesota Franchise Act or the rules and regulations promulgated thereunder by the Commissioner of Commerce.

C.    Subsection B of Section 2 of the Franchise Agreement, "Term and Renewal," shall be supplemented by the following language which shall be an integral part of the Franchise Agreement:

Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes, Section 80C.14, subdivision 4 requires, except in certain specified cases, that franchisees be given written notice of a franchisor's intention not to renew 180 days prior to expiration of the franchise and that the franchisee be given sufficient opportunity to operate the franchise in order to enable the franchisee the opportunity to recover the fair market value of the franchise as a going concern.

D.     Section 11.B.3 of the Franchise Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect and the following shall be substituted in lieu thereof:

> The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as Franchisee may have that have arisen under the Minnesota Franchise Act or the rules and regulations promulgated thereunder by the Commissioner of Commerce;

E.     Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Franchise Agreement:

> **WITH RESPECT TO FRANCHISES GOVERNED BY MINNESOTA LAW, THE FRANCHISOR WILL COMPLY WITH MINN. STAT. SEC. 80C.14, SUBDS. 3, 4, AND 5 WHICH REQUIRE, EXCEPT IN CERTAIN SPECIFIED CASES, THAT A FRANCHISEE BE GIVEN 90 DAYS NOTICE OF TERMINATION (WITH 60 DAYS TO CURE) AND 180 DAYS NOTICE FOR NON-RENEWAL OF THE FRANCHISE AGREEMENT.**

F.     Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection F. which shall be considered an integral part of the Franchise Agreement:

> Minnesota Rule 2610.4400J. deems it an unfair and inequitable practice for any person to require a franchisee to consent to liquidated damages, and any provisions requiring a franchisee to consent to liquidated damages shall no longer have any force or effect.

G.     Section 18 of the Franchise Agreement, "Dispute Resolution," shall be supplemented with the addition of the following paragraph.

> **MINN. STAT. SECTION 80C.21 AND MINN. RULE 2860.4400J PROHIBITS REQUIRING LITIGATION TO BE CONDUCTED OUTSIDE MINNESOTA. IN ADDITION NOTHING IN THE FRANCHISE AGREEMENT CAN ABROGATE OR REDUCE ANY OF YOUR RIGHTS AS PROVIDED FOR IN MINNESOTA STATUTES, CHAPTER 80C, OR YOUR RIGHTS TO ANY PROCEDURE, FORUM, OR REMEDIES PROVIDED FOR BY THE LAWS OF JURISDICTION.**

H.     Minn. Rule 2860-4400J prohibits waiver of a jury trial. All references in the Agreement to waiver of a jury trial are deleted in their entirety.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-7 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____
Name: _____
Title:_____

Witness

FRANCHISEE:

ATTEST:

By:_____
Name:_____
Title:_____

Witness

## 8. NEW YORK ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the New York General Business Law, Article 33, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE LICENSE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A.     Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; provided, however, that all rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York General Business Law, Sections 687.4 and 687.5 be satisfied.

B.     Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; provided, however, that all rights enjoyed by the transferor and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York General Business Law, Sections 687.4 and 687.5 be satisfied.

C.     Subsection H of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee acknowledges that a violation of the terms of this Section 14 would result in irreparable injury to PDA for which no adequate remedy at law may be available, and Franchisee agrees that PDA is entitled to apply for an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 14. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

D.       Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAWS RULES); EXCEPT THAT THE FOREGOING CHOICE OF LAW SHOULD NOT BE CONSIDERED A WAIVER OF ANY RIGHT CONFERRED UPON FRANCHISEE BY THE NEW YORK GENERAL BUSINESS LAW, ARTICLE 33.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-8 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____          Title:_____
Witness

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____          Title:_____
Witness

2

## 9. NORTH DAKOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the laws of North Dakota and the policies of the office of the state of North Dakota Securities Commission, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A.       Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding any provision that requires a North Dakota Franchisee to sign a general release upon renewal of the franchise license agreement. The Commissioner has determined this to be unfair, unjust and inequitable within the intent of Section 51-19-05 of the North Dakota Franchise Investment Law.

B.       Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding any provision that requires a North Dakota Franchisee to sign a general release upon renewal of the franchise license agreement. The Commissioner has determined this to be unfair, unjust and inequitable within the intent of Section 51-19-05 of the North Dakota Franchise Investment Law.

C.       Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Franchise Agreement:

Under Section 51.19.09 of the North Dakota Franchise Investment law, the Commissioner has determined it to be unfair, unjust and inequitable to require a franchisee to consent to liquidated damages. Any provisions requiring a franchisee to consent to liquidated damages shall not have any force or effect.

D.     Section 14 of the Agreement, "Covenants," shall be prefaced by the following paragraph which shall be considered an integral part of the Agreement:

Covenants not to compete during the term of and upon termination or expiration of the Agreement are enforceable only under certain conditions according to North Dakota Law. PDA does not know whether the obligations in Section 14 are enforceable under North Dakota Law.

E.     Subsection E of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect.

F.     Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of North Dakota, the Agreement and this Addendum shall be governed and construed in accordance with the North Dakota Franchise Investment Law, and any provision in the Agreement that is inconsistent with North Dakota law shall have no force and effect..

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-9 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____
Name: _____
Title:_____

Witness

FRANCHISEE:

ATTEST:

By:_____
Name:_____
Title:_____

Witness

**10.    RHODE ISLAND ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Rhode Island Franchise Investment Act; Section 19-28.1-14, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A.    Section 18 of the Franchise Agreement, "Dispute Resolution," is hereby amended by the addition of the following language which shall be considered an integral part of this Agreement:

Any provision in the Agreement restricting jurisdiction or venue to a forum outside of the State of Rhode Island or requiring the application of the laws of a state other than Rhode Island state is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-10 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____    Name: _____

Witness    Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____    Name: _____

Witness    Title:_____

**11.** **SOUTH DAKOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the laws of South Dakota, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

The laws of the State of South Dakota shall supersede any provision of the Agreement which is in conflict with South Dakota law.

A.     Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be considered an integral part of the Franchise Agreement:

Any provision of this Agreement which requires a franchisee to consent to liquidated damages shall not have any force or effect.

B.     Notwithstanding any inconsistent provision in this Agreement, franchise registration, employment, covenants not to compete and other matters of local concern will be governed by the laws of the State of South Dakota. As to contractual and all other matters, the Franchise Agreement will be and remains subject to the construction, enforcement and interpretation of the laws of the State of Texas. Any provision in the Agreement which designates jurisdiction or venue, or requires the franchisee to agree to jurisdiction or venue, in a forum outside of South Dakota, is deleted from any Agreement issued in the State of South Dakota.

C.     No release language set forth in the Agreement shall relieve Franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of South Dakota.

D.     Termination provisions covering breach of the Agreement, failure to meet performance and quality standards, and failure to make royalty payments contained in the Agreement shall afford the Franchisee thirty (30) days written notice with an opportunity to cure said default prior to termination.

E.     Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of South Dakota, the Agreement and this Addendum shall be governed and construed in accordance with South Dakota law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-11 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

## 12. WASHINGTON ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the laws of Washington, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated_____, _____, (the "Agreement") agree as follows:

A.     In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

B.     In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Washington Revised Code Sections 19.100.010 *et seq.*, shall prevail.

C.     Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of Washington, the Agreement and this Addendum shall be governed and construed in accordance with Washington law.

D.     Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD FOR TEXAS CHOICE OF LAW RULES); HOWEVER WASHINGTON LAW WILL GOVERN THE FRANCHISE AGREEMENT UNDER THE JURISDICTION OF THE WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT.**

E.     A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

F.     Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-12 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____
Witness

Name: _____

Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____
Witness

Name:_____

Title:_____

**13.  WISCONSIN ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. Franchise Agreement _____, _____, (the "Agreement") agree as follows:

A.  Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsection 2.E which shall be considered an integral part of the Agreement:

To the extent that the provisions in this Section 2 regarding renewal are inconsistent with the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135 (which, among other things, grants a Franchisee the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the renewal provisions shall be superseded by the Law's requirements and shall have no force or effect.

B.  Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection 12.E which shall be considered an integral part of the Agreement:

To the extent that the provisions in this Section 12 regarding termination are inconsistent with the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135 (which, among other things, grants a Franchisee the right, in most circumstances, to 90 days prior written notice of termination and 60 days within which to remedy any claimed deficiencies), the termination provisions shall be superseded by the Law's requirements and shall have no force or effect.

C.  Section 17 of the Agreement, "Miscellaneous," shall be supplemented with the following language which shall be considered an integral part of the Agreement:

**TO THE EXTENT THAT ANY PROVISION OF THIS AGREEMENT CONFLICTS WITH THE WISCONSIN FAIR DEALERSHIP LAW SUCH PROVISION SHALL BE SUPERSEDED BY THE LAW'S REQUIREMENTS.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-13 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____



# PROPERTY DAMAGE APPRAISERS
## INCORPORATED

# FRANCHISE LICENSE AGREEMENT

*Version: 2011*

**PROPERTY DAMAGE APPRAISERS, INC.**

**FRANCHISE LICENSE AGREEMENT**

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

### TABLE OF CONTENTS

1. GRANT OF FRANCHISE ........................................................................................................2
2. TERM AND RENEWAL.........................................................................................................2
3. PDA ASSISTANCE................................................................................................................4
4. ROYALTY FEES ...................................................................................................................5
5. FRANCHISEE ORGANIZATION .........................................................................................6
6. OBLIGATIONS OF FRANCHISEE .......................................................................................8
7. PROPRIETARY MARKS .....................................................................................................14
8. CONFIDENTIAL OPERATIONS MANUAL .......................................................................16
9. CONFIDENTIAL INFORMATION......................................................................................17
10. ACCOUNTING AND RECORDS ........................................................................................19
11. TRANSFER OF INTERESTS AND ASSIGNMENT OF THIS AGREEMENT .........................20
12. DEFAULT AND TERMINATION .......................................................................................23
13. RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION.........................................27
14. COVENANTS......................................................................................................................29
15. TAXES, PERMITS, AND INDEBTEDNESS.........................................................................31
16. INDEPENDENT CONTRACTOR AND INDEMNIFICATION................................................31
17. MISCELLANEOUS.............................................................................................................34
18. DISPUTE RESOLUTION ....................................................................................................37

**EXHIBIT A** – FRANCHISEE'S OFFICE LOCATION AND MARKETING AREA
**EXHIBIT B** – GENERAL RELEASE AND WAIVER
**EXHIBIT C** – ACKNOWLEDGMENT OF RECEIPT OF OPERATIONS MANUAL
**EXHIBIT D** – FACTORING AGREEMENT
**EXHIBIT E** – ACKNOWLEDGMENT OF RECEIPT OF PDA INFRACTION/COMPLAINT
       REVIEW SYSTEM
**EXHIBIT F** – STATEMENT OF OWNERSHIP INTERESTS
**EXHIBIT G** – GUARANTY AND ASSUMPTION OF OBLIGATIONS
**EXHIBIT H** – SOFTWARE LICENSE AGREEMENT
**EXHIBIT I** – FORM OF MONTHLY REPORT
**EXHIBIT J** – LIMITED POWER OF ATTORNEY FOR CONTACT INFORMATION
**EXHIBIT K** – REQUIRED INSURANCE COVERAGE
**EXHIBIT L** – CONFIDENTIALITY AGREEMENT

**EXHIBIT M** – CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

**EXHIBIT N** – STATE LAW ADDENDA

# PROPERTY DAMAGE APPRAISERS, INC.

## FRANCHISE LICENSE AGREEMENT

THIS FRANCHISE LICENSE AGREEMENT (this "Agreement") is entered into between Property Damage Appraisers, Inc., a Texas corporation ("PDA"), and ___Brian K. Nygaard___ ("Franchisee") on this ___15th___ day of ___September___, ___2011___ (the "Effective Date").

## RECITALS:

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of such appraisal businesses. The Franchisee acknowledges that Franchisee, but for its relationship with PDA under this Agreement or a prior similar agreement with PDA, does not independently know these procedures, techniques, business methods or business policies, or have these business forms or access to PDA's body of knowledge.

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time;

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks");

WHEREAS, Franchisee understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a franchised appraisal business under the PDA System (the "Franchised Business") using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance (however communicated to Franchisee), know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (as amended from time to time in PDA's sole discretion, the "Manual");

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **GRANT OF FRANCHISE**

   A.     PDA hereby grants to Franchisee the non-exclusive license and right, and Franchisee undertakes the obligation, for the Term (as defined below) and on the terms and conditions hereinafter set forth, to operate the Franchised Business solely within the non-exclusive marketing area set forth in Exhibit A (the "Marketing Area") and to use, solely in connection therewith, the Proprietary Marks, the PDA Software (as defined below), the PDA System, the Documentation, and any other confidential information or correspondence provided by PDA to Franchisee, as such may be changed, improved or discontinued by PDA from time to time.

   B.     Franchisee shall devote its full time to the Franchised Business and shall use its best efforts to solicit and provide appraisal services in the Marketing Area and shall market the Franchised Business as required by this Agreement.

   C.     Franchisee assumes all cost, liability, expense and responsibility for locating and obtaining a site for the Franchised Business solely within the Marketing Area. The location and premises for such site (the "Office") shall meet PDA's then-current criteria as set forth in the Manual or otherwise provided to Franchisee in writing, and must be approved by PDA prior to commencing business. The street address of the Office shall be set forth in Exhibit A. Franchisee shall not relocate the Office without the express prior written consent of PDA, and without first completing an Office Change Form in the form provided by PDA. This Agreement does not grant to Franchisee the right or franchise to operate the Franchised Business or to offer to sell any products or services described hereunder at or from any fixed location other than the Office.

   D.     PDA and any other authorized person or entity may, at any time, advertise and promote the PDA System in the Marketing Area and solicit and service any clients for appraisal services, including clients located in the Marketing Area. PDA may itself establish or grant franchises to others to establish a Property Damage Appraisers office using the PDA System and the Proprietary Marks both within and outside the Marketing Area. In addition, PDA may offer and sell (and may authorize others to offer and sell) products and services in the Marketing Area which may be similar to those offered by the Franchised Business under names and marks other than the Proprietary Marks, as well as under the Proprietary Marks.

2. **TERM AND RENEWAL**

   A.     The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue for the duration of the initial term and any renewal terms, unless earlier terminated as provided herein. The initial term of this Agreement shall be five (5) years, commencing on the Effective Date.

   B.     Franchisee may, at its option, renew the franchise granted under this Agreement for three (3) additional consecutive five (5)-year terms subject to the following conditions, all of which must be met prior to and at the time of renewal of each such term, and subject to the other provisions in this Section 2:

      1.     Franchisee must give PDA written notice of Franchisee's election to renew no less than one hundred and eighty (180) days and no more than two hundred and forty (240) days prior to the expiration of the then-current term. Franchisee expressly acknowledges and agrees that giving such notice to PDA does not entitle Franchisee to renewal of the franchise granted hereunder.

2.     Franchisee shall, at Franchisee's sole cost and expense, renovate and modernize to the satisfaction of PDA, the Office and equipment and computer software used in the Office, pursuant to PDA's then-current standards as stated in the Manual.

3.     At the expiration of the then-current term, neither Franchisee nor any subsidiary or affiliate shall be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and PDA or any of its subsidiaries or affiliates; and Franchisee and any subsidiary or affiliate shall have substantially and timely complied with all terms and conditions of such agreements throughout the Term hereof.

4.     Franchisee and its subsidiaries and affiliates shall have satisfied all monetary obligations owed to PDA and its subsidiaries and affiliates and shall have timely met those obligations throughout the Term hereof.

5.     Franchisee shall execute PDA's then-current form of franchise agreement for any renewal term prescribed herein, which agreement shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher royalty fee. Any Designated Person(s) (as defined below), as determined by PDA, shall execute the then-current form of guaranty attached to such franchise agreement.

6.     Franchisee shall comply with PDA's then-current qualification and training requirements as stated in the Manual.

7.     Franchisee shall present appropriate documentation (including but not limited to any leases or ownership documents) satisfactory to PDA that Franchisee has the right to remain in possession of the Office or has found a new location for the operation of the Franchised Business acceptable to PDA for the duration of any renewal term.

8.     Franchisee and all Designated Person(s) shall execute a General Release and Wavier, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders. A copy of PDA's current form of General Release and Waiver is attached hereto as Exhibit B.

C.     Notwithstanding the provisions of Section 2.B above, Franchisee shall have no right to renew this Agreement if PDA, at such time or prior to the expiration of the then-current term, elects, in its sole discretion, to cease offering new or additional Property Damage Appraisers franchises in the Marketing Area or the region or other geographic area reasonably adjacent thereto (and without regard to whether PDA has permitted any other franchisee to renew its franchise). In such event, PDA shall give Franchisee written notice of such determination upon receipt of Franchisee's election to renew.

D.     If Franchisee fails to provide notice as required by Section 2.B above or otherwise fails to satisfy any of the conditions precedent to renewing the franchise, then this Agreement shall, at PDA's sole discretion, (1) continue in full force and effect on a month-to-month basis at the end of the then-applicable term, or (2) expire at the end of the then-applicable term, which shall automatically terminate all of the rights granted hereby without further action by any party, unless applicable law requires that either party give notice to the other prior to the expiration of this Agreement, in which case this Agreement shall remain in effect on a month-to-month basis until such notice requirement has been met.

3.    **PDA ASSISTANCE**

A.    PDA will provide Franchisee with an initial training program in connection with the opening of the Franchised Business, and may provide such other training programs as it deems appropriate.

B.    PDA will provide to Franchisee one (1) hard copy of the Manual, as more fully described in Section 8 hereof, and may provide Franchisee access to an electronic version of the Manual on PDA's password-protected website. PDA may amend the Manual from time to time, and it will be Franchisee's responsibility to stay apprised of any such amendments, by accessing the electronic version of the Manual or otherwise. PDA may, in its sole discretion, provide to Franchisee a hard copy of any such amendment or of a restated copy of the Manual (in which case Franchisee shall immediately return the prior version of the Manual to PDA). Upon receipt of the Manual and any hard copies of amendments thereto or restatements thereof, Franchisee agrees to sign and return  an Acknowledgement of Receipt substantially in the form attached hereto as <u>Exhibit C</u>.

C.    PDA may, but will have no obligation to refer (or to continue to refer) clients to Franchisee. Franchisee shall strictly comply with the requirements and special arrangements prescribed by PDA in rendering services to accounts originated by PDA, including the handling and billing of such accounts.

D.    Upon Franchisee's request, PDA may, in its sole discretion, purchase the accounts receivable of Franchisee attributable to the Franchised Business pursuant to the terms and following the parties' execution of  a Factoring Agreement substantially in the form attached hereto as <u>Exhibit D</u>.

E.    PDA may, in its sole discretion, provide ongoing assistance to the Franchisee from time to time through its field representatives (subject to availability of personnel). Such assistance may include, at PDA's discretion, regional conference calls, regional meetings, site visits and other meetings or phone calls. Franchisee agrees to fully cooperate and make itself available for any phone calls, meetings or site visits that PDA deems necessary.

F.    PDA may, in its sole discretion, provide certain advertising and promotional materials, subject to availability, for Franchisee's use in marketing the Franchised Business, and written materials concerning techniques for managing, marketing and operating the Franchised Business.

G.    PDA expects uniformity and high quality services from all franchisees operating under the PDA System and may conduct audits and/or inspections of the Franchised Business in furtherance thereof and to protect the PDA brand, which audits and/or inspections Franchisee shall permit pursuant to Section 6.L. Franchisee shall comply with any and all uniform standards that may, in PDA's sole discretion, be established by PDA from time to time for operation of the Franchised Business. To ensure compliance with such uniform standards, PDA has established a PDA Infraction/Complaint Review System (as amended from time to time in PDA's sole discretion, the "Infraction System"), the current version of which  is attached at <u>Exhibit E</u>, together with  a form of Acknowledgement of Receipt to be executed by Franchisee in connection with the execution of this Agreement. Amendments to the Infraction System will be provided and acknowledged as amendments to the Manual as set forth in Section 3.B. Franchisee acknowledges and agrees that Franchisee is subject to the terms and conditions of the Infraction System for any violations of the uniform standards.

4. **ROYALTY FEES**

A.    In partial consideration for the rights granted herein, Franchisee shall pay to PDA a royalty fee in an amount equal to fifteen percent (15%) of Franchisee's Gross Invoice Fees (as defined below). During the Term of this Agreement, Franchisee shall submit to PDA a weekly report in a form prescribed by PDA setting forth (i) the Gross Invoice Fees for the prior week's operations and (ii) the amount of the royalty fee to be paid based on the amount of Gross Invoice Fees for such prior week. If no Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee in the manner provided in Section 4.B. If a Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee in the manner provided in Section 4.C.

B.    For the duration of all periods within the Term of this Agreement during which no Factoring Agreement is in effect between Franchisee and PDA, Franchisee shall pay the royalty fee due hereunder (based on the prior week's Gross Invoice Fees) on or before the fifth business day after Franchisee submits its weekly report to PDA. A business day for the purpose of this Agreement means any day other than Saturday, Sunday or a United States bank holiday. Royalty fees shall be paid by personal delivery, regular mail or expedited delivery to PDA at its corporate offices in Fort Worth, Texas or to such other location as PDA may direct, or in the form of an automated clearing house or wire transfer to PDA, or in such other form as PDA may reasonably request from time to time. However, PDA reserves the right, if any payment is overdue more than once within any three (3) consecutive weeks, to require Franchisee to pay all future royalty fees by automated clearing house, wire transfer, certified check, or in such other manner as PDA deems appropriate, and to require that Franchisee enter into a Factoring Agreement with PDA. Franchisee shall promptly execute and cause to be executed all documents requested by PDA to authorize and facilitate such automated clearing house or wire transfers and to authorize the initiation of such automated clearing house or wire transfers by PDA. Franchisee shall not be entitled to withhold any payments due to PDA for any reason. Any payment not actually received by PDA on or before its due date and any payment made by a check that is returned by the bank upon which it is drawn for insufficient funds or for any other reason, shall be deemed overdue.

C.    For the duration of all periods within the Term of this Agreement during which a Factoring Agreement is in effect between Franchisee and PDA, PDA may, in its sole discretion, (i) require Franchisee to pay the weekly royalty fee due hereunder in the manner provided in Section 4.B, or (ii) offset the amount of such payment owed by Franchisee against any sum then or in the future owed by PDA to Franchisee, including, but not limited to, any sums received by PDA for the benefit of Franchisee.

D.    If any payment or fee due under this Agreement is not paid by Franchisee when the payment or fee is due, Franchisee shall pay PDA, in addition to the overdue amount, interest on such amount from the date it was due until paid at a rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. If any interest in excess of the maximum rate allowed by applicable law is provided for, or shall be adjudicated to be so provided in this Agreement, Franchisee shall not be obligated to pay the excess amount of such interest. If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts which may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid to the party that paid such interest. Entitlement to such interest shall be in addition to any other remedies PDA may have at law or in equity, arising under this Agreement or otherwise.

E.    The term "Gross Invoice Fees" as used herein shall mean the sum of all invoice amounts and billings of the Franchised Business from appraisal services of whatever kind or nature, and the sale of all other services or goods, and income of any other kind and nature related to the Franchised Business or

the PDA System generally, whether for cash or credit and regardless of collection in case of credit. Gross Invoice Fees shall include, without limitation, proceeds from business interruption insurance. Gross Invoice Fees shall not include applicable state sales taxes or other taxes collected from clients of the Franchised Business which are transmitted to the appropriate taxing authority. Franchisee shall diligently and vigorously collect all of its accounts receivables relating to the Gross Invoice Fees.

5. **FRANCHISEE ORGANIZATION**

A. If Franchisee is a corporation, limited liability company (LLC), or a partnership, Franchisee and each Designated Person(s), as applicable, represents, warrants, and covenants that, as of the Effective Date of this Agreement and at all times during the Term of this Agreement:

1. Franchisee is duly organized and validly existing under the state law of its formation;

2. Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

3. Franchisee's corporate charter, operating agreement, or written partnership agreement shall at all times provide that the activities of Franchisee are confined exclusively to the development and operation of a property damage appraisal business unless otherwise expressly consented to, in advance, by PDA in writing;

4. The execution of this Agreement and the transactions contemplated hereby are within Franchisee's corporate power if Franchisee is a corporation, or if Franchisee is a LLC or partnership, are permitted under Franchisee's operating agreement or written partnership agreement, respectively;

5. If Franchisee is a corporation, true, correct, and complete copies of the Franchisee's Articles of Incorporation, Bylaws, other governing documents, any amendments to the foregoing, resolutions of the Board of Directors authorizing entry into and performance of this Agreement, and any certificates or other documents as may be reasonably required by PDA shall be furnished to PDA prior to the execution of this Agreement; or, if Franchisee is a partnership, true, correct, and complete copies of the written partnership agreement, other governing documents, and any amendments to the foregoing, shall be furnished to PDA prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by Franchisee's written partnership agreement; or, if Franchisee is a LLC, true, correct, and complete copies of the Articles of Organization, regulations or operating agreement, other governing documents, and any amendments to the foregoing, shall be furnished to PDA, prior to execution of this Agreement;

6. If Franchisee is a corporation, LLC, or partnership, the ownership interests in Franchisee are accurately and completely described in the Statement of Ownership Interests attached hereto as Exhibit F. Further, if Franchisee is a corporation, Franchisee shall maintain at all times a current list of all owners of record and all beneficial owners of any class of equity securities in Franchisee or, if Franchisee is a partnership, Franchisee shall maintain at all times a current list of all owners of an interest in the partnership, or, if Franchisee is a LLC, Franchisee shall maintain at all times a current list of all members, managers and/or officers with an interest in the company. If there is a change in the information contained in Exhibit F, Franchisee shall execute any documents deemed necessary by PDA to amend such exhibit in order to reflect such changes. In consideration for PDA's grant of a franchise to Franchisee hereunder, which grant will inure to the economic benefit of each of the following parties, as

applicable, the spouse of Franchisee (in the case Franchisee is an individual), each officer, director (in case of a corporation or partnership) and member or manager (in the case of a limited liability company) of Franchisee, each holder or owner of a beneficial interest (excluding limited partners) of any class of securities of Franchisee, and any corporation, partnership or limited liability company directly or indirectly controlling Franchisee, if Franchisee is a corporation, partnership or limited liability company, and the general partners of Franchisee and the officers, directors (in the case of a corporation or partnership) and members or managers (in the case of a limited liability company) of, and the holders or owners of a beneficial interest of any class of securities of a general partner that is a corporation, partnership or limited liability company and any corporation, partnership or limited liability company which directly or indirectly controls a general partner of Franchisee, if Franchisee is a partnership, at the discretion of PDA, shall execute a Guaranty substantially in the form attached hereto as Exhibit G and shall be individually bound by all obligations hereunder pursuant to the Guaranty. Each person subsequently elected as officer, director or manager of Franchisee that is approved by PDA shall additionally execute the Guaranty. Such persons, individually and collectively, shall be referred to herein as "Designated Person(s)."

7.  If any officer, director, member or manager of Franchisee shall cease to serve as such or any individual shall be elected as an officer, director, member or manager of Franchisee after the Effective Date, Franchisee shall provide PDA with written notice thereof within seven (7) days subsequent to any such change and any newly elected officer or director shall execute the Guaranty and shall be individually bound by all obligations hereunder pursuant to the Guaranty.

If Franchisee is a corporation, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to and that further assignment or transfer thereof is subject to all restrictions imposed upon assignments by this Agreement. Such statement shall read "Any transfer, sale or other disposition of the stock represented by this certificate is subject to the restrictions contained in that certain Franchise License Agreement dated _____September 15_____, 2011___, by and between Property Damage Appraisers, Inc. and the Company." If Franchisee is a partnership, its written partnership agreement shall provide that ownership of an interest in the partnership is held subject to and that further assignment or transfer of such interest is subject to all restrictions imposed upon assignments by this Agreement. If Franchisee is a LLC, its operating agreement shall provide that ownership of an interest in the company is held subject to and that further assignment or transfer of such interest is subject to all restrictions imposed upon assignments by this Agreement.

8.  If requested by PDA, Franchisee has provided PDA with the most recent financial statements of Franchisee and if required by PDA, the most recent financial statement of any Designated Person(s). Such financial statements present fairly the financial position of Franchisee and such Designated Person(s) at such dates indicated therein and with respect to Franchisee, the results of operations, and its cash flow for the years then ended. Franchisee agrees that it shall maintain at all times, during the Term of this Agreement, sufficient working capital to fulfill its obligations under this Agreement. Each of the financial statements mentioned above has been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the notes thereto, applied on a consistent basis. Franchisee and each Designated Person(s) have no material liabilities, adverse claims, commitments or obligations of any nature as of the Effective Date of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise, which are not reflected as liabilities on the financial statements of Franchisee or such person(s).

B.  Franchisee acknowledges and agrees that the representations, warranties, and covenants set forth above in Sections 5.A.1 through 5.A.9 are continuing obligations of Franchisee during the Term of this Agreement.

6. **OBLIGATIONS OF FRANCHISEE**

A. Upon execution of this Agreement, Franchisee shall designate an individual to serve as the "Operating Principal." The Operating Principal shall, at all times during which he serves as Operating Principal, meet any and all of PDA's standards and criteria for this position, as set forth in this Agreement, in the Manual or otherwise in writing by PDA. Without limiting the foregoing, the Operating Principal shall meet the following qualifications:

1. a. If Franchisee is an individual, Franchisee shall perform the obligations of the Operating Principal.

b. If Franchisee is a corporation, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) directly or indirectly beneficially own at least fifty-one percent (51%) of the shares of each class of Franchisee's issued and outstanding capital stock and (ii) be entitled, under its governing documents and under any agreements among the shareholders, to cast a sufficient number of votes to require the corporation to take or omit to take any action which the corporation is required to take or omit to take under this Agreement.

c. If Franchisee is a partnership, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) own at least a fifty-one percent (51%) interest in the operating profits and operating losses of the partnership as well as at least a fifty-one percent (51%) ownership interest in the partnership (and at least a fifty-one percent (51%) interest in the shares of each class of capital stock of any corporate general partner) and (ii) be entitled under its partnership agreement or applicable law to act on behalf of the partnership without the approval or consent of any other partner or be able to cast a sufficient number of votes to require the partnership to take or omit to take any action which the partnership is required to take or omit to take under this Agreement.

d. If Franchisee is a LLC, the Operating Principal shall, at all times during which he serves as Operating Principal, (i) own at least fifty-one percent (51%) interest in the operating profits and operating losses of the company, as well as at least fifty-one percent (51%) ownership interest in the company and (ii) be entitled under its operating agreement or applicable law to act on behalf of the company without the approval or consent of any other member or be able to cast a sufficient number of votes to require the company to take or omit to take any action which the company is required to take or omit to take under this Agreement.

e. Except as may otherwise be provided in this Agreement, the Operating Principal's interest in the Franchised Business shall be and shall remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options.

2. The Operating Principal shall be involved in the management and the day-to-day operations of the Franchised Business, shall devote full time and best efforts to the management and operation of the Franchised Business and shall be individually, jointly and severally bound by all obligations of Franchisee, the Operating Principal and Designated Person(s) hereunder.

3. If, during the Term of this Agreement, the Operating Principal is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section 6, Franchisee shall promptly notify PDA and designate a replacement within thirty (30) days after the Operating Principal ceases to serve, such replacement being subject to the same qualifications listed above and subject to PDA's prior written approval in its sole discretion. Any failure to comply with this Section 6.A shall constitute an Event of Default (as defined below).

B.     Franchisee acknowledges that it is important to the operation of the PDA System and the Franchised Business that Franchisee and Franchisee's employees receive such training as specified in the Manual or as PDA may require, and to that end agrees as follows:

1.     Franchisee (including the Operating Principal) shall complete, to PDA's sole satisfaction, an initial training program. Training shall be conducted at PDA's corporate offices, the Office or at another location designated by PDA. PDA shall determine, in its sole discretion, whether the Operating Principal has satisfactorily completed the initial training program. If the initial training program is not satisfactorily completed by the Operating Principal, Franchisee shall not commence operation of the Franchised Business until PDA so approves.

2.     Franchisee (including the Operating Principal) shall complete, to PDA's satisfaction, such additional training as PDA may require from time to time, at such times and places as PDA may determine in its sole discretion. For all such programs, PDA will provide the instructors and training materials; provided, however, PDA reserves the right to impose a fee for such additional training programs.

3.     Franchisee (including the Operating Principal) may also attend such optional training programs that PDA may from time to time offer at its sole discretion.

4.     Franchisee shall be solely responsible for and shall pay all of the expenses incurred by Franchisee in connection with any and all training programs, including without limitation, the cost of travel, lodging, meals and wages.

C.     Prior to opening the Office, Franchisee shall, at its sole expense, complete to PDA's satisfaction, all preparations of the Office, including acquisition by purchase or lease and installation of fixtures, furnishings, equipment and supplies as specified in the Manual or other Documentation. Among other items, Franchisee shall acquire by purchase or lease a computer that is compatible with the PDA System and, unless otherwise approved in writing by PDA, certain computer software prescribed by PDA for conducting the Franchised Business. In addition, as a condition to PDA providing to Franchisee certain computer software for the management of the Franchised Business, Franchisee shall execute the Software License Agreement in the form attached hereto as Exhibit H. As used herein, the term "PDA Software" shall mean and refer to the computer software provided by PDA that is identified in the Software License Agreement, as it may be amended from time to time. Within thirty (30) days following completion, to PDA's satisfaction, of pre-opening training as set forth in Section 6.B and such other pre-opening requirements stated above, Franchisee shall open the Franchised Business to the public and commence operations. However, if Franchisee has not commenced operation of the Franchised Business within forty-five (45) days after the Effective Date of this Agreement, for whatever reason, then PDA may terminate this Agreement immediately upon written notice to Franchisee. Time is of the essence.

D.     Franchisee agrees to utilize competent, ethical, conscientious, trained and fully licensed (if applicable) employees or independent contractors to perform appraisal services under the PDA System as required by this Agreement and in the Manual or other written directives of PDA. Franchisee shall not permit appraisal services to be performed by any individual other than Franchisee, the Operating Principal or an employee or independent contractor fully satisfying the uniform standards of the PDA System. Franchisee shall preserve good customer relations and comply with such customer relation policies as PDA may prescribe in the Manual or otherwise. To ensure that the highest degree of quality and service is maintained, Franchisee and, where applicable, each Designated Person(s) shall operate the Franchised Business in conformity with such uniform standards, techniques, and procedures as PDA may from time to time prescribe in the Manual or otherwise in writing, and shall refrain from deviating therefrom without PDA's prior written consent. PDA shall have the right to audit and/or inspect Franchisee's

operations to determine Franchisee's compliance with PDA's standards, techniques, and procedures, and Franchisee acknowledges and agrees that Franchisee shall be subject to the Infraction System. In order to ensure compliance with all applicable requirements of the PDA System, Franchisee and each Designated Person(s) further agree:

1. To perform all types of appraisal services and related services authorized by PDA as part of the PDA System, and to refrain from performing any services which are not expressly authorized by PDA as part of the System or for which personnel of Franchisee are not qualified, as determined by PDA, in its sole discretion.

2. To maintain the Office in a clean, orderly condition and in good repair and in conformity with the standards, specifications and requirements of the PDA System, as may be designated by PDA from time to time.

3. Except as otherwise approved in writing by PDA, to keep the Franchised Business open and in operation for such minimum number of days and hours as prescribed in the Manual or as PDA may specify from time to time in writing.

4. To keep PDA currently advised on such information concerning Franchisee's personnel as PDA may request.

5. To use only the forms and procedures approved by PDA from time to time in its sole discretion.

6. To assure that all appraisers of Franchisee execute and deliver to PDA a Confidentiality Agreement substantially in the form set forth in Exhibit L attached hereto. Failure by Franchisee to assure such execution and delivery will be deemed a breach of Franchisee's confidentiality obligations hereunder.

7. To not accept, directly or indirectly, any bribe or kickback regardless of monetary value, nor to accept any gift, favor or gratuity which may affect, or appear to influence, Franchisee's business judgment, except tokens of appreciation having an aggregate monetary value of $25 or less per occurrence.

8. To not use body shop or contract estimates without making its own independent estimates and investigations.

9. To not purchase or sell any type of salvage unless expressly approved by PDA in writing.

10. To not be involved in any activity that may create a conflict of interest unless any such conflict is fully disclosed to PDA and PDA expressly waives any such conflict in writing.

E. Franchisee shall repair or replace, at Franchisee's cost and expense, any computer hardware, software other than the PDA Software (which shall be repaired or replaced pursuant to the terms of the Software License Agreement), supplies and other products and materials required for the operation of the Franchised Business as necessary, desirable or required by PDA and shall obtain, at Franchisee's cost and expense, any new or additional computer hardware, software or PDA Software, supplies and other products and materials which may be reasonably required by PDA to comply with the then-current standards of the PDA System.

F.    1.    Franchisee acknowledges the importance of its involvement in the promotion of the Franchised Business and specifically, promotion of Franchised Business' services in the Marketing Area. Franchisee shall actively promote the sale of appraisal services under the PDA System in the Marketing Area during the Term of this Agreement. Without limiting the foregoing, unless otherwise approved in writing by PDA, Franchisee shall devote not less than ten (10) hours per calendar month to promoting and marketing the sale of appraisal services under the PDA System. Franchisee shall maintain a written monthly report in the form specified in Exhibit I, detailing the promotional activities undertaken in the previous month, including time spent on each activity and an up-to-date mailing list and client contact list with names, addresses and telephone numbers; upon PDA's request, Franchisee shall furnish any and all such reports to PDA within seven (7) days of such request.

2.    Franchisee shall only use advertising and promotional materials furnished by PDA or approved in advance by PDA in writing, and shall cease using any material, including previously approved material, immediately upon notice from PDA. All advertising and promotional materials shall comply with PDA's advertising standards and shall indicate that Franchisee is a franchisee of the Franchised Business. Franchisee shall not advertise or use in advertising or any other form of promotion, the trademarks or service marks of PDA without appropriate ©, ®, $^{TM}$, or $^{sm}$ designations as are appropriate. Franchisee agrees to comply with PDA's trademark usage policy contained in Section 7 of this Agreement, as amended by PDA from time to time notwithstanding the provisions of Section 17.I.

3.    Franchisee shall not issue any statements to the media whatsoever, including but not limited to any opinions on the potential effect of natural disasters on the damage appraisal industry in general or on the Franchised Business in particular, without the prior written consent of the Vice President of Franchise Relations for PDA.

G.    Franchisee agrees to maintain a telephone line acceptable to PDA and, if Franchisee does not maintain commercial space in the city or other geographic area in which the Office is located as described in Exhibit A, then Franchisee also shall maintain a post office box in such city or geographic area. Franchisee understands and agrees that the telephone number(s) and any post office box(es) for the Franchised Business constitute a part of and the use and maintenance thereof are essential to, the PDA System. Accordingly, Franchisee agrees:

1.    To provide the applicable local telephone company and post office with notice, in a form satisfactory to PDA, stating that PDA will be entitled to all telephone number(s) and post office box(es) utilized by Franchisee in the conduct of the Franchised Business for the duration of this Agreement and following expiration or termination of this Agreement. Accordingly, upon execution of this Agreement and at any time during the Term hereof, Franchisee shall execute such forms and documents as PDA deems necessary, including but not limited to a Limited Power of Attorney substantially in the form attached hereto as Exhibit J, to irrevocably appoint PDA its true and lawful agent and attorney-in-fact with full power and authority for the sole purpose of assigning to PDA all rights to the telephone number(s), post office box(es) and any business listings upon expiration or termination of this Agreement.

2.    Franchisee shall not at any time during the Term of this Agreement change or allow to be changed the telephone number(s) or post office box(es) for the Franchised Business without the prior written consent of PDA.

3.    Except as may be required in connection with any express written assignment to PDA, nothing contained herein shall obligate PDA to pay any charges incurred by Franchisee for telephone services, or any form of advertising, including, but not limited to, telephone advertising and listings or for Franchisee's post office box(es).

H.    1.    Franchisee shall procure upon execution of this Agreement, and maintain in full force and effect during the entire Term of this Agreement, at Franchisee's sole expense, insurance policies protecting Franchisee, PDA and PDA's subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, agents and independent contractors, against any demand or claim with respect to personal injury, death or property damage or any loss, liability or expense whatsoever arising out of or occurring upon or in connection with the operation of the Franchised Business (the "Required Insurance"). To the extent any Required Insurance policies are offered through a national insurance program administered by PDA (the "Required National Program"), Franchisee shall participate in and purchase such applicable Required Insurance policies through the Required National Program. Franchisee shall purchase all other Required Insurance only from insurance companies having a Bests Key Rating Guide of A-VIII or better and approved by PDA. Any and all deductibles and/or self insured retentions are the sole responsibility of Franchisee. No such Required Insurance policy may have a deductible that exceeds $5,000, which such deductible shall be the responsibility of Franchisee. The Required Insurance policies shall include, at a minimum, the coverages specified on <u>Exhibit K</u>, which exhibit identifies the policies offered as of the Effective Date by, and which must be purchased through, the Required National Program.

2.    Franchisee's obligation to obtain and maintain the Required Insurance set forth in <u>Exhibit K</u> shall not be limited in any way by reason of any insurance which may be maintained by PDA, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 16. Each of the policies shall contain a contractual coverage endorsement specifically insuring the performance by Franchisee of the applicable indemnity provision(s) set forth in Section 16.

3.    All Required Insurance policies shall contain a provision that Franchisee's insurance coverage shall be primary to any coverage maintained by PDA, and that PDA shall be entitled to recover under Franchisee's policies for any loss occasioned to PDA, its subsidiaries, affiliates, successors and assigns, and their respective officers, directors, shareholders, employees, agents and independent contractors, for whatever reason. All Required Insurance policies also shall contain a waiver of Franchisee's right of subrogation, and Franchisee's workers compensation policies shall contain an alternate employer endorsement in favor of PDA.

4.    Upon execution of this Agreement and, thereafter, at least thirty (30) days prior to the expiration of any such Required Insurance policy, Franchisee shall deliver to PDA certificates of insurance and, if requested by PDA, true, correct, and complete copies of the applicable insurance policies evidencing the proper coverage with limits not less than those required hereunder. All Required Insurance policies and certificates required hereunder, with the exception of Workers' Compensation (or any legally appropriate alternative approved by PDA), shall name PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, agents, and independent contractors as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions. Further, all Required Insurance policies and certificates shall expressly provide that not less than thirty (30) days' prior written notice shall be given to PDA in the event of a material alteration to or cancellation of the policies.

5.    All of Franchisee's personal property, equipment, furniture, supplies and tangible items in, on or around the Office shall be at the risk of Franchisee only, and PDA shall not be liable for any damage thereto or theft thereof, even if due in whole or in part to the negligence of PDA. No party will have any right or claim against any of the Indemnitees (as hereafter defined) for any property damage (whether caused by negligence or the condition of the Office or any part thereof) by way of subrogation or assignment, such parties hereby waiving and relinquishing any such right. To the extent any such property is insured, Franchisee shall request the insurance carrier to endorse all applicable policies

-12-

waiving the carrier's right of recovery under subrogation or otherwise in favor of any of the Indemnitees and provide a certificate of insurance to PDA verifying this waiver.

            6.      Should Franchisee, for any reason, not procure and maintain the Required Insurance, PDA shall have the right, but not the obligation, to procure such insurance, and upon notice Franchisee will immediately pay and reimburse PDA for all costs of same. The foregoing remedies shall be in addition to any other remedies at law or in equity or under this Agreement that PDA may have.

            I.      Franchisee shall immediately notify PDA in writing of the receipt of any complaint or claim of any nature relating, directly or indirectly, to the operation of the Franchised Business or of the commencement of any action, suit, or proceeding against Franchisee, or any Designated Person(s), and of the issuance of any inquiry, subpoena, order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which arises out of, concerns, or may affect the operation or financial condition of the Franchised Business, including, without limitation, any action or proceeding brought by Franchisee against employees, clients, or other persons. Without limiting the foregoing, Franchisee shall notify PDA of its intent to initiate any civil or criminal action against a client or employee relating to the operation of the Franchised Business at least (30) days before initiating such action.

            J.      Franchisee understands and agrees that due to changes in competitive circumstances or presently unforeseen changes in the needs of clients, the PDA System is subject to change, in order that it best serve the interests of PDA, Franchisee and the PDA System. Accordingly, Franchisee expressly acknowledges and agrees that PDA may from time to time change the PDA System including, but not limited to, altering the programs, services, methods, uniform standards, forms, policies and procedures of the PDA System; adding to, deleting from or modifying those programs and services which the Franchised Business is authorized to offer; and changing, improving or modifying the Proprietary Marks. Franchisee expressly agrees to abide by any such modifications, changes, additions, deletions and alterations and expressly acknowledges and agrees that Franchisee is subject to the Infraction System to ensure compliance with all of the standards of the PDA System.

            K.      Franchisee, at its sole cost and expense, shall comply with all federal, state and local laws, ordinances and regulations, as applicable, and shall timely obtain and maintain any and all permits, certificates or licenses necessary for the operation of the Franchised Business. Franchisee shall submit copies of all such permits, certificates and licenses to PDA upon its request.

            L.      Franchisee shall permit, or shall secure permission for, PDA and its agents to enter the Office at any time during normal business hours, without notice, for the purpose of conducting audits or inspections or rendering such assistance as PDA deems reasonably necessary. Upon notice from PDA, and without limiting PDA's other rights under this Agreement or applicable law, Franchisee shall take such steps as may be necessary to immediately correct any deficiencies detected during any such audit or inspection. Should Franchisee, for any reason, fail to immediately correct such deficiencies , PDA shall have the right, but not the obligation, in addition to any of PDA's other rights under this Agreement or applicable law, to correct any deficiencies which may be susceptible to correction by PDA and to charge Franchisee a fee for PDA's expenses in so acting, such fee to be payable by Franchisee upon demand.

            M.      PDA may approve exceptions or changes from the uniform standards of the PDA System, which PDA, in its sole discretion, believes necessary or desirable under any particular circumstances. Franchisee understands that it has no right to object to or to obtain such variances, and that any exception or change from the uniform standards for Franchisee's operation of the Franchised Business must be approved in advance by PDA in writing. Franchisee acknowledges that certain variances may be granted to a franchisee or some franchisees and not others. The granting of such variances shall not entitle Franchisee to like or similar variances. Franchisee also recognizes that some franchisees may operate

under different forms of agreements, and their rights and obligations under those agreement may differ materially from the rights and obligations of Franchisee hereunder.

        N.     Franchisee shall properly and timely perform all other obligations of Franchisee as stated herein.

## 7.    **PROPRIETARY MARKS**

        A.     It is understood and agreed that the franchise granted herein provides Franchisee the non-exclusive license to use only in the Marketing Area in connection with the Franchised Business the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ as well as any trademarks, services marks, or trade names as PDA may develop and designate for use in connection with the PDA System. With respect to Franchisee's authorized use of such Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

        1.     Franchisee shall use only those Proprietary Marks designated by PDA in writing, and shall use them only in the manner authorized and permitted by PDA pursuant to this Agreement;

        2.     Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of PDA's rights;

        3.     Franchisee shall not use any Proprietary Marks as part of any corporate or trade name or with any prefix, suffix or other modifying or extraneous words, terms, designs or symbols (including but not limited to any religious symbols), or in any modified form, nor may Franchisee use any Proprietary Marks in connection with the sale of any unauthorized service or product or in any other manner not expressly authorized in writing by PDA. Franchisee agrees to display the Proprietary Marks prominently and in the manner prescribed by PDA on or in connection with signs, posters, displays, service contracts, stationery and other forms PDA designates. Further, Franchisee agrees to give such notices of trademark or service mark registrations and copyrights as PDA specifies and to obtain such fictitious or assumed name registrations as may be required under applicable law;

        4.     All bank accounts, licenses, permits or other similar documents shall contain the actual name of the person or entity owning the Franchised Business. Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of PDA;

        5.     Franchisee shall not use the Proprietary Marks as part of any corporate or other legal name and Franchisee shall not license, register or purchase vehicles, fixtures, products, supplies or equipment, or perform any other activity or incur any obligation or indebtedness except in its individual, corporate or other business name;

        6.     Franchisee shall comply with PDA's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by PDA or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability;

        7.     Franchisee's corporate or legal name must be displayed conspicuously on all licenses and permits required for the operation of the Franchised Business, on all tax returns, on all stationery and business cards, and on all contractual agreements entered into by Franchisee with respect to the Franchised Business. The format for the display of Franchisee's own name in conjunction with the Proprietary Marks must be approved in advance in writing by PDA.

B.     Franchisee acknowledges PDA's sole ownership of the Proprietary Marks and the goodwill associated with and symbolized by them and that Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or any other interest in or to the Proprietary Marks, except the non-exclusive license granted by this Agreement. Franchisee shall not directly or indirectly contest the validity of PDA's ownership or validity of the Proprietary Marks. Any and all goodwill arising from Franchisee's use of the Proprietary Marks in its operations under the PDA System shall inure solely and exclusively to PDA's benefit and upon the expiration or earlier termination of this Agreement and the non-exclusive license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the PDA System or the Proprietary Marks.

C.     Franchisee shall immediately notify PDA in writing of any apparent infringement of or challenge to Franchisee's use of any Proprietary Marks, or claim by any person of any rights in any Proprietary Marks or any similar trade name, trademark or service mark of which Franchisee becomes aware. Franchisee shall not communicate with any person other than PDA and its counsel and Franchisee's legal counsel in connection with any such infringement, challenge or claim. PDA and its affiliates shall have sole discretion to take such action as they deem appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Proprietary Marks. Franchisee agrees to execute any and all instruments and documents, render such assistance and do such acts and things as may, in the reasonable opinion of PDA's counsel, or the counsel of PDA's affiliates, be necessary or advisable to protect and maintain the interests of PDA and its affiliates in any such litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding or to otherwise protect and maintain the interests of PDA and its affiliates in the Proprietary Marks.

D.     Franchisee acknowledges and agrees that the right to use the Proprietary Marks is not exclusive to Franchisee, and that PDA has the right to grant other licenses for use of the Proprietary Marks, to develop and license other marks in conjunction with other business systems on any terms and conditions as PDA deems advisable and to engage, directly or indirectly, in the license and sale of products and services, and the use in connection with such license and sale, of the Proprietary Marks and any other trademarks, trade names, service marks, logos and other identifying characteristics as may be developed from time to time by PDA.

E.     PDA reserves the right to add or substitute different trade names, service marks, trademarks, logos, emblems and indicia of origin for the Proprietary Marks for use in identifying the PDA System and the business operating thereunder if PDA's currently used Proprietary Marks no longer can be used, or if PDA, in its sole discretion, determines that the addition or substitution of different trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin will be beneficial to the PDA System. In such event, Franchisee shall, at Franchisee's expense, discontinue or modify Franchisee's use of any of the Proprietary Marks or use one or more additional or substitute trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin as required by PDA.

F.     If it becomes advisable at any time, in PDA's sole discretion, for PDA and/or Franchisee to modify or discontinue use of any Proprietary Marks, and/or use one or more additional or substitute trademarks or service marks, Franchisee agrees to comply therewith a reasonable time after notice thereof by PDA.

G.     Franchisee acknowledges PDA's prior rights in and to the Proprietary Marks and that Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of Franchisee's business pursuant to and in compliance with this Agreement and all applicable

specifications, standards and operating procedures prescribed by PDA from time to time during the term of this Agreement. Any unauthorized use of the Proprietary Marks by Franchisee shall constitute an infringement of the rights of PDA in and to the Proprietary Marks. Franchisee agrees that all usage of the Proprietary Marks by Franchisee and any goodwill established thereby shall inure to the exclusive benefit of PDA, and Franchisee acknowledges that this Agreement does not confer any goodwill or other interest in the Proprietary Marks upon Franchisee. All provisions of this Agreement applicable to the Proprietary Marks shall apply to any additional trademarks, service marks, logo forms and commercial symbols hereafter authorized for use by and licensed to Franchisee pursuant to this Agreement. All products, services, and any sales, marketing or promotional programs concerning same, which are developed presently or in the future by or on behalf of Franchisee in conjunction with, for use in, or arising from or related to the Franchised Business are irrevocably and permanently licensed to PDA for no additional charge to become part of PROPERTY DAMAGE APPRAISERS System and for subsequent use by PDA and its affiliates and, if PDA determines, other PROPERTY DAMAGE APPRAISERS franchisees.

## 8.    CONFIDENTIAL OPERATIONS MANUAL

A.    Franchisee shall retain its hard copy of the Manual provided by PDA, and any hard copies of amendments thereto or restatements thereof , for so long as this Agreement remains in effect. Franchisee acknowledges and agrees that the Manual is at all times to be kept confidential and is to be returned upon PDA's request or upon the termination of this Agreement for any reason.

B.    Franchisee understands and acknowledges that every detail of the PDA System and each franchised business operated by a PDA franchisee is important to Franchisee, PDA, and the other franchisees of PDA in order to develop and maintain high operating standards, to increase the demand for the products and services offered by all facilities operating under the PDA System, and to protect PDA's reputation and goodwill. Accordingly, Franchisee will operate the Franchised Business in strict accordance with the provisions, standards and procedures as may be set forth in the Manual, the Documentation, the other written directives which PDA may issue from time to time, and any other manuals and materials created or approved for use in the operations of the Franchised Business, and will not operate the Franchised Business in such a manner as to damage the goodwill and trade reputation of PDA, other PDA franchisees and/or the Proprietary Marks. Franchisee shall maintain PDA's high standards with respect to facilities, services, products and operations. Franchisee shall keep the Franchised Business open and in normal operation for such minimum hours and days as PDA may specify in the Documentation from time to time.

C.    Franchisee shall at all times treat the Manual, any other manuals created for or approved for use in the operation of the Franchised Business, the Documentation and the information contained therein as confidential, and shall not at any time, without the prior written consent of PDA, disclose, copy, duplicate, record, or otherwise reproduce, in whole or in part, or otherwise make available to any unauthorized person or source, the contents of the foregoing materials, and shall maintain such information as secret and confidential. Any disclosure of any of the contents of the Manual by Franchisee to any third party constitutes an Event of Default under this Agreement.

D.    The Manual shall at all times remain the sole property of PDA, and shall be kept in a secure place in the Office.

E.    PDA may, from time to time, revise the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed provision thereof .

F.     Franchisee shall at all times ensure that its copy of the Manual is kept current and up to date; and in the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by PDA at PDA's corporate office shall be controlling.

9.     **CONFIDENTIAL INFORMATION**

A.     For purposes of this Agreement, "Trade Secrets" means any confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA Software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee or Franchisee's Operating Principals or employees containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business.

B.     Franchisee agrees that both during the Term of this Agreement and after the Term of this Agreement:

1.     Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents (together "Franchisee Parties"), use or duplicate in any way for their own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of this Agreement;

2.     Franchisee shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Franchisee may disclose to its employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of this Agreement, and Franchisee may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.     Franchisee shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Franchisee uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Franchisee shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Franchisee shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Franchisee shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

C.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Franchisee's possession. No license to the Franchisee of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Franchisee shall ensure that Franchisee's copy of any Trade Secrets are kept current at all times and are kept in a secure place at the Office. Franchisee agrees that any goodwill that may arise from Franchisee's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

D.     At the request of PDA, Franchisee shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Franchisee agrees to notify and instruct Franchisee's employees and Operating Principals regarding the confidential nature of the Trade Secrets. Franchisee agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Franchisee shall be liable for any loss or damage arising from a breach of this Section 9 by Franchisee, Franchisee's Operating Principals, or Franchisee's employees or agents.

E.     Franchisee shall require all Franchisee's independent contractors performing appraisal services on Franchisee's behalf or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute and deliver to PDA a Confidentiality Agreement substantially in the form attached hereto as Exhibit L. Failure by Franchisee to assure such execution and delivery will be deemed a breach of Franchisee's confidentiality obligations hereunder. Franchisee shall sign and shall ensure that any of its employees, Designated Persons, and Operating Principals who have access to Trade Secrets sign a Confidentiality Agreement and Ancillary Covenants Not to Compete substantially in the form attached hereto as Exhibit M, prior to any disclosure of Trade Secrets to such employees. Franchisee shall ensure that any parties who execute such agreements act as required by such agreements.

F.     Franchisee acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Franchisee or any of its Designated Persons or employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Franchisee hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Franchisee or any Designated Person or employee of Franchisee jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Franchisee agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its Designated Persons and employees, Franchisee (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Franchisee now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Franchisee or such Designated Persons or employees.

G.     Franchisee acknowledges that any failure to comply with the requirements of this Section 9 shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee or any Designated Person(s) in violation of the terms of this Section 9. Franchisee agrees to pay all court costs and attorneys' fees incurred by PDA in

obtaining specific performance of, or an injunction against a violation of, the requirements of this Section 9. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

H.     All appraisals, data, and other information prepared by Franchisee, its Designated Persons, employees or independent contractors in connection with the performance of appraisal services on behalf of the Franchised Business (1) shall constitute confidential information subject to the confidentiality restrictions and protections for Trade Secrets hereunder, and (2) shall not be used or disclosed by Franchisee, its Designated Persons, employees, or independent contractors in violation of any provision of this Section or the Confidentiality Agreements at Exhibit L and Exhibit M, nor for any purpose other than to carry on the ordinary course of the Franchised Business.

10.    **ACCOUNTING AND RECORDS**

A.     Franchisee shall maintain during the Term of this Agreement, and shall preserve for the time period specified in the Manual, full, complete, and accurate books, records, and accounts in accordance with the accounting system prescribed by PDA in the Manual or otherwise. Franchisee shall keep current and accurate financial records for the operation of the Franchised Business in accordance with generally accepted accounting principals on a consistent basis, and upon PDA's request shall provide PDA with complete and accurate weekly reports (as prescribed in Section 4.A), and balance sheets, income statements and other financial statements of Franchisee as may be prescribed in the Manual or otherwise by PDA for each calendar quarter and calendar year. If required by PDA, each such statement shall be delivered to PDA within sixty (60) days after the last day of the applicable calendar quarter or year, as the case may be. Franchisee shall additionally provide PDA with a copy of any other financial reports and operating statements prepared for Franchisee with respect to the Franchised Business. If at any time Franchisee is required to furnish any lender, lessor, government agency or other person(s) audited financial statements with respect to Franchisee or the Franchised Business, Franchisee shall concurrently furnish PDA with a copy of such audited financial statements.

B.     Franchisee acknowledges that any failure to comply with the requirements of this Section 10 shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee or any Designated Person(s) in violation of the terms of this Section 10. Franchisee agrees to pay all court costs and attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Section 10. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise including but not limited to the termination of this Agreement.

C.     PDA or its designees shall have the right at any time during normal business hours, without notice, to examine and copy, at PDA's expense, the books, records and tax returns of Franchisee and the Franchised Business. PDA shall also have the right, at any time, to have an independent audit made of the books of Franchisee. If any audit reveals that Franchisee had understated Gross Invoice Fees in any report or statement, then Franchisee shall immediately pay PDA the additional amount of fees owing as a result of such understatement, together with interest as provided in Section 4.D. If an audit reveals that Gross Invoice Fees have been understated in any report or statement by two percent (2%) or more, Franchisee shall additionally pay and reimburse PDA for all costs of the audit, including without limitation, travel, lodging, meals and wage expenses and accounting and legal fees. These remedies shall be in addition to any other remedies PDA may have at law or in equity. If, however, any audit reveals that Franchisee has overstated Gross Invoice Fees and that Franchisee has therefore overpaid any fees, the

-19-

amount of the overpayment, without interest, shall be credited toward Franchisee's future fees or payment on future invoices.

11. **TRANSFER OF INTERESTS AND ASSIGNMENT OF THIS AGREEMENT**

      A.    PDA has the right to effect any corporate transaction during the Term of this Agreement, including without limitation, to sell its assets, the Proprietary Marks or the PDA System to a third party; to merge, acquire other corporations or partnerships or be acquired by another corporation or partnership; to undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and to cease operating, and to cease operating franchises, at any time for any reason. With regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of the Proprietary Marks or the PDA System against PDA hereunder. Nothing contained in this Agreement shall require PDA to remain in the business of operating or licensing Property Damage Appraisers' businesses or to offer any services or products, whether or not bearing the Proprietary Marks, to Franchisee, if PDA exercises its rights hereunder to assign its rights in this Agreement. PDA shall have the right to transfer or assign all or any part of its rights or obligations under this Agreement to any person or legal entity without Franchisee's consent.

      B.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that PDA has granted this franchise in reliance on the business skill, financial capacity, business reputation and personal character of Franchisee. Accordingly, neither Franchisee nor any successor or assign to any part of Franchisee's interest in this Agreement or the Franchised Business, nor any individual, partner, partnership, corporation, or other legal entity (including any Designated Person(s)) which directly or indirectly owns any interest in this Agreement, the Franchised Business or in Franchisee (if Franchisee is a partnership, corporation or other legal entity) shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement (including any of Franchisee's rights or obligations hereunder), the Franchised Business or Franchisee without the prior written consent of PDA, and only upon the following conditions in this Section 11.B. Any purported assignment or transfer, by operation of law or otherwise, not having the prior written consent of PDA required by this Section 11.B shall be null and void.

      1.    All of Franchisee's and any affiliate's or subsidiary's accrued monetary obligations and all other outstanding obligations to PDA and any affiliate or subsidiary of PDA shall have been satisfied in a timely manner and Franchisee and any subsidiary or affiliate shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner.

      2.    Neither Franchisee nor any subsidiary or affiliate shall be in default of any provision of this Agreement, any amendment hereof or successor hereto, any other agreement between Franchisee and PDA or its subsidiaries and affiliates, or any lease, license, loan or other agreement which relates to the Franchised Business.

      3.    The transferor and any subsidiary or affiliate shall have executed a general release and waiver, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective offices, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances.

      4.    The transferee shall enter into a written agreement, in a form prescribed by PDA, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement and any related

agreements with any subsidiary or affiliate of PDA; and, if the obligations of Franchisee were guaranteed by Designated Person(s), the designated person(s) of the transferee shall guarantee the performance of all such obligations in writing in a form prescribed by PDA.

5.     The transferee shall demonstrate to PDA's sole satisfaction that it meets PDA's education, managerial, and business standards; has obtained all permits and licenses required to operate the Franchised Business and is in good standing with any governmental agency or instrumentality responsible for regulating same; possesses a good moral character, business reputation, and credit rating; has the aptitude, technical knowledge and ability to conduct the business franchised herein (as may be evidenced by prior related business experience or otherwise); has adequate financial resources and capital to operate the Franchised Business; and the appropriateness of the geographic proximity of other areas in which the transferee operates other Property Damage Appraisers appraisal businesses, in relation to the Marketing Area.

6.     The transferee shall execute, for a term ending on the expiration of the then-current initial or renewal term of this Agreement, the standard form Franchise License Agreement then being offered to new franchisees under the PDA System and other ancillary agreements as PDA may require for the Franchised Business, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher royalty fee; and if the obligations of Franchisee were guaranteed by Designated Person(s), the transferee's designated person(s) shall guarantee the performance of all such obligations pursuant to the then current form of guaranty attached to the Franchise License Agreement.

7.     The transferee shall, at its sole cost and expense, renovate and modernize to the satisfaction of PDA, the Office and the equipment and computer software used in the Office, pursuant to PDA's then-current standards as stated in the Manual, and shall complete the upgrading and other requirements within the time specified by PDA.

8.     The transferor shall remain liable for all obligations to PDA in connection with the Franchised Business incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by PDA to evidence such liability.

9.     At the transferee's expense, the transferee and the transferee's Operating Principal, if any, shall complete any training programs then in effect for PDA System franchisees as then specified in the Manual or otherwise upon such terms and conditions as PDA may reasonably require.

10.    Franchisee shall pay a transfer fee of Two Thousand Dollars ($2,000.00), or such greater amount as PDA may require from time to time in its sole discretion, including but not limited to such additional amounts as may be necessary to reimburse PDA for its costs and expenses associated with reviewing the applicant for transfer, including, without limitation, legal and accounting fees.

11.    If the transferee is a corporation, Limited Liability Company, or a partnership, transferee shall be made and will be bound by any or all of the representations, warranties and covenants in Section 5, as PDA requests. The transferee shall provide to PDA evidence satisfactory to PDA that such representations, warranties and covenants have been satisfied and are true and correct on the date of transfer.

12.    No part of any interest of Franchisee under the provisions of this Agreement will be subject to attachment, garnishment, levy, or seizure by any creditor or any other person claiming against or in the right of Franchisee under any proceeding or writ at law or in equity. Except with the

prior written consent of PDA, Franchisee agrees not to pledge or encumber this Agreement or any rights created hereunder.

13.    Franchisee acknowledges and agrees that each condition which must be met by the transferee is necessary to assure such transferee's full performance of the obligations hereunder.

C.    1.    Any party holding any interest in Franchisee or in the Franchised Business who desires to accept any bona fide offer from a third party to purchase such interest shall promptly notify PDA in writing of such offer, with such notice including the name and address of the proposed purchaser, the amount of the proposed purchase price, a copy of the proposed purchase contract, all of the terms and conditions of such offer and all other information requested by PDA. PDA shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that PDA intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event PDA elects to purchase the seller's interest, the closing on such purchase shall occur within sixty (60) days of the date of notice to the seller of the election to purchase by PDA, or as may be extended by the parties. Failure of PDA to exercise the option provided for by this Section 11.C shall not constitute a waiver of any other provision in this Agreement, including all of the requirements of Section 11.B, with respect to a proposed transfer.

2.    If the offer from the third party provides for payment of consideration other than cash or involves certain intangible benefits, PDA may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash consideration offered by a third party, an independent appraiser shall be designated by PDA to determine such amount, and his determination shall be binding. PDA shall have the right to set off the cost of any such appraisal against any payment made hereunder.

3.    In the event PDA waives its right of first refusal and approves the transfer in accordance with Section 11.B above, then, subject to the other terms and provisions of the Agreement, including, but not limited to, PDA's approval requirements set forth in Section 11.B hereof, Franchisee shall be free to consummate the sale between it and the third party indicated in the notice to PDA on the same terms and conditions indicated in said notice. If such sale is not consummated within sixty (60) days, or if there is a material variance in the terms and conditions of sale, Franchisee's right to consummate such sale to the third party shall terminate and Franchisee shall be required to comply with all the provisions of this Section 11 with respect to any further proposed transfer.

D.    1.    Upon the death of any person with an interest in the Franchised Business or in Franchisee (the "Deceased"), the executor, administrator, or other personal representative of the Deceased shall transfer such interest to a third party approved by PDA within twelve (12) months after the death. If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by PDA. If the distributee is not approved by PDA, then the distributee shall transfer such interest to a third party approved by PDA within twelve (12) months after the death of the Deceased.

2.    Upon the permanent disability of any person with an interest in the Franchised Business or in Franchisee, PDA may, in its sole discretion, require such interest to be transferred to a third party approved by PDA within six (6) months after notice to Franchisee. "Permanent disability" of a person shall mean that person's failure, refusal or inability, whether for physical, emotional, or mental reasons, or the determination of a licensed practicing physician selected by PDA that the person is unable, to perform the person's obligations to the Franchised Business or as otherwise set forth in this Agreement for a period of ninety (90) or more consecutive days. If the person refuses to submit to an examination, then PDA will automatically deem the person permanently disabled as of the date of such refusal for the

purpose of this Section 11.D.2. The costs of any examination required by this Section 11.D.2 shall be paid by PDA.

3.        In the event of the death or permanent disability of any person with a twenty-five percent (25%) or more interest the Franchised Business or in Franchisee, or any person with an interest less than twenty-five percent (25%) if PDA determines, in its sole discretion, that such person had substantial control over the operation of the Franchised Business, PDA, at its option, may elect to operate the Franchised Business during the interim twelve (12) months following such death or the interim six (6) months following such permanent disability, as applicable, until the interest of such person is transferred in accordance with this Section 11 or until the applicable interim period expires, whichever comes first. As compensation for managing the Franchised Business, PDA will charge a management fee of two percent (2%) of the Gross Invoice Fees of the Franchised Business for each calendar week, which will be in addition to the royalty fee and any other fees or payments due and owing to PDA. In addition, if PDA provides one of its employees to manage the Franchised Business, PDA will also be entitled to payment of the employee's then current salary for the time of such interim management. Franchisee will execute any agreements or other documents required by PDA to effect the foregoing and shall remain responsible for payment of employee salaries, taxes, rent, utilities, supplies and all other costs and expenses associated with the operation of the Franchised Business. PDA shall exercise its best efforts in managing the Franchised Business, but shall not be liable for any losses incurred by the Franchised Business during the time of such management and thereafter.

4.        Upon the death or claim of permanent disability of any person with an interest in the Franchised Business or in Franchisee, Franchisee or a representative of Franchisee must promptly notify PDA of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Section 11 for any inter vivos transfer. If an interest is not transferred upon death or permanent disability as required in this Section 11.D and in accordance with the terms and conditions of this Section 11, PDA may terminate this Agreement immediately upon notice to Franchisee.

E.        In the event the proposed transfer is to a corporation formed solely for the convenience of ownership, PDA's consent may be conditioned upon any of the requirements set forth in Section 11.B, except the requirements in Sections 11.B.8 through 11.B.10 shall not apply. Franchisee shall be the owner of all the voting stock or interest of the corporation and if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

F.        PDA's consent to a transfer of any interest in Franchisee, the Franchised Business or this Agreement shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of PDA's rights to demand exact compliance with any of the terms of this Agreement by the transferee.

12.    **DEFAULT AND TERMINATION**

A.        If PDA materially breaches any of its obligations under this Agreement, then Franchisee may terminate this Agreement upon ninety (90) days prior written notice to PDA of such breach, but only if PDA fails to cure or to commence a cure of the breach within thirty (30) days after receipt of such notice. To constitute effective written notice under this section, any such notice of a breach must specifically state the precise nature of the alleged breach by PDA. Failure of Franchisee to provide such detailed notice of default shall preclude Franchisee from terminating this Agreement until such time as such notice has been received by PDA and the applicable cure period has expired without a cure of the default.

B.     Franchisee shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default"):

1.     Franchisee relocates the Office without the prior written consent of PDA or fails to properly complete the required Office Change Form;

2.     Franchisee or any Designated Person(s) is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of PDA, to adversely affect the PDA System, the Proprietary Marks, the goodwill associated therewith or PDA's interest therein;

3.     Franchisee, any Designated Person(s) or any partner or shareholder of Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee, the Franchised Business or this Agreement to any third party without PDA's prior written consent or without offering PDA a right of first refusal with respect to such transfer, contrary to the terms of Section 11 of this Agreement;

4.     Franchisee or any Designated Person(s) breaches or is in default under any of the representations, warranties and covenants in Section 5;

5.     Franchisee, Operating Principal, or any Designated Person(s) discloses or divulges to unauthorized persons the contents of the Manual, Documentation or other confidential information provided to Franchisee by PDA or Franchisee fails to obtain the covenants on confidentiality as required by Section 9.E;

6.     An approved transfer is not effected within the time prescribed by Section 11.D of this Agreement, following Franchisee's or any other applicable person's death or permanent disability;

7.     Franchisee knowingly maintains false books or records, or submits any false reports or financial statements to PDA;

8.     Franchisee fails to timely provide PDA with a written record of its marketing and promotional activities, if such record is requested by PDA, under Section 6.F.1, and does not cure the default within seven (7) days following notice thereof from PDA;

9.     Franchisee or any Designated Person(s) misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs, in the sole opinion of PDA, the goodwill associated therewith or with the PDA System or PDA's rights therein and does not cure such default within twenty-four (24) hours following notice thereof from PDA;

10.     Franchisee or any Designated Person(s) uses body shop or contractor estimates without making its own independent estimates and investigations unless the use of any such estimates is approved in writing by PDA;

11.     Franchisee or any Designated Person(s) purchases or sells any type of salvage without the express written consent of PDA;

12.     Franchisee, its employees, independent contractors or any Designated Person directs or "steers" business to any facilities such as body shops, towing companies, repair shops or similar service providers;

13.     Franchisee or any Designated Person(s) accepts, directly or indirectly, any bribe or kickback regardless of monetary value, or any gift, favor or gratuity which may affect, or appear to influence, Franchisee's business judgment, except tokens of appreciation having an aggregate monetary value of $25 or less per occurrence;

14.     Franchisee fails to procure and maintain such insurance policies as required by Section 6.H and Franchisee fails to cure such default within seven (7) days following notice from PDA;

15.     Franchisee fails, refuses, or neglects promptly to pay any monies owing to PDA or its subsidiaries or affiliates when due under this Agreement or any other agreement between Franchisee and PDA or its subsidiaries or affiliates, or to submit the financial or other information required by PDA under or pursuant to this Agreement and does not cure such default within seven (7) days following notice thereof from PDA;

16.     Franchisee is in default with respect to the payment of any monetary obligation due to PDA hereunder more than one time during any three (3) consecutive weeks, whether or not cured by Franchisee after notice by PDA;

17.     Franchisee or any Designated Person(s) fails to comply with the covenants of Section 14.A or obtain execution of the covenants required under Section 14.J within seven (7) days after being requested by PDA to do so;

18.     Franchisee fails to obtain, loses or forfeits any permit, certificate or license necessary for the operation of the Franchised Business;

19.     The Factoring Agreement is terminated by PDA as a result of Franchisee's submission of false or fraudulent invoices or the Software License Agreement is terminated by PDA;

20.     The Franchised Business incurs any additional "Infraction" (as determined by PDA pursuant to the Infraction System) within the 90-day period following notice from PDA that Franchised Business has incurred the threshold number of Infractions applicable to the Franchised Business under the Infraction System;

21.     Franchisee fails to commence operations of the Franchised Business within the time limits specified in this Agreement, or if Franchisee at any time ceases to operate or otherwise abandons the Franchised Business or loses or is otherwise denied the right to operate at the location stated in Exhibit A;

22.     Franchisee or any Designated Person fails, refuses, or neglects to obtain PDA's prior written approval or consent as required by this Agreement;

23.     Franchisee or any Designated Person or any partner or shareholder of Franchisee engages in any business or markets any service or product under a name or mark which, in PDA's opinion, is confusingly similar to the Proprietary Marks;

24.     Franchisee becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Franchisee applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Franchisee or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Franchisee or for a substantial part of the property thereof;

25. A petition in bankruptcy is filed by Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state or such a petition is filed against and not opposed by Franchisee or dismissed within 30 days after the filing date;

26. Franchisee is adjudicated bankrupt or insolvent under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state or admits in writing its inability to pays its debts when due;

27. A bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed or consented to by Franchisee;

28. A receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction;

29. Proceedings for a composition of creditors under any law are instituted by or against Franchisee;

30. The real or personal property of Franchisee's Office sold after levy thereupon by any sheriff, marshal, constable or other officer acting on behalf of a court;

31. Franchisee is dissolved or ceases doing business;

32. Suit to foreclose any lien or mortgage against Franchisee's Office premises or its improvements or inventory is instituted against Franchisee and not dismissed or contested by litigation within thirty (30) days of such institution; or a final judgment against Franchisee remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or Franchisee surrenders all or a substantial portion of its property to a creditor; the effect of any of which PDA believes, in the exercise of its sole discretion, is to substantially impair Franchisee's ability to perform its obligations under this Agreement;

33. Execution is levied against Franchisee's business or property, the effect of which, in the sole opinion of PDA, is to substantially impair Franchisee's ability to perform hereunder and such levy is not released within thirty (30) days of execution;

34. Franchisee or any Designated Person fails to comply with any other agreement, term, or condition contained herein or with any other standard, procedure, term or condition contained in the Documentation, including the Manual, or fails to carry out the terms of this Agreement in good faith.

C. Except as otherwise provided herein with respect to particular Events of Default, Franchisee shall have thirty (30) days after written notice from PDA of an Event of Default, to cure the Event of Default and to provide evidence thereof satisfactory to PDA. If any Event of Default is not cured within its respective cure period, then PDA may terminate this Agreement without further notice to Franchisee effective immediately upon the expiration of such cure period. No cure period will be permitted with respect to the Events of Default listed in Sections 12.B.1 thru 12.B.3, 12.B.5, 12.B.7, 12.B.16, 12.B.20, 12.B.21, and 12.B.24 thru 12.B.31, and PDA may terminate this Agreement immediately upon notice to Franchisee after the occurrence of any such Event of Default. Furthermore, if any Event of Default occurs within any twelve (12) month period during which two (2) or more Events of Default have already occurred, regardless of whether such Events of Default are of the same or different types or whether such defaults have been cured after notice, then no cure period will be permitted with respect to any such third (or subsequent) Event of Default in that period, and PDA may terminate this Agreement immediately upon notice to Franchisee.

D.       During the period of time beginning at the occurrence of an Event of Default and ending on the earlier of (i) the date on which this Agreement terminates or expires, or (ii) the date on which all the Event of Default has been cured in the manner required by this Agreement (collectively, the "Interim Period"), PDA shall have the right, but not the obligation, (1) to manage and operate the Franchised Business or (2) to appoint a third-party to manage and operate the Franchised Business, as Franchisee's agent and on Franchisee's behalf and at Franchisee's sole expense, and Franchisee hereby irrevocably appoints PDA as its agent and its attorney-in-fact to so manage and operate the Franchised Business or appoint a third-party to manage and operate the Franchised Business on Franchisee's behalf. All such management and operational activities conducted by PDA or the third-party manager pursuant to this Section may be conducted by such party in a manner determined by such party to be appropriate with such party acting in its sole and absolute discretion; provided, however, such managing party will use reasonable efforts to manage and operate the Franchised Business pursuant to this Section in a manner that is similar to how such party conducts, or would conduct, the management and operation activities of its facilities that are similar in size, scope, and location to the Franchised Business. This Agreement constitutes conclusive evidence of PDA's (or the designated third-party's) right to operate the Franchised Business on Franchisee's behalf. PDA (or the designated third-party) shall be entitled to reimbursement from Franchisee of all expenses PDA (or designated third-party) incurs in operating the Franchised Business on Franchisee's behalf, plus a fee for any such operation of the Franchised Business by PDA (or the designated third-party) during the Interim Period, such expenses and fee to be payable by Franchisee upon PDA's written demand therefor. Franchisee shall be fully liable for, and neither PDA nor the designated third-party shall be responsible for, any claims that arise in connection with the ownership or operation of the Franchised Business during the Interim Period, unless such claims are directly attributable to the gross negligence or willful misconduct of PDA (or the designated third-party). If PDA elects to exercise its rights under this Section 12.D with respect to the Franchised Business, PDA shall have no duty to continue to operate (or allow the operation of) the Franchised Business and PDA may at any time thereafter, in PDA's sole and absolute discretion, elect to cease operating the Franchised Business pursuant to this Section 12.D and, upon such election, PDA may pursue any other rights or remedies available to PDA under this Agreement.

13.    **RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION**

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

A.       Franchisee shall immediately cease to operate the Franchised Business and shall not thereafter, directly or indirectly, represent itself to the public or hold itself out as a present or former franchisee of PDA.

B.       Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any confidential methods, procedures, techniques and any other Trade Secrets associated with the PDA System; the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and any other Proprietary Marks and distinctive forms, slogans, signs, symbols, logos, or devices associated with the PDA System. In particular, Franchisee shall cease to use, without limitation, all signs (whether on the Office or otherwise), advertising materials, stationery, forms (regardless of whether such forms display the Proprietary Marks), PDA Software, and any other articles comprising a part of the Franchised Business, and shall immediately return to PDA any such items that were provided to Franchisee by PDA. Franchisee shall furnish PDA evidence satisfactory to PDA of compliance with this obligation within thirty (30) days after such termination or expiration.

C.       Franchisee shall immediately cease to use any telephone number(s), post office box(es), street, email, and internet addresses, and any other business listings used by Franchisee in the Franchised

Business, and shall comply with Section 6.G of this Agreement regarding the transfer of Franchisee's telephone listing(s) and post office box(es) to PDA or its designee. Notwithstanding any forms and documents which may have been executed by Franchisee under Section 6.G.1, Franchisee does hereby appoint PDA its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. Such power of attorney shall be irrevocable and coupled with an interest and shall survive the expiration or termination of this Agreement. Franchisee shall thereafter use different telephone numbers, post office boxes and business listings at or in connection with any subsequent business conducted by Franchisee.

D.     Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name PROPERTY DAMAGE APPRAISERS™ or any other service mark, trademark, or other Proprietary Mark of PDA, and Franchisee shall furnish PDA with evidence satisfactory to PDA of compliance with this obligation within seven (7) days after the termination or expiration of the Agreement.

E.     Franchisee and its subsidiaries and affiliates shall promptly pay all sums owing to PDA and its subsidiaries and affiliates. Such sums shall include interest on any past due amounts as prescribed herein and, in the event of termination for any Event of Default by Franchisee, such sums shall include all damages, costs, and expenses, including attorneys' fees, incurred by PDA as a result of the Event of Default, which obligation shall give rise to and remain, until paid in full, a lien in favor of PDA against any and all of the personal property, equipment, inventory, and fixtures owned by Franchisee at the time of the Event of Default. Franchisee agrees to execute all documents reasonably required by PDA to perfect such security interests under applicable law.

F.     Franchisee shall make such modifications or alterations to the Office operated hereunder immediately upon termination or expiration of the Agreement as may be necessary to distinguish the appearance of such premises from that of other offices operating under the PDA System, and shall make such specific additional changes thereto as PDA may reasonably request for that purpose.

G.     Franchisee shall pay to PDA all damages, costs, and expenses, including attorneys' fees, incurred by PDA subsequent to the termination or expiration of the franchise herein granted in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement.

H.     Franchisee shall immediately deliver to PDA the Manual, the Documentation, all other manuals, client lists, records, files, computer software licensed or provided by PDA, databases, instructions, correspondence and brochures, and any and all other confidential and proprietary materials related to the operation of the Franchise Business in Franchisee's possession, custody, or control, and all copies thereof (all of which are acknowledged to be PDA's property) and shall retain no copy of record of the foregoing, except only Franchisee's copy of this Agreement and of any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

I.     Franchisee and each Designated Person(s) shall comply with all provisions of this Agreement which explicitly or implicitly concern Franchisee's obligations after termination, expiration, or the transfer of all of Franchisee's interest in, this Agreement, including, without limitation, the covenants contained in Sections 8, 9 and 14 of this Agreement.

14.     **COVENANTS**

Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee and Franchisee's employees will receive valuable training and other Trade Secrets which are beyond the

present skills and experience possessed by Franchisee and Franchisee's managers and employees. Franchisee acknowledges that such training and other Trade Secrets provide a competitive advantage and will be valuable to them in the development and operation of the Franchised Business and that gaining access to such training and other Trade Secrets are, therefore, a primary reason why it is entering into this Agreement. In consideration for access to such training and other Trade Secrets, Franchisee covenants as follows:

A.      Franchisee covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of this Agreement, neither Franchisee nor any other Franchisee Party shall, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

1.      Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

2.      Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA's Franchised Business, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

3.      Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services to customers that is (i) located in the Marketing Area; or (ii) located or provides such services to customers or within a twenty-five (25) mile radius of the perimeter of any marketing area of any PDA franchisee operating under the PDA System.

B.      Without limiting any term or condition of the Guaranty , any Designated Person(s) shall comply with and adhere to the restrictions contained in the covenants set forth in Section 14.A; provided that the two-year period non-compete period shall commence with respect to any Designated Person, and shall continue for an uninterrupted period, upon the earlier of (i) the expiration of the Term of this Agreement, (ii) the transfer of all of the Franchisee's interest in the Franchised Business, or (iii) the time such person ceases to hold or own any direct or indirect interest in Franchisee or be a director or officer of Franchisee.

C.      With regard to Section 14.A.3, such provisions shall not apply to ownership by Franchisee of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly-held corporation. A publicly-held corporation is a corporation having its securities registered pursuant to Section 12 under the Securities Exchange Act of 1934, as amended, or a corporation subject to the reporting requirements of Section 15(d) of the Securities Exchange Act of 1934, as amended.

D.      Franchisee and each Designated Person(s) acknowledge that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee or any Designated Person(s).

E.     Franchisee understands and acknowledges that PDA shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 14, or any portion thereof, without Franchisee's consent, effective immediately upon written notice to Franchisee, and Franchisee agrees to comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 17.I hereof.

F.     Franchisee expressly agrees that the existence of any claim that Franchisee has or may have against PDA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by PDA of the covenants in this Section 14. Franchisee agrees to pay all costs and expenses (including attorneys' fees) incurred by PDA in connection with the enforcement of this Section 14.

G.     The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section 14 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 14. The two-year period referred to in Section 14 A above shall be tolled during any period of Franchisee's noncompliance with the terms of this Agreement.

H.     Franchisee acknowledges that any failure to comply with the requirements of this Section 14 would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 14. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

I.     Franchisee understands and acknowledges that compliance by all franchisees operating under the PDA System in accordance with PDA's training and operational requirements and the covenants described in this Section 14 are essential and material elements of the PDA System and that PDA expends substantial time, effort and expense in developing and improving the PDA System for the benefit of all franchisees. The parties agree that such expenditures incurred by PDA may be uncertain and difficult to ascertain and therefore agree that the compensation specified herein reasonably represents such expenditures and is not a penalty. Accordingly, and in addition to any other relief that PDA may be entitled to receive, if Franchisee shall violate the terms and provisions of this Section 14, in addition to all rights and remedies available to PDA, Franchisee shall pay to PDA for each violation a sum of money equal to ten (10) times the total of the payments made to PDA pursuant to Section 4 for the most recent twelve (12) months during which Franchisee operated the Franchised Business (or such period of time Franchisee operates the Franchised Business, if less than twelve (12) months) preceding such violation.

J.     Franchisee shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in Section 14 (including covenants applicable upon the termination of a person's relationship with Franchisee) from all Designated Persons, spouse of Franchisee, if such spouse is not otherwise a Designated Person(s) and participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Franchisee. Each covenant required by this Section 14.J shall be substantially in the form set forth in Exhibit M. Failure by Franchisee to obtain execution of an agreement required by this Section 14.J shall constitute an Event of Default. If by virtue of the community property laws of any state, Franchisee's spouse is deemed to have any property interest in this Agreement, Franchisee's ownership interest, or the Franchised Business, PDA will have the right to require Franchisee's spouse to consent and join in all of the terms and conditions of this Agreement, any related agreements and any amendments thereto.

-30-

15. **TAXES, PERMITS, AND INDEBTEDNESS**

A.     Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, all liens or encumbrances of every kind or character created or placed upon or against any of Franchisee's property used in connection with the Franchised Business, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the Franchised Business. Franchisee shall pay to PDA an amount equal to any sales tax, gross receipts tax, or similar tax imposed on PDA with respect to any payments to PDA required under this Agreement, unless the tax is credited against income tax otherwise payable by PDA.

B.     In the event of a bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business, or any improvements thereon.

C.     Franchisee shall, at Franchisee's sole expense, comply with all federal, state, and local laws, rules, and regulations and shall timely obtain, and shall keep in force as required throughout the Term of this Agreement, all permits, certificates, and licenses necessary for the full and proper conduct of the Franchised Business, including, without limitation, any required permits, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

D.     Franchisee shall immediately notify PDA in writing of the commencement of any action, suit or proceeding against Franchisee, of the issuance of any inquiry, subpoena, order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which arises out of, concerns, or may affect the operation or financial condition of the Franchised Business, including, without limitation, any criminal action or proceeding brought by Franchisee's employees, customers or other persons.

16. **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

A.     This Agreement does not create a fiduciary relationship between PDA and Franchisee. Franchisee is not and shall not represent itself to be the agent, joint venturer, partner, servant, representative or employee of PDA, or to be related to PDA other than as its independent franchisee. No representations shall be made or acts taken by Franchisee which could establish any apparent relationship of agency, joint venture, partnership or employment, and PDA shall not be bound in any manner whatsoever by any agreements, warranties or representations made by Franchisee to any other person nor with respect to any other action of Franchisee. No employee, agent or independent contractor of Franchisee shall be deemed to be an employee of PDA for any purpose whatsoever. PDA shall not have the power to hire or retain or fire or discharge Franchisee's employees, agents or independent contractors and, except as herein expressly provided, PDA may not control or have access to Franchisee's funds or the expenditure thereof, or in any other way exercise dominion or control over Franchisee's business, employees, agents, or independent contractors.

B.     It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on PDA's behalf, or to incur any debt or other obligation in PDA's name, and that PDA shall in no event assume liability for, or be deemed liable hereunder as a result of any such action, or by reason of any act or omission of Franchisee in its conduct of the Franchised Business, or any claim or judgment arising there from against PDA.

C. During the Term of this Agreement and any extension hereof, Franchisee shall hold itself out to the public as an independent contractor operating its business pursuant to a franchise license agreement from PDA. Franchisee shall conspicuously identify itself in all dealings with Franchisee's clients, contractors, suppliers, and public officials as an independent franchisee of PDA, and shall place such notice of the franchise relationship on all forms, business cards, stationery, advertising, signs and other materials in such fashion as PDA may, in its sole and exclusive discretion, specify and require from time to time, in its manual, as the same may be amended from time to time, or otherwise.

D. Except as otherwise expressly authorized by this Agreement, neither party hereto shall make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between PDA and Franchisee is other than that of PDA and Franchisee. Except as expressly provided herein, PDA does not assume any liability, and will not be deemed liable for any agreements, representations, or warranties by Franchisee which are not expressly authorized under this Agreement, nor will PDA be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the business franchised hereby.

E. 1. Franchisee and all Designated Persons agree at all times to defend at Franchisee's sole cost and expense, and to indemnify and hold harmless to the fullest extent permitted by law, PDA, its subsidiaries, affiliates, successors, assigns and designees and their respective current or former directors, officers, shareholders, partners, servants, employees, agents, independent contractors and representatives of each (PDA and all others hereinafter referred to collectively as "Indemnitees") from all "losses and expenses" (as hereinafter defined) incurred in connection with any actual or threatened action, suit, proceeding, arbitration, claim, demand, investigation or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following: (i) Franchisee's alleged infringement or any other violation or any other alleged violation of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such relates to the authorized use of the Proprietary Marks as described in Section 7); (ii) Franchisee's alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive or of any industry standard; (iii) libel, slander or any other form of defamation of Indemnitees or the PDA System by Franchisee; (iv) Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement; (v) any acts, errors or omissions of Franchisee or any of its current or former agents, servants, employees, independent contractors, partners, proprietors, affiliates or representatives including, without limitation, any negligent or intentional misconduct, and any acts, errors or omissions in the operation of any motor vehicle; (vi) any services or goods provided by any affiliated or non-affiliated participating entities; (vii) any action by any client of the Franchised Business; (viii) any damage to the property of Franchisee or Indemnitees, their agents, or employees, or any third person, firm or corporation, whether or not such losses, claims, costs, expenses, damages, liabilities were actually or allegedly caused in part through the active or passive negligence of Indemnitees or any of its agents or employees, or resulted from any strict liability imposed on Indemnitees; and (ix) PDA's enforcement of any of the provisions of this Agreement or any ancillary agreements, including but not limited to the agreements in the forms attached hereto as exhibits. The parties understand and agree that PDA cannot and does not exercise control over the manner of operation of any motor vehicle used by, or on behalf of, Franchisee or any employee, agent or independent contractor of Franchisee and that the safe operation of any vehicle therefore, is Franchisee's sole responsibility.

2. Franchisee shall immediately notify PDA in writing of any such action, suit, proceeding, claim, demand, inquiry or investigation. At the expense and risk of Franchisee, PDA may assume (but under no circumstances is obligated to undertake) and associate counsel of its own choosing, or may approve any counsel of Franchisee, with respect to the defense and/or settlement of any such

action, suit, proceeding, claim, demand, inquiry or investigation, provided that PDA will seek the advice and counsel of Franchisee, and shall keep Franchisee informed, with regard to any such proposed or contemplated settlement(s). Such an undertaking by PDA shall in no manner or form diminish Franchisee's obligation to indemnify PDA and to hold it harmless.

3.    For purposes of this Section 16.E the term "losses and expenses" shall be deemed to include all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorneys' fees, experts' fees, court costs, settlement amounts, judgments, compensation for damages to PDA's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space and costs of changing, substituting or replacing same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

4.    In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, PDA may, at any time and without notice as in its judgment it deems appropriate, offer, order, consent or agree to settlements or take such other remedial or corrective actions as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in PDA's sole judgment, there are reasonable grounds to believe that: (1) any of the acts or circumstances enumerated in Section 16.E.1 have occurred, or (2) any act, error or omission of Franchisee may result directly or indirectly in damage, injury or harm to any person or any property.

5.    All losses and expenses incurred under this Section 16.E shall be chargeable to and paid by Franchisee pursuant to Franchisee's obligations of indemnity under this Section, regardless of any actions, activity or defense undertaken by PDA or the subsequent success or failure of such actions, activity or defense.

6.    Indemnitees do not assume any liability whatsoever for acts, errors or omissions of those with whom Franchisee or its subsidiaries and affiliates may contract, regardless of the purpose. Franchisee shall defend (with counsel of PDA's choice and/or approval), hold harmless and indemnify Indemnitees for all losses and expenses which may arise out of any acts, errors or omissions of Franchisee, Franchisee's subsidiaries and affiliates, the officers, directors, shareholders, partners, agents, independent contractors, servants, employees, and representatives of Franchisee and its subsidiaries and affiliates, and any such third parties without limitation and without regard to the cause or causes thereof or the negligence of PDA or any other party or parties arising in connection therewith, and whether such negligence be sole, joint or concurrent, or active or passive. **THE PARTIES HERETO EXPRESSLY INTEND THAT FRANCHISEE INDEMNIFY PDA AND INDEMNITEES FROM THE CONSEQUENCES OF THEIR OWN NEGLIGENCE.**

7.    Under no circumstances shall Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by Indemnitees from Franchisee. It is understood and agreed by Franchisee that the terms of this Section 16.E shall survive the termination, expiration, or transfer of this Agreement or any interest therein.

17.    **MISCELLANEOUS**

A.    Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right

thereafter to insist upon strict adherence to that term or any other term in this Agreement. Any waiver must be in writing and authorized by an officer of the waiving party.

B.    Any notice required or permitted by any party to this Agreement shall be in writing and may be delivered personally to the party being given notice or to the person in charge of the office of the party being given notice or by expedited delivery service or certified mail, return receipt requested, or sent by prepaid facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy thereof by expedited delivery service or certified mail, return receipt requested, within three (3) business days after transmission thereof) at the party's address indicated below, and any notice will be effective upon delivery in the case of personal delivery, upon transmission in the case of facsimile or telegram (provided confirmation is sent as described above) and upon deposit in the mail, postage prepaid, in the case of delivery by expedited delivery service or mail. The addresses of the parties are as follows:

> PDA:    Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

> Franchisee:    Brian K. Nygaard
> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Facsimile: 925-634-6275

The names and addresses of persons to receive notice as stated in this Section may be changed by notice given in accordance with this Section.

C.    This Agreement, the exhibits hereto and the documents referred to herein constitute the entire, full and complete agreement between PDA and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement. No representations, inducements, promises, or agreements, oral or otherwise, not embodied herein, attached hereto or referred to herein were made by any party, and none shall be of any force or effect with reference to this Agreement or otherwise. Notwithstanding the immediately preceding sentences, nothing in this Agreement is intended to disclaim the representations PDA made in the Franchise Disclosure Document that was furnished to Franchisee pursuant to the Federal Trade Commission's Franchise Trade Regulation Rule identified below.

D.    1.    Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, this shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and provisions of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; the invalid portions, sections, parts, terms and provisions shall be deemed not to be a part of this Agreement; and there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any law or regulation.

2.     Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, PDA, PDA's officers, directors and personnel and such of Franchisee's and PDA's respective successors and assigns as may be contemplated (and, as to Franchisee, authorized) by Section 11, any rights or remedies under or as a result of this Agreement.

3.     Franchisee and the Designated Person(s) expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any  provision hereof, as though it were separately stated in and made a part of this Agreement, that may result from striking from any of the provisions of this Agreement any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which PDA is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

E.     **THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES) OR APPLICATION OF THE PRINCIPLE OF FORUM NON CONVENIENS.**

F.     1.     Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee or Operating Principal, as applicable, as an independent business person.  PDA EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS, OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.  NO REPRESENTATION OR STATEMENT HAS BEEN MADE BY PDA (OR ANY EMPLOYEE, AGENT OR SALESPERSON THEREOF) AND RELIED UPON BY FRANCHISEE REGARDING THE ANTICIPATED INCOME, EARNINGS AND GROWTH OF PDA OR OF THE PDA SYSTEM, OR THE VIABILITY OF THE FRANCHISE BEING GRANTED HEREUNDER.

2.     Franchisee acknowledges having received, read, and understood this Agreement, including the exhibits hereto and the documents referred to herein; and Franchisee acknowledges that PDA has accorded Franchisee ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement and that Franchisee has entered into this Agreement after making an independent investigation of PDA's operations.

3.     Franchisee acknowledges that it has received a complete copy of this Agreement, the exhibits referred to herein, and agreements relating hereto, if any, at least fourteen (14) calendar days prior to the date on which this Agreement is executed or any payments by Franchisee to PDA of any consideration in connection with the sale or proposed sale of the franchise granted hereby.   Franchisee further acknowledges that it has received the Franchise Disclosure Document required by the Franchise Trade Regulation Rule of the Federal Trade Commission (16 C.F.R. Part 436), entitled "Disclosure – Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," and as required by applicable state law at least fourteen (14) calendar days prior to the date on which this Agreement is executed or any payments by Franchisee to PDA of any consideration in connection with the sale or proposed sale of the franchise granted hereby.  Franchisee acknowledges that it has read and understands PDA's Franchise Disclosure Document, and that no representations have been made to it which are inconsistent with information presented in PDA's disclosure document, and that Franchisee has not relied upon any representations inconsistent with or not contained in PDA's Franchise Disclosure Document.

4. Franchisee affirms that all information set forth in any and all applications, financial statements and submissions to PDA is true, complete and accurate in all respects, with Franchisee expressly acknowledging that PDA is relying upon the truthfulness, completeness and accuracy of such information.

5. No representation or statement has been made by PDA (or any employee, agent or salesperson thereof) and relied upon by Franchisee regarding Franchisee's ability to procure any required license or permit that may be necessary to the offering of one or more of the services contemplated to be offered by the Franchised Business.

G. All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any section, paragraph or clause herein may require, as if such word had been fully and properly written in the appropriate number and gender. The headings in this Agreement are solely for the convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

H. This Agreement shall not be binding until it is executed by an authorized officer of PDA at PDA's principal place of business in Tarrant County, Texas.

I. Except as otherwise expressly provided herein, this Agreement shall not be modified or amended except by written agreement executed by both parties.

J. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

K. At any time and from time to time, each party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

L. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits attached hereto.

M. Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to organizational documents, equity owners, directors and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

N. A Designated Person(s) who is the spouse of Franchisee is fully aware of, understands and fully consents and agrees to the provisions of this Agreement and its binding effect upon any community property interest it may now or hereafter own, and agrees that the termination of the marital relationship with any party to this Agreement for any reason shall not have the effect of creating any right

for such spouse in any property or transactions the subject of this Agreement and that its understanding, consent and agreement is evidenced by the execution of the Guaranty .

O. PDA and Franchisee acknowledge that certain state franchise statutes have been enacted that may supersede various provisions of this Agreement. The State Law Addenda attached as <u>Exhibit N</u> describe the provisions of certain state franchise laws, as such laws exist on the Effective Date of this Agreement. To the extent such laws are applicable to this Agreement and differ from the terms of this Agreement, as of the dates on which compliance with such any such law is sought (referred to herein as the "then-current laws"), the then-current laws shall prevail, but only if and to the extent that the jurisdictional scope provisions of such referenced laws independently apply to this Agreement. For purposes of determining the applicability of such state franchise laws, Franchisee shall be conclusively presumed to be a resident and domiciliary of the state in which the Office is located, unless at the time that this Agreement is executed, Franchisee notifies PDA in writing that Franchisee is a resident and/or domiciliary of another state.

P. Franchisee recognizes that the nature of the Property Damage Appraisers businesses may change over time, that an investment in the Franchised Business involves business risks and that the success of the venture is largely dependent on Franchisee's own business abilities, efforts and financial resources. Franchisee acknowledges that it has conducted an independent investigation of the business contemplated by this Agreement and recognizes that the appraisal industry is highly competitive. Franchisee acknowledges that it has not received from PDA or PDA's representatives or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement, nor has Franchisee received from PDA or PDA's representatives any information from which Franchisee may easily ascertain a specific level or range of actual or potential sales, income, costs, gross or net profits from franchised or non-franchised Property Damage Appraisers businesses. Franchisee acknowledges that it has had the opportunity to seek independent counsel concerning the execution of this Agreement and operation of the Franchised Business.

Q. No approval of any matter requiring PDA's approval hereunder will be effective unless in writing. Wherever PDA has the right to take action or make a decision as described herein, any such action may be taken (or omitted) and any such decision may be made in PDA's sole discretion.

18. **DISPUTE RESOLUTION**

A. **THE PARTIES AGREE TO FIRST SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND EXHIBITS) OR THE RELATIONSHIP CREATED BY SUCH AGREEMENT TO NON-BINDING MEDIATION PRIOR TO SEEKING ARBITRATION OR FILING SUCH CLAIM, CONTROVERSY OR DISPUTE, IF APPLICABLE, IN A COURT. THE MEDIATION SHALL BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATION SERVICES ORGANIZATION OR BODY AGREED UPON BY THE PARTIES AND FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION (NOT TO EXCEED FIFTEEN (15) DAYS), THROUGH THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA") IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION. THE MEDIATION SHALL TAKE PLACE AT PDA'S CORPORATE HEADQUARTERS IN TARRANT COUNTY, TEXAS OR AT SUCH OTHER PLACE AS PDA DESIGNATES. THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE MEDIATION, ALL EVENTS LEADING UP TO THE MEDIATION, AND THE OUTCOME OF THE MEDIATION CONFIDENTIAL. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT**

HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.

B.     WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH ARE NOT FINALLY RESOLVED THROUGH MEDIATION OR AS OTHERWISE PROVIDED ABOVE, THE PARTIES AGREE TO SUBMIT THEIR DISPUTE TO ARBITRATION IN ACCORDANCE WITH THE COMMERCIAL RULES OF THE AAA THEN IN EFFECT. THE ARBITRATION SHALL BE HELD IN FORT WORTH, TEXAS AT PDA'S CORPORATE HEADQUARTERS, BEFORE A SOLE ARBITRATOR AGREED TO BY THE PARTIES AND SELECTED FROM THE PANEL OF ARBITRATORS OF THE AAA. THE PARTIES SHALL ATTEMPT TO IN GOOD FAITH TO AGREE UPON AN ARBITRATOR, AND IF THERE IS NO AGREEMENT, THEN THE SELECTION OF THE ARBITRATOR SHALL BE MADE BY THE AAA. THE ARBITRATOR SHALL AWARD THE PREVAILING PARTY ITS ATTORNEYS' FEES AND COSTS. THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE ARBITRATION, ALL EVENTS LEADING UP TO THE ARBITRATION, AND THE OUTCOME OF THE ARBITRATION CONFIDENTIAL. IT IS THE INTENT OF THE PARTIES THAT THIS SECTION 18.B PROVIDE A BROAD ARBITRATION CLAUSE AND IS INTENDED TO INCLUDE CLAIMS AND CAUSES OF ACTION REGARDING, ARISING OUT OF, OR RELATING TO THIS AGREEMENT, WHETHER ARISING IN CONTRACT, TORT, STATUTE, REGULATION, COMMON LAW, OR OTHERWISE. THE PARTIES' SUBMISSION AND AGREEMENT TI ARBITRATE SHALL BE SPECIFICALLY ENFORCEABLE AND, SUBJECT TO SECTION 18.C, THE JUDGMENT OF THE ARBITRATOR GRANTING AN AWARD TO A PARTY (THE "ARBITRATION AWARD") MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.   DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS, WITH THERE BEING NO RIGHT OR AUTHORITY FOR ANY DISPUTES TO BE ARBITRATED ON A CLASS ACTION BASIS OR IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OTHER PDA FRANCHISEES OR OTHER ENTITIES SIMILARLY SITUATED.

C.     NOTWITHSTANDING THE PROVISIONS OF THIS SECTION 18 THE PARTIES ACKNOWLEDGE AND AGREE THAT ANY ACTIONS OF THE FRANCHISEE WHICH VIOLATE THE RIGHTS OF PDA UNDER SECTIONS 7, 9, 10, AND 14 OF THIS AGREEMENT OR WHICH IN PDA'S  DETERMINATION, THREATEN, PDA'S INTELLECTUAL PROPERTY RIGHTS, MAY CAUSE IRREPARABLE HARM AND SIGNIFICANT INJURY TO AN EXTENT THAT (i) MAY BE EXTREMELY DIFFICULT TO ASCERTAIN AND (ii) AN IMMEDIATE REMEDY MAY BE NECESSARY YET CANNOT BE ADEQUATELY ADDRESSED WITHIN THE DISPUTE MEDIATION TIMEFRAME SET FORTH IN THIS SECTION 18.  ACCORDINGLY FRANCHISEE AGREES THAT WITH REGARD TO ANY BREACH OR THREATENED BREACH BY FRANCHISEE OF SECTIONS 7, 9, 10, AND 14 OR VIOLATION OR THREATENED VIOLATION OF PDA'S INTELLECTUAL PROPERTY RIGHTS, PDA WILL HAVE THE RIGHT TO OBTAIN INJUNCTIVE RELIEF TO ENJOIN ANY SUCH BREACH OR VIOLATION WITHOUT THE PRIOR NECESSITY OF POSTING BOND OR OTHER SECURITY OR PROVING THE LIKELIHOOD THAT SUBSTANTIAL DAMAGES WILL ACCRUE TO PDA IN THE ABSENCE OF SUCH INJUNCTIVE RELIEF.

D.     THE PARTIES HEREBY IRREVOCABLY SUBMIT THEMSELVES, WHERE APPLICABLE UNDER THE TERMS OF THIS AGREEMENT, TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION.  THE PARTIES HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. THE PARTIES HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW.  THE PARTIES FURTHER AGREE THAT THE EXCLUSIVE VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.

E.     FRANCHISEE AND PDA ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH IN SECTIONS 17.E AND 18.D PROVIDE EACH OF THE PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT.  EACH OF FRANCHISEE AND PDA FURTHER ACKNOWLEDGE THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT.  THE OBLIGATIONS UNDER THE TERMS OF THIS AGREEMENT ARE PERFORMABLE IN TARRANT COUNTY, TEXAS, AND ANY AND ALL PAYMENTS UNDER THE TERMS OF THIS AGREEMENT ARE TO BE MADE IN TARRANT COUNTY, TEXAS.

F.     To the extent permitted by applicable law, PDA and Franchisee irrevocably waive trial by jury in any applicable action, proceeding, or counterclaim, whether at law or in equity, brought by any of them against any of the others, whether or not there are other parties in such action or proceeding. To the extent permitted by applicable law, any and all claims and actions arising out of or relating to this Agreement brought by any party hereto against the other, shall be commenced within two (2) years (provided, however, that tort claims and actions shall be commenced within one (1) year) from the occurrence of the facts giving rise to such claim or action, whether the occurrence of such facts is known or unknown, or such claim or action shall be barred.  PDA and Franchisee hereby waive, to the fullest extent permitted by law, any right to or claim of any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

G.     FRANCHISEE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS IT MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, OR ARISING BY OPERATION OF LAW, RELATING TO THIS AGREEMENT, ANY OFFICE THE SYSTEM, OR THE DOCUMENTATION, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

H.     IN NO EVENT SHALL PDA BE LIABLE TO FRANCHISEE FOR LOSS OF PROFIT OR OTHER ECONOMIC LOSS, INDIRECT, SPECIAL, CONSEQUENTIAL, OR

**OTHER SIMILAR DAMAGES, ARISING OUT OF ANY BREACH OF THIS AGREEMENT OR ANY OBLIGATION UNDER THIS AGREEMENT OR FOR ANY CLAIM MADE AGAINST FRANCHISEE BY ANY OTHER PARTY, EVEN IF PDA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIM.**

I.  No right or remedy conferred upon or reserved to PDA or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

J.  Nothing herein contained shall bar PDA's right to obtain injunctive relief against threatened conduct that will cause it loss or damage, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

K.  Franchisee shall reimburse PDA, due on demand, for all fees, costs and expenses, including, without limitation, attorneys' fees and costs incurred by PDA in connection with enforcing this Agreement and the obligations of Franchisee hereunder.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Agreement on the day and year first above written in this Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

Witness: _Elizabeth chapman_

By: _Katherine Slate_
Name: _Katherine Slate_
Title: _VP of Franchise Relations_

FRANCHISEE:
BRIAN K. NYGAARD

Witness: _Dan M boettch_

By: _B. K. Nygaard_
Name: _Brian K. Nygaard_
Title: _Owner_

**PROPERTY DAMAGE APPRAISERS, INC.**

**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT A**

**FRANCHISEE'S OFFICE LOCATION AND MARKETING AREA**

**OFFICE NAME:___ STOCKTON, CA ___ PDA #__915__**


Location for Office, Post Office Box (if applicable) and Telephone Number:

Physical: ___4719 Greenleaf Circle, Modesto, California 95356___

P.O. Box: ___1163 East March Lane, #447, Stockton, California 95210___

Telephone: ___209-462-1210___ Fax: ___925-634-6275___

Marketing Area:
Counties of : ___San Joaquin, Amador, Calaveras, Stanislaus & Tuolumne___


[See also the map attached to this Exhibit A]


PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: ___*Katherine Slate*___
Name: ___Katherine Slate___
Title: ___VP of Franchise Relations___


FRANCHISEE:
BRIAN K. NYGAARD

By: ___*Brian K. Nygaard*___
Name: ___Brian K. Nygaard___
Title: ___Owner___
Dated: ___September 15, 2011___



**COUNTIES**
(58 Counties)

| Name of County | Population | Location on Map |
|---|---|---|
| ALAMEDA | 1,073,184 | I-4 |
| ALPINE | 484 | H-8 |
| AMADOR | 11,281 | H-6 |
| BUTTE | 100,360 | F-4 |
| CALAVERAS | 10,585 | H-6 |
| COLUSA | 12,430 | F-3 |
| CONTRA COSTA | 553,365 | I-4 |
| DEL NORTE | 14,580 | B-1 |
| EL DORADO | 43,833 | G-6 |
| FRESNO | 413,329 | K-5 |
| GLENN | 17,521 | F-3 |
| HUMBOLDT | 99,692 | D-1 |
| IMPERIAL | 74,492 | P-12 |
| INYO | 16,871 | J-8 |
| KERN | 329,271 | L-9 |
| KINGS | 60,717 | K-7 |
| LAKE | 19,548 | G-2 |
| LASSEN | 16,796 | D-5 |
| LOS ANGELES | 7,036,887 | N-8 |
| MADERA | 41,519 | J-6 |
| MARIN | 206,768 | I-3 |
| MARIPOSA | 6,015 | I-6 |
| MENDOCINO | 61,101 | E-2 |
| MERCED | 104,629 | J-5 |
| MODOC | 7,469 | B-5 |
| MONO | 4,016 | H-7 |
| MONTEREY | 247,450 | K-4 |
| NAPA | 79,140 | H-3 |
| NEVADA | 28,348 | F-6 |
| ORANGE | 1,420,600 | O-9 |
| PLACER | 77,632 | G-6 |
| PLUMAS | 11,707 | E-5 |
| RIVERSIDE | 459,074 | O-10 |
| SACRAMENTO | 631,190 | H-5 |
| SAN BENITO | 18,226 | J-4 |
| SAN BERNARDINO | 681,525 | L-10 |
| SAN DIEGO | 1,357,854 | P-10 |
| SAN FRANCISCO | 716,524 | I-3 |
| SAN JOAQUIN | 289,564 | H-5 |
| SAN LUIS OBISPO | 105,690 | L-5 |
| SAN MATEO | 566,591 | I-3 |
| SANTA BARBARA | 264,324 | M-6 |
| SANTA CLARA | 1,068,421 | J-4 |
| SANTA CRUZ | 123,790 | J-3 |
| SHASTA | 77,640 | D-3 |
| SIERRA | 2,365 | F-5 |
| SISKIYOU | 33,225 | B-2 |
| SOLANO | 171,065 | H-4 |
| SONOMA | 204,885 | G-2 |
| STANISLAUS | 194,506 | I-5 |
| SUTTER | 41,935 | G-4 |
| TEHAMA | 29,517 | E-3 |
| TRINITY | 7,615 | D-2 |
| TULARE | 188,322 | K-8 |
| TUOLUMNE | 22,169 | I-6 |
| VENTURA | 376,437 | N-7 |
| YOLO | 91,788 | G-3 |
| YUBA | 44,736 | F-6 |
| **TOTAL** | **18,933,124** | |

# CLEARTYPE
## COUNTY OUTLINE
## CALIFORNIA

Scale of Miles

0  20  40  60  80  100

MAP NO. 204

COPYRIGHT
**AMERICAN MAP COMPANY, INC.**

No part of this map may be reproduced or
projected in any form or by any means, elec-
tronic or mechanical, including photocopying,
recording, printing, or information storage
and retrieval systems, without written permis-
sion from American Map Co., Inc.

## EXHIBIT B

### GENERAL RELEASE AND WAIVER

This General Release and Waiver (this "Release") is entered into as of _____September 15 ,  2011_ between _____Brian K. Nygaard_____ ("Franchisee") and Property Damage Appraisers, Inc. ("PDA").

WHEREAS, PDA and Franchisee are parties to that certain Franchise Agreement dated _____August 30_____ , _____2007_____ (the "Agreement"), and certain related documents;

WHEREAS, Franchisee desires to renew the Agreement and PDA has determined that, at this time, the Franchisee has met the requirements for said renewal;

WHEREAS, as a condition to renew the Agreement, Franchisee and all other Designated Person(s), as that term is defined by the Agreement, have agreed to execute a general release as to PDA and various PDA related parties;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties to this Release, PDA and Franchisee and all Designated Persons hereby agree as follows:

**1.     Continuing Effect.**  Franchisee and all Designated Persons understand, acknowledge and agree that the execution of this Release shall not in and of itself be the final determining factor in PDA's decision process regarding renewal, and should PDA determine, in its sole discretion, that it is not going to renew the Agreement for reasons that arise or may become known after this Release is executed by Franchisee and all Designated Persons, this Release shall not be impacted and shall remain in full force and effect.

**2.     Release of All Claims.**  Franchisee, and each Designated Person, each individually and on behalf of themselves, their predecessors, and each of their present and former officers, employees, directors, shareholders, parents, subsidiaries, alter egos, affiliates, partners, agents, attorneys, accountants, heirs, executors, administrators, conservators, successors and assigns ("Releasing Parties"), hereby fully and forever releases and discharges PDA, and any predecessor, and each of their respective former and present officers, employees, directors, shareholders, parents, subsidiaries, alter egos, affiliates, partners, representatives, agents, attorneys, successors and assigns (collectively, "PDA Parties"), from any and all claims, demands, liens, actions, agreements, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or suspected which have existed or may have existed, or which do exist or which hereafter can, shall or may exist, based on any facts, events or omissions occurring from any time on or prior to the execution of this Release which arise out of, concern, pertain or relate in any way to the Agreement, and any rights or claims the Releasing Parties may have against PDA Parties arising thereunder, and any claims based on any federal, state or local laws, rules, regulations or orders.

**3.     Waiver of Other Claims.**  Releasing Parties acknowledge that there is a possibility that subsequent to the execution of this Release, they will discover facts or incur or suffer claims which were unknown or unsuspected at the time this Release was executed, and which if known by it at that time may have materially affected its decision to execute this Release.  Releasing Parties acknowledge and agree

that by reason of the release contained in Paragraph 2 above, they are assuming any risk of such unknown facts and such unknown and unsuspected claims.

4.     **Representations and Warranties.** Franchisee represents and warrants as follows:

(a)     no other party, nor any agent or attorney of any other party, has made any promise, representation or warranty whatever, express or implied, not contained herein concerning the subject matter hereof, to induce it to execute this document;

(b)     the person executing this Release on behalf of Franchisee is authorized and empowered to do so;

(c)     it has read this Release and understands the contents thereof, and it has made such an investigation of the facts pertinent to this Release and of all the matters pertaining thereto as it deemed necessary;

(d)     it has had the opportunity to be represented by legal counsel or is represented by legal counsel of its own choice related to this Release; and

(e)     These representations and warranties are deemed to survive the date of the execution of this Release.

5.     **Disclaimer.** Nothing in this Release or any related document shall be construed as an express or implied admission or acknowledgement by PDA of any liability to Releasing Parties or to any other person, all such liability being expressly denied.

6.     **No Assignment of Claims.** Releasing Parties hereby represent to PDA that they have not assigned or transferred any claim covered by this Release that it has or may have against the PDA Parties, and agrees to indemnify and hold the PDA Parties harmless from any liabilities, claims, demands, damages, costs, expenses and attorneys' fees incurred by the PDA Parties as a result of any person asserting any such assignment or transfer.

7.     **Forbearance of Suit.** Releasing Parties agree that they will forever refrain and forbear from commencing, instituting or prosecuting any lawsuit, arbitration, action or other proceeding of any kind whatsoever, by way of action, defense, set-off, cross-complaint or counterclaim, against the PDA Parties based on, arising out of, or in connection with any claim, debt, liability, demand, obligation, cost, expense, action or cause of action which is released and discharged by reason of the execution and delivery of this Release.

8.     **Integration.** This document constitutes the entire agreement and understanding between the parties concerning the subject matter hereof, and supersedes and replaces all prior negotiations, proposed agreements and agreements, written and oral, relating thereto. No covenants, agreements, representations and warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Release.

9.     **Additional Documentation and Cooperation.** The Releasing Parties agree to execute such additional documentation as PDA may request and cooperate in further proceedings necessary to effectuate the terms of this Release without charge or other consideration.

**10.** **Governing Law and Venue.** The dispute resolution provisions of the Agreement shall apply and are incorporated herein by reference.

**11.** **Confidentiality.** The Releasing Parties and their attorneys each agree to keep confidential the terms of this Release except to the extent such disclosure is otherwise required by federal or state law, including pursuant to any discovery procedures authorized by such laws, and then only to such persons and/or agencies authorized to receive such information.

**12.** **Counterparts/Amendment/Waiver.** This Release may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of this Release electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Release. This Release may be amended, modified, canceled, or waived only by written instrument executed by each of the parties. A waiver of any term or condition of this Release will not be deemed to be, and may not be construed as, a waiver of any other term or condition hereof.

**13.** **Severability.** In the event that any covenant, condition or other provision of this Release is held to be invalid, void or illegal by any court of competent jurisdiction, it shall be deemed severable from the remainder of the Release and shall in no way affect, impair or invalidate any other covenant, condition or provision of this Release.

**14.** **Successors and Assigns.** This Release shall bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, administrators, executors and conservators.

**15.** **Attorneys' Fees.** Should any action or other proceeding be necessary to enforce any of the provisions of this Release, the prevailing party will be entitled to recover its actual attorneys' fees incurred in each and every action or proceeding, including any and all appeals or petitions therefrom.

IN WITNESS WHEREOF, the undersigned have executed this Release as of the date first set forth above in this Release.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _____

Name: _____Katherine Slate_____

Title: _____VP of Franchise Relations_____

Notary Public _____ 12/27/2014 Date

TERESA K. KANTZOS
Notary Public, State of Texas
My Commission Expires
April 20, 2015

FRANCHISEE:
BRIAN K. NYGAARD

By: _____

Name: _____Brian K. Nygaard_____

Title: _____Owner_____

_____
Notary Public                    Date

See attached for Notary Public

DESIGNATED PERSON:

By: _____

Name: _____

_____
Notary Public                    Date

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of El Dorado       }

On Dec 21, 2011 before me, Melba Henderson , Notary Public
<br>*Date*                       *Here Insert Name and Title of the Officer*

personally appeared Brian K. Nygaard
<br>*Name(s) of Signer(s)*

**MELBA HENDERSON**
COMM. #1933065
Notary Public • California
El Dorado County
Comm. Expires May 15, 2015

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: *Melba Henderson*
<br>*Signature of Notary Public*

Place Notary Seal and/or Stamp Above

## ———— OPTIONAL ————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: General Release & Waiver

Document Date: 12-21-2011             Number of Pages: 4

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: Brian K Nygaard

☑ Corporate Officer — Title(s): President

☐ Individual

☐ Partner — ☐ Limited ☐ General

☐ Attorney in Fact

☐ Trustee

☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____

☐ Corporate Officer — Title(s): _____

☐ Individual

☐ Partner — ☐ Limited ☐ General

☐ Attorney in Fact

☐ Trustee

☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2008 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org     Item #5907   Reorder: Call Toll-Free 1-800-876-6827

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

## EXHIBIT C

**ACKNOWLEDGMENT OF RECEIPT OF**
**OPERATIONS MANUAL**

Pursuant to Section 3.B of the Franchise License Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby acknowledges that it has received and reviewed a copy of PDA's confidential Operations Manual (the "Manual"). Capitalized terms used but not defined in this Exhibit C have the meanings set forth in the Franchise Agreement.

Franchisee further acknowledges and agrees that it shall keep the Manual in accordance with all applicable provisions of the Franchise Agreement. Without limiting the foregoing, Franchisee expressly reaffirms its agreement under Sections 8 and 9 of the Franchise Agreement to treat the Manual, the Documentation and any other manuals created for or approved for use in the operation of the Franchised Business, and the information contained therein as confidential. Franchisee further reaffirms its agreement under Section 8.A of the Franchise Agreement that upon request or upon the expiration or termination of the Franchise Agreement, Franchisee shall return the Manual to PDA.

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____Brian K. Nygaard_____
Title: _____Owner_____
Dated: _____September 15, 2011_____

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## EXHIBIT D
## FACTORING AGREEMENT

This Factoring Agreement (the "Agreement") is entered between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"), and _____Brian K. Nygaard_____ ("Franchisee") on this__15th__ day of _____September, 2011_____.

### WITNESSETH:

WHEREAS, PDA and Franchisee are parties to that certain Franchise Agreement dated _____September 15__, ___2011___, (the "Franchise Agreement");

WHEREAS, the Franchise Agreement provides that if Franchisee requests and PDA elects to do so, PDA will purchase Franchisee's accounts receivables attributable to the Franchised Business which are approved by PDA (the "Receivables") pursuant to the terms of this Agreement;

WHEREAS, Franchisee desires that PDA purchase the Receivables and PDA agrees to do so pursuant to the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.  Capitalized terms not otherwise defined herein shall have the meaning given them in the Franchise Agreement.

2.    Assignment.  This is an account purchase transaction.  Franchisee does hereby sell and assign to PDA, and PDA does hereby purchase all of Franchisee's right, title and interest in and to the Receivables, with the exception of those Receivables rejected by PDA due to failure of those Receivables to satisfy the criteria specified in Section 5 below.  PDA will have no obligation to approve or purchase any accounts receivable that PDA determines to be uncollectible, invalid, fraudulent, or for appraisal work not performed by the Franchised Business.

3.    Payment for Receivables.  Upon receipt from Franchisee of the report required by Section 4.A of the Franchise Agreement (including all applicable invoices), PDA shall pay for the Receivables by submitting to Franchisee a check in an amount equal to the total Gross Invoice Fees reflected on the report (and confirmed by the invoices) less (i) the fifteen percent (15%) royalty fee due with respect to such Gross Invoice Fees and (ii) the two percent (2%) factoring fee due with respect to such Gross Invoice Fees submitted with report.  PDA may from time to time modify the factoring fee described in clause (ii) of the immediately preceding sentence upon thirty (30) days prior written notice to Franchisee. Furthermore, PDA may deduct from any payment due to Franchisee hereunder any and all amounts due from Franchisee to PDA in connection with Franchisee's purchase of insurance policies and software licenses from PDA under the Franchise Agreement and the documents related thereto.

4.    Notification to Account Debtors.  With respect to Receivables assigned to PDA hereunder, Franchisee shall notify the account debtor of the assignment and direct it to submit payment thereon to PDA.

5.    Franchisee's Warranties.  Franchisee represents and warrants to PDA with respect to every Receivable sold and assigned to PDA that (i) Franchisee is the owner of the Receivable with the legal right to sell and assign it; (ii) the amount shown on the invoice representing the Receivable is the correct amount and is not disputed; (iii) Franchisee has fulfilled all its obligations to the customer identified on the invoice as of the invoice date and is entitled to payment; (iv) the invoice is based on services rendered, is not past due or in default, has not been previously sold, assigned, transferred, or pledged, and is free of any liens, security interests and encumbrances; (v) there are no defenses, offsets, counterclaims or agreements for which the customer identified on the invoice may claim any deduction or discount; and (vi) the customer identified on the invoice has not objected to payment or to the quality of the services rendered.

6.    Uncollected Receivables.  If PDA does not collect payment in full from the account debtor on any particular purchased Receivable within one hundred twenty (120) days of the date of the invoice relating to  such Receivable, Franchisee shall immediately repurchase the Receivable from PDA upon notice for the full invoice amount underlying the Receivable (less any partial payments received by PDA).  PDA may, in its sole discretion, offset the amount owed by Franchisee with  respect to the uncollected Receivable against any future Receivables purchased by PDA hereunder, any other sums that may be owed by PDA to Franchisee, or any other property of Franchisee which may come into the possession of PDA.  Franchisee shall thereafter have all rights to payment on the repurchased Receivable.

7.    Sale of Account.  This is a sale of an account under the Texas Uniform Commercial Code with respect to each Receivable purchased by PDA under this Agreement.  Franchisee agrees to execute and deliver such instruments and documents, including, without limitation, financing statements as PDA may request from time to time.  Franchisee authorizes PDA to file such initial financing statements and amendments as PDA deems necessary to perfect its interest in the Receivables.

8.    Term and Termination.

(a)    This Agreement shall run conterminously with the Franchise Agreement and, unless earlier terminated as provided in Section 8(b) below, shall terminate, without notice to Franchisee, immediately upon the expiration or termination of the Franchise Agreement.

(b)    PDA may, in its sole discretion, terminate this Agreement and all rights granted hereunder effective upon thirty (30) days written notice to Franchisee; provided, however, if Franchisee shall at any time submit any false or fraudulent invoice, termination shall be effective immediately upon written notice to Franchisee.

(c)    Franchisee may terminate this Agreement upon thirty (30) days written notice to PDA in the event PDA increases the factoring fee as provided by Section 3 above.

9.    Miscellaneous.

(a)    Franchisee shall not assign this Agreement or otherwise transfer its rights or obligations hereunder without the express prior written consent of PDA, provided that any assignment shall be subject to the terms of Section 11 of the Franchise Agreement.

(b)    Notice under this Agreement shall be in writing addressed to the parties as indicated in Section 17.B of the Franchise Agreement.

(c) Any dispute relating to the interpretation or performance of this Agreement shall be resolved through non-binding mediation and binding arbitration conducted in Tarrant County, Texas in accordance with Sections 17.E, 18.A and 18.B of the Franchise Agreement.

(d) In the event that either party commences litigation or arbitration to enforce the provisions of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs.

(e) If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provision shall remain in full force and effect and in no way shall be affected, impaired or invalidated.

(f) **THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES).**

(g) The terms of the Franchise Agreement are incorporated into this Agreement by reference, including but not limited to the provisions of the Franchise Agreement relating to jurisdiction and exclusive venue. This Agreement and related provisions of the Franchise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede all related prior and contemporaneous agreements between the parties.

(h) This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written in this Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _____
Name: _____ Katherine Slate _____
Title: _____ VP Franchise Relations _____


FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____

**PROPERTY DAMAGE APPRAISERS, INC.**
**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT E**

**ACKNOWLEDGMENT OF RECEIPT OF**
**PDA INFRACTION/COMPLAINT REVIEW SYSTEM**

Pursuant to Section 3.G of the Franchise License Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby acknowledges that it has received and has reviewed a copy of the PDA Infraction/Complaint Review System (the "Infraction System"), attached hereto.

Franchisee further acknowledges and agrees that Franchisee is subject to the terms and conditions of the Infraction System, including but not limited to the threshold numbers of Infractions set forth therein, for any violation of the uniform standards that PDA may establish from time to time for operation of the Franchised Business (as defined in the Franchise Agreement). Franchisee agrees to comply with the terms and conditions of the Infraction System, and acknowledges that failure to comply with the Infraction System shall constitute an Event of Default as provided in the Franchise Agreement.

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____
Date: _____ September 15, 2011 _____

[INFRACTION SYSTEM FOLLOWS]



# PDA Infraction/Complaint Review System
### Effective 7-1-10
### Revisions as of 2/22/11

## PDA Infraction/Complaint Review System
**Effective 7-1-10**

I. To ensure uniform compliance with operational standards and high quality service by all franchisees operating under the PDA System, PDA has established the following PDA Infraction/Complaint Review System (the "Infraction System").

II. Infractions may include, but are not limited to:

- Failure to answer the office telephone during operating hours
- Failure of an office to be open for operation Monday–Friday 8:00 a.m. – 5:00 p.m. except for designated holidays
- Failure to respond to communications
- Failure to provide status on an assignment
- Failure to upload an assignment properly to a client
- Failure to follow Client Procedure Agreements, client instructions, and/or any mutually agreed upon directive issued by the client
- Failure to provide coverage in your marketing area without providing written documentation to the Regional Manager
- Failure to exhibit professional behavior
- Failure to handle supplements properly
- Improper invoicing – e.g., invoicing an assignment prior to proper completion of the assignment
- Failure to participate in mandatory training and/or meetings

III. When a complaint is received from any party with respect to a franchise office's performance, PDA will investigate the complaint and will determine whether the franchise office's conduct constitutes an Infraction. If an Infraction has occurred, PDA will send written notice of the Infraction to the applicable franchisee. If the conduct forming the basis of the complaint does not constitute an Infraction, the complaint will be used as a training opportunity for the subject franchise office and applicable franchisee.

IV. All complaints from clients must be documented in an email and forwarded to the PDA Client Service Center ("CSC") at csc@pdaorg.net. The franchisee whose - franchise office is the subject of the client complaint shall work with the CSC, Operations Manager, Regional Manager, Marketing Manager and/or any other Corporate Personnel to resolve the complaint.

V. If a franchise office incurs, within any consecutive 12-month period, the number of Infractions set forth below with respect to that franchise office's applicable appraisal tier, then PDA will send the applicable franchisee written notice to that effect.

| **Appraisal Tier for Prior Calendar Year** | **Infraction Threshold** |
| --- | --- |
| 765 or Less | (6) Infractions of same nature<br>(10) Infractions of any nature |
| 766 – 2,525 | (8) Infractions of same nature<br>(12) Infractions of any nature |
| 2,526 or Greater | (10) Infractions of same nature<br>(14) Infractions of any nature |

Receipt of such notice by the franchisee will commence a 90-day probationary period. If at any time during that 90-day probationary period the subject franchise office incurs an additional Infraction, then an uncurable Event of Default will exist under the applicable franchisee's PDA Franchise License Agreement relating to the subject franchise office, and PDA may terminate that Franchise License Agreement and the licenses granted thereunder immediately upon notice to the applicable franchisee. If, on the other hand, the subject franchise office does not incur any additional Infractions during the 90-day probationary period, then at the end of that period, no previous Infractions will be counted toward that franchise office's threshold for any subsequent consecutive 12-month period.

A franchise office's very first Infraction, regardless of its nature, will not be counted toward that franchise office's threshold, if (a) the applicable franchisee requests a training session by PDA no later than five business days after receiving notice of the Infraction from PDA, (b) PDA, in its sole discretion, agrees to provide such training for the subject franchise office, and (c) the subject franchise office successfully completes the training, to the satisfaction of PDA in its sole discretion, no later than 30 calendar days after receiving the Infraction notice. No subsequent Infractions by that franchise office, regardless of their nature, will be eligible for such an exemption from being counted toward the franchise office's threshold in any subsequent consecutive 12-month period.

*****Management reserves the right to revise, amend or modify this policy at any time and in any manner.**

**PROPERTY DAMAGE APPRAISERS, INC.**

**FRANCHISE LICENSE AGREEMENT**

**EXHIBIT F**

**STATEMENT OF OWNERSHIP INTERESTS**

Articles of Incorporation, Articles of Organization, or their equivalent were filed on
_____ December 17 _____ , _____ 2011 _____ , in the state of ___ California ___ for ___ BKN Appraisals Inc. ___

Shareholders: ___ Brian K. Nygaard – 100% of shares ___

_____

_____

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

By: _Katherine Slate_____
Name: _____ Katherine Slate _____
Title: _____ VP Franchise Relations _____

FRANCHISEE:
BRIAN K. NYGAARD

By: _B.K. Nygaard_____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____

## EXHIBIT G

## GUARANTY AND ASSUMPTION OF

## OBLIGATIONS

In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement (the "Franchise Agreement") between Property Damage Appraisers, Inc. ("PDA") and _____ Brian K. Nygaard _____ ("Franchisee") dated as of ____ September 15 __, __ 2011 _____, and any and all additional agreements concurrently being, or hereafter to be, executed on behalf of PDA and Franchisee, (collectively the "Agreements") each of the undersigned (being a Designated Person as defined in the Franchise Agreement), hereby individually, personally, jointly, severally and unconditionally:

1.  acknowledge that he has read all of the terms and conditions of the Franchise Agreement that PDA would not have granted the franchise described therein without the execution of this Guaranty and the undertakings of each of the undersigned, and that the grant of said franchise will inure to the economic benefit of the undersigned;

2.  make all of the covenants, representations and agreements of Designated Persons set forth in the Franchise Agreement, including, without limitation, those in Sections 5, 6, 9, 11 and 14, and is obligated to perform thereunder as if the undersigned had been a party to the Franchise Agreement;

3.  agree to be personally bound by, personally liable for and obligated to perform in the event of the breach of, each and every provision in the Agreements; and

4.  irrevocably guarantee to PDA and its successors and assigns, for the Term of the Franchise Agreement and thereafter as provided in the Franchise Agreement, that all of Franchisee's obligations under the Agreements shall be paid and performed when due and upon default by Franchisee and notice thereof by PDA, each shall immediately make each payment and perform each obligation required of Franchisee under the Agreements.

In addition to the foregoing, the Designated Person serving as a replacement Franchisee's Operating Principal under Section 6.A.3 of the Franchise Agreement, hereby individually, personally, and unconditionally makes all of the covenants, representations and agreements of Operating Principal set forth in the Franchise Agreement including, without limitation, those in Sections 5, 6, 9, 11 and 14, and is obligated to perform thereunder as if the undersigned had been a party to the Franchise Agreement.

Each of the undersigned waives:

1.  acceptance and notice of acceptance by PDA of the foregoing undertakings;

2.  notice of presentment or demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

3.  protest and notice of default to Franchisee, any Designated Person(s) or other guarantor with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

4.  any right he may have to require that an action be brought against Franchisee, any Designated Person or any other person as a condition of liability;

5. notice of any release of any guarantor or other security given for the obligations of Franchisee; and

6. any and all other notices to which he might otherwise be entitled.

Without limiting the foregoing, each of the undersigned consents and agrees that:

1. his direct and immediate liability under this Guaranty shall be joint and several;

2. he shall render any payment or performance required under the Agreements upon demand if Franchisee fails or refuses punctually to do so upon notice from PDA;

3. such liability shall not be contingent or conditioned upon pursuit by PDA of any remedies against Franchisee, any Designated Person or any other person;

4. such liability shall not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which PDA may from time to time grant to Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable;

5. such liability of each of the undersigned under this Guaranty is irrevocable, continuing, absolute and unconditional, and the obligations of each of the undersigned shall not be discharged or impaired or otherwise affected by, and each of the undersigned hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a) any illegality or lack of validity or enforceability of any obligation or any provision of the Franchise Agreement or any of the other Agreements;

(b) any change in the time, place or manner of payment of, or in any other term of, the obligations of any party under the Franchise Agreement, or any rescission, waiver, amendment or other modification of the Franchise Agreement or any of the other Agreements, including any increase in the obligations;

(c) any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the obligations of the undersigned;

(d) any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the obligations;

(e) the failure of any other person to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of any guarantor or surety with respect to the obligations of Designated Persons set forth in the Franchise Agreement.

If any provision of this Guaranty is deemed to be invalid or inoperative for any reason, that part shall be deemed modified to the extent necessary to make it valid and operative or if it cannot be so modified, then severed, and the remainder of this Guaranty shall continue in force and effect as if it had been signed with the invalid portion so modified or eliminated.

Upon receipt by PDA of notice of the death of any Designated Person(s) executing this Guaranty, the estate of the deceased will be bound by the foregoing provisions, but only for defaults and obligations under the Franchise Agreement existing at the time of death and in such event, the obligations of Franchisee and the remaining Designated Person(s) shall continue in full force and effect.

A Designated Person who is the spouse of Franchisee agrees that the termination of the marital relationship with Franchisee for any reason shall not have the effect of creating any right for such spouse in any property or transactions the subject of the Agreement.

**THE UNDERSIGNED HEREBY IRREVOCABLY SUBMIT THEMSELVES, WHERE APPLICABLE UNDER THE TERMS OF THIS AGREEMENT, TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. THE PARTIES HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. THE PARTIES HEREBY AGREE THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. THE PARTIES FURTHER AGREE THAT THE EXCLUSIVE VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.**

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his/her signature on the same day and year as the Franchise Agreement was executed, unless otherwise dated below with respect to a replacement Operating principal or new Designated Person.

Attest:

_____
Witness

Designated Persons:

*Name: _____ Brian K. Nygaard _____

_____
Witness

Name: _____

_____
Witness

Name: _____

* Denotes individual who is the Franchised Business's Operating Principal

## PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## EXHIBIT H
## SOFTWARE LICENSE AGREEMENT

This Software License Agreement ("Software License") is entered into as of ___September 15___, 2011, between Property Damage Appraisers, Inc. ("PDA") and ___Brian K. Nygaard___ ("Franchisee") pursuant to a Franchise Agreement dated ___September 15___, ___2011___, ("Franchise Agreement") under which Franchisee will operate a Property Damage Appraisers appraisal business (the "Franchised Business").

1.     PDA hereby grants to Franchisee a non-exclusive, non-transferable, non-assignable license to use the computer programs ("Software") listed in Schedule I to this Software License. The schedule may be updated from time to time by PDA to include enhancements, upgrades or replacements ("Enhancements") to the Software which, in the sole discretion of PDA, may be made from time to time at no additional cost.

2.     In consideration of the software license granted hereby, Franchisee shall make payments to PDA as provided in Schedule II attached hereto; provided, however, that if Franchisee and PDA are parties to a Factoring Agreement that is then currently in effect, PDA may offset any amounts owed to Franchisee under such Factoring Agreement by the amounts due to PDA from Franchisee hereunder. PDA may from time to time modify the fee schedule described in the immediately preceding sentence upon thirty (30) days prior written notice to Franchisee.

3.     Franchisee shall use the Software only in the operation of the Franchised Business. Franchisee may not modify, copy or reproduce in any form all or any part of the Software without the prior written consent of PDA, and in such event solely to the extent required for use of the Software in the operation of the Franchised Business. Franchisee shall not make available the Software or any copy thereof to any party except as described below in paragraph 5.

4.     All copies of the Software, including any produced by Franchisee with PDA's consent, are and shall be the sole and exclusive property of PDA during and after the term of this Software License.

5.     Franchisee understands and acknowledges that the Software contains PDA's trade secrets and agrees, during the term of this Software License and thereafter, not to communicate, divulge or use the Software other than in the operation of the Franchised Business. Franchisee shall divulge and allow access to the Software only to its employees who must have access to it in connection with their employment in the Franchised Business. At PDA's request, Franchisee shall require and obtain execution of covenants concerning the confidentiality of the Software from any persons employed by Franchisee or who otherwise have access to the Software. These covenants shall be in a form substantially similar to the confidential covenants contained herein.

6.     Franchisee agrees to notify PDA immediately of the existence of any unauthorized knowledge, possession or use of the Software or of any part thereof.

7.     The term of this Software License shall be co-extensive with the Term of the Franchise Agreement, including any renewal of the Franchise Agreement.

8.     Expiration or termination of the Franchise Agreement for whatever reason shall automatically terminate this Software License and the right granted by it to use the Software, without notice to Franchisee. In addition, PDA may terminate this Software License upon the failure by

Franchisee to comply with any of the terms and conditions herein, by giving Franchisee written notice of termination stating the nature of the breach at least thirty (30) days prior to the effective date of termination; provided that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to PDA's satisfaction within the thirty (30)-day period and by promptly providing proof thereof to PDA. If any such default is not cured within that time (or, if appropriate, substantial and continuing action to cure the default is not initiated within that time), or such longer period as applicable law may require, this Software License shall terminate without further notice to Franchisee effective immediately upon expiration of the thirty (30)-day period or such longer period as applicable law may require.

Upon the expiration or termination of this Software License or upon the expiration or termination of the Franchise Agreement, whichever shall occur earlier, Franchisee shall immediately deliver to PDA all copies of the Software then in Franchisee's possession or control and shall immediately cease to use the Software.

9.      PDA will, in its sole discretion, repair or replace without charge to Franchisee any copies of the Software provided under this Software License which have defects in materials and workmanship, except that this limited warranty does not cover any Software that has been damaged, while in transit to Franchisee or in Franchisee's possession, by accident (including an act of God), misuse (including improper storage), abuse, unauthorized modification or unauthorized repair of the Software. This limited warranty shall be Franchisee's sole and exclusive remedy as to any defects in the Software.

10.      **EXCEPT FOR THE LIMITED WARRANTY DESCRIBED ABOVE, PDA MAKES NO WARRANTIES WITH RESPECT TO THE SOFTWARE TO FRANCHISEE OR ANY OTHER PERSON(S) OR ENTITY WITH RESPECT TO THE SOFTWARE, , WHETHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE; AND ALL SUCH WARRANTIES ARE EXPRESSLY AND SPECIFICALLY DISCLAIMED.**

11.      **FRANCHISEE IS SOLELY RESPONSIBLE FOR DETERMINING ITS DESIRED RESULTS FROM THE USE OF THE SOFTWARE, FOR EVALUATING THE SOFTWARE'S CAPABILITIES AND FOR SUCCESSFULLY OPERATING THE SOFTWARE. IN NO EVENT SHALL PDA BE RESPONSIBLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES, OR FOR LOST DATA OR LOST PROFITS TO FRANCHISEE OR ANY OTHER PERSON(S) OR ENTITY, WHETHER OR NOT DUE TO PDA'S NEGLIGENCE, ARISING OUT OF THE USE OR INABILITY TO USE THE SOFTWARE, EVEN IF PDA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OCCURRING. IN THE EVENT THAT ANY OTHER TERM OF THIS SOFTWARE LICENSE IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISION OF WAIVER BY AGREEMENT OF DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OR FOR LOST DATA OR LOST PROFITS SHALL CONTINUE IN FULL FORCE AND EFFECT.**

12.      **THIS SOFTWARE LICENSE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

13.      If any term herein is declared to be void or unenforceable by a court of competent jurisdiction, such declaration shall have no effect on the other terms of this Software License, which will remain in effect and fully enforceable.

14. Franchisee agrees to pay any sales, use, ad valorem, personal property and general intangibles tax and any registration fees arising out of this Software License and the transactions contemplated herein, except for any taxes imposed upon the gross income of PDA.

15. Franchisee may not assign, sublicense or otherwise transfer any of its rights or obligations under this Software License without the prior written consent of PDA.

16. Notice under this Software License shall be provided as indicated in Section 17 of the Franchise Agreement.

17. The terms of the Franchise Agreement are incorporated into this Software License by reference, including but not limited to the provisions of the Franchise Agreement relating to jurisdiction and exclusive venue. This Software License and related provisions of the Franchise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede all related prior and contemporaneous agreements between the parties.

18. This Software License may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Software License shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Software License electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Software License.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Software License on the date first set forth above in this Software License.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _____
Name: _____ Katherine Slate _____
Title: _____ VP of Franchise Relations _____


FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____

**Schedule I**
**Licensed Software**

**Name of Licensed Software Programs**

Roadmap – PDA's proprietary Franchise Management System software.

**Additional Right to Use Third-Party Software**

    1. Pursuant to the terms of a certain Product License Agreement between PDA and Mitchell, International, Inc., PDA also hereby grants Franchisee a non-exclusive, limited right to use the following software programs (the "<u>Mitchell Software</u>"):

    **Mitchell Estimating and Workflow Product bundle, which includes: UltraMate, MAPP, QRP, Tire Database, Paintless Dent Removal, NADA/Redbook Online Valuation Tool (WorkCenter Total Loss), Refinishing Materials Calculator, TruckEst, eClaim Manager, AIM Online, WorkCenter Review and WorkCenter Compliance.**

The right to use the Mitchell Software is not a license or sublicense of such software. Franchisee agrees to use the Mitchell Software strictly in accordance with instructions provided by PDA from time to time, and to reimburse PDA for the cost of Franchisee's user rights granted hereby.

    2. Pursuant to the terms of a certain Product License Agreement between PDA and Marshall & Swift/Boeckh LLC, PDA also hereby grants Franchisee a non-exclusive, limited right to use the following software programs ("<u>MSB IntegriClaim</u>"):

    **MSB IntegriClaim with Administrator and ComCentral, which is the property estimating software, including the management reporting and workflow software, and the connectivity software providing unlimited communications and file upload/download capabilities to Administrator (respectively).** (Will be phased out beginning Q1 2011, at which point you will have the limited right to continue using IntegriClaim in connection with completing claims processing for any claims pending in IntegriClaim on the day you are switched over to EyeQ.)

    **MSB IntegriClaim EyeQ Edition property estimating software ("EyeQ"), the IntegriClaim EyeQ Web-Based Administrator browser based administrative tool for claims management ("Web Admin") and the IntegriClaim EyeQ Claim Management Client claims examining and editing tool ("Examiner").** (Effective the day you are switched over from MSB IntegriClaim, beginning Q1 2011.)

The right to use the MSB software is not a license or sublicense of such software. Franchisee agrees to use the MSB software strictly in accordance with instructions provided by PDA from time to time, and to reimburse PDA for the cost of Franchisee's user rights granted hereby.

**Schedule II**
**Licensing Fees**

**Name of Licensed Software Programs**

Roadmap -- No Charge

**Additional Right to Use Third-Party Software***

Mitchell - $120.00 weekly

MSB IntegriClaim or EyeQ (whichever is applicable) - $16.00 weekly

TOTAL - $136.00

*PDA Inc., reserves the right to change or adjust these fees as necessary from time to time, to cover increased vendor rates.

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## EXHIBIT I

### FORM OF MONTHLY REPORT

Pursuant to Section 6.F of the Franchise License Agreement between Property Damage Appraisers, Inc. ("PDA") and the undersigned ("Franchisee"), Franchisee hereby certifies that it has performed the following marketing activities during the following monthly period, to promote the sale of appraisal services under PDA's proprietary appraisal system:

PERIOD: _____ to _____

MARKETING ACTIVITIES:

| Description of Activity | Approximate Time Spent | Analysis of Activity |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Franchisee certifies that the contact list attached to this <u>Exhibit I</u> is an up-to-date list of Franchisee's clients and prospects.

Date: ___September 15, 2011_____

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: ___Brian K. Nygaard_____
Title: ___Owner_____

# Updated Contact List of Clients and Prospects

## EXHIBIT J

## LIMITED POWER OF ATTORNEY

This limited power of attorney is made and entered into as of ___September 15___ , ___2011___ , between Property Damage Appraisers, Inc., a Texas corporation ("Assignee"), ___Brian K. Nygaard___ ("Assignor").

WHEREAS, PDA has granted Franchisee a limited right to operate a business using unique system developed by PDA for the development and operation of appraisal businesses, for the period defined in the Franchise Agreement made and entered into ___September 15___ , ___2011___ , ("Franchise Agreement") between PDA and Franchisee;

WHEREAS, pursuant to Section 6.G.1 of the Franchise Agreement, Assignee is entitled to the use of all telephone numbers and post office boxes, if any, used by Assignor in the conduct of its business franchised under the Franchise Agreement (the "Franchised Business"), for the duration of said Franchise Agreement and following expiration or termination of the Franchise Agreement;

NOW, THEREFORE, Assignor hereby irrevocably appoints Assignee as its true and lawful agent and attorney-in-fact to act in the name, place and stead of Assignor for the purpose of assigning to PDA all rights to any telephone numbers, post office boxes and business listings used by Assignor in the conduct of the Franchised Business upon the expiration or termination of the Franchise Agreement, and for the purpose of taking any other actions necessary to enable Assignee to exercise the powers granted hereby.

Assignee may by written instrument delegate any or all of the powers granted hereby to any person or persons whom Assignee may select, but such delegation may be amended or revoked by Assignee at any time.

This limited power of attorney will commence and be in full force and effect on the date hereof and may not be revoked by Assignor at any time hereafter.

This limited power of attorney is governed by the laws of the State of Texas, without regard to conflict of laws principles. If any provision of this limited power of attorney is deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the remainder of this Agreement. Assignor acknowledges that it is fully informed as to the contents and understands the meaning of this limited power of attorney. Assignor acknowledges that a copy of this limited power of attorney executed by facsimile signature will have the same force and effect as a signed original.

ASSIGNOR:
BRIAN K. NYGAARD

By: _____

Name: ___Brian K. Nygaard___

Title: ___Owner___

## EXHIBIT K

## REQUIRED INSURANCE COVERAGE

A.    **Hired and non-owned automobile liability and garagekeepers legal liability insurance in coverage amounts of not less than $1,000,000 per occurrence.

B.    Workers compensation, including employer's liability insurance for each employee in the amounts required or described under state law.

C.    Owned automobile liability insurance with coverage in an amount of not less than $500,000 as a combined single limit for bodily injury and property damage.

D.    **Errors and omission coverage in an amount not less than $1,000,000 per occurrence and $5,000,000 in the aggregate.

E.    Any insurance which may be required by statute or rule of the state or locality in which the Franchised Business will be located.

F.    **Commercial General and Commercial Umbrella Liability Insurance with independent contractor's coverage for claims involving bodily injury and/or property damage liability arising out of the acts of Franchisee and/or its employees, agents or independent contractors, with a minimum combined single coverage limit of $1,000,000 per occurrence and $2,000,000 in the aggregate.

        **Policies offered as of the Effective Date by, and which must be purchased through, the Required National Program.

## PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

### EXHIBIT L

### CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement") is made and entered into _____September 15___, ___2011___, between Property Damage Appraisers, Inc., a Texas corporation ("PDA"), _____Brian K. Nygaard_____("Franchisee") and ____Walter Garrett___("Promissor").

### RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design)™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of ___September 15___, __2011__ , ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## Confidentiality Agreement

1.　　Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.　　Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.　　Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.　　PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.　　At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.　　Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.     Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works.  If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work.  If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.     Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement.  Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement.  Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.     Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**Miscellaneous**

1.     Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.     Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law.  Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.     Promissor agrees to pay all expenses (including court costs and  legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.     Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.     **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.     The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.     This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.     All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

Property Damage Appraisers, Inc.
P.O. Box 471909
Fort Worth, Texas 76147
Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Attn: Brian K. Nygaard
> Facsimile: 925-634-6275

If directed to the Promissor, the notice shall be addressed to:

> Walter Garrett
> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Facsimile: 925-634-6275

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.      The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.      This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_
Name: _Katherine Slate_
Title: _VP Franchise Relations_
Executed: _12|28|11_

FRANCHISEE:
BRIAN K. NYGAARD

By: _Brian K. Nygaard_
Name: _Brian K. Nygaard_
Title: _Owner_

PROMISSOR
WALTER GARRETT

By: _Walter Garrett_
Name: _Walter Garrett_

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT
## EXHIBIT M
## CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into ___September 15___, ___2011___, between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"),___Brian K. Nygaard___("Franchisee") and ___Susan Osoria___ ("Promissor").

## RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of   September 15,  2011, ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.     Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.     Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.     Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.     At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.     Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.    Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.    Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.    Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**B. Covenants Not to Compete**

1.    Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.    Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.      Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.      Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.      Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.      Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.      The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.      Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.      Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

### C. Miscellaneous

1.      Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.      Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.     Promissor agrees to pay all expenses (including court costs and  legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.     Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.     **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING  RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT  SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.   WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.     The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.     This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.     All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Attn: Brian K. Nygaard
> Facsimile: 925-634-6275

If directed to the Promissor, the notice shall be addressed to:

> Susan Osoria
> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Facsimile: 925-634-6275

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.      The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.      This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _____

Name: _____Katherine Slate_____

Title: _____VP of Franchise Relations_____

Executed: ____12|28|11_____

FRANCHISEE:
BRIAN K. NYGAARD

By: _____

Name: _____Brian K. Nygaard_____

Title: _____Owner_____


PROMISSOR:
SUSAN OSORIA

By: _____

Name: _____Susan Osoria_____

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT
### EXHIBIT M
## CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into __September 15__ , __2011__ , between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"),_____Brian K. Nygaard_____("Franchisee") and ____Kimberly Osoria_____ ("Promissor").

### RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of  September 15,  2011, ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.     Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.     Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.     Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.     PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession. No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets. Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA. Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.     At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets. Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets. Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge. Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.     Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities. Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.    Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.    Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.    Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**B. Covenants Not to Compete**

1.    Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.    Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.     Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.     Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.     Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.     Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.     The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.     Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.     Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

## C. Miscellaneous

1.     Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.     Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.      Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.      Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.      **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.      The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.      This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.      All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Attn: Brian K. Nygaard
> Facsimile: 925-634-6275

If directed to the Promissor, the notice shall be addressed to:

> Kimberly Osoria
> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Facsimile: 925-634-6275

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9. The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_

Name: _____ Katherine Slate _____

Title: _____ VP of Franchise Relations _____

Executed: _12/28/11_

FRANCHISEE:
BRIAN K. NYGAARD

By: _____

Name: _____ Brian K. Nygaard _____

Title: _____ Owner _____


PROMISSOR:
KIMBERLY OSORIA

By: _____

Name: _____ Kimberly Osoria _____

# PROPERTY DAMAGE APPRAISERS, INC.
# FRANCHISE LICENSE AGREEMENT

## EXHIBIT M

## CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

This Confidentiality Agreement and Ancillary Covenants not to Compete (this "Agreement") Agreement is made and entered into ___September 15___, ___2011___, between PROPERTY DAMAGE APPRAISERS, INC., a Texas corporation ("PDA"),___Brian K. Nygaard___("Franchisee") and ___Janice Garvin___ ("Promissor").

## RECITALS

WHEREAS, PDA, as a result of the expenditure of time, skill, effort and money, has created, developed and franchised (the "Franchised Business") under the trade name and Proprietary Marks (defined below) a unique and distinctive system (the "PDA System") relating to the establishment and operation of appraisal businesses which specialize in, among other things, providing damage appraisal services of property, including, without limitation, appraisal of automobiles, motorcycles, heavy equipment, off-road equipment, boats, recreational vehicles, mobile homes and real property) using certain procedures, techniques, business methods, business forms, business policies and a body of knowledge pertaining to the establishment and operation of the Franchised Businesses. The Promissor acknowledges that Promissor does not presently know these procedures, techniques, business methods or business policies, nor does the Promissor have these business forms or access to PDA's body of knowledge; and

WHEREAS, the distinguishing characteristics of the PDA System include, without limitation, uniform standards, specifications and procedures for operations; quality and uniformity of products and services offered; training and assistance; and advertising and promotional programs; all of which may be changed, improved or discontinued by PDA, in its sole discretion, from time to time; and

WHEREAS, PDA identifies the PDA System through certain trade names, trademarks, service marks, symbols, logos, emblems and indicia of origin, including, without limitation, the mark PROPERTY DAMAGE APPRAISERS™, the service mark PDA (and design) ™ and such other trade names, trademarks and service marks as PDA may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and under the PDA System and representing the PDA System's high standards of quality, appearance and service (collectively, the "Proprietary Marks"); and

WHEREAS, Promissor understands and acknowledges the importance of PDA's brand, high standards of quality, appearance and service and the necessity of operating the business franchised hereunder in conformity with PDA's standards and specifications; and

WHEREAS, Franchisee desires to operate a Franchised Business under the PDA System using the Proprietary Marks, PDA's proprietary software, PDA's confidential and proprietary information and trade secrets, deriving the benefit of and incorporating PDA's brand, information, experience, advice and guidance, know-how, customer goodwill, PDA's confidential specifications and standards for providing property damage appraisal services, including but not limited to the PDA System; and any written, printed or electronic material provided by PDA in relation thereto (the "Documentation"), including but not limited to PDA's confidential operations manual (the "Manual"); and

WHEREAS, the PDA System incorporates PDA's confidential, proprietary and/or trade secret information in tangible or intangible form, transferred orally, visually, electronically, or by any other means, including, without limitation, information that relates to the Manual, the Documentation, the PDA proprietary software, the PDA System, the Franchised Business, its products, services, marketing, advertising, licensing, sales activities, techniques or methods, operations, training, policies, practices, outlooks, studies, reports, analyses, strategies or forecasts, finances, revenue, pricing, costs or profits, accounting procedures, intellectual property, catalogues, information bulletins, development, research, designs, sketches, photographs, plans, drawings, specifications, performance characteristics, code, formulas, algorithms, data, techniques, processes, inventions, testing strategies, industry, customer or consumer information, and third party confidential information, business forms, computer programs, test materials, or the like, this Agreement and any other agreement executed between Franchisee and PDA, any knowledge, know-how, advice, guidance, or expertise of PDA received by Franchisee in connection with the operation of the Franchised Business, all memoranda, notes, documents, and other writings prepared by Franchisee, Franchisee's Operating Principals or employees, or Promissor containing or based in whole or in part on the PDA System or prepared in connection with the Franchised Business (collectively, the "Trade Secrets"); and

WHEREAS, the Trade Secrets provide economic advantages to PDA and are not generally known to, and are not readily ascertainable by proper means by, PDA's competitors who could obtain economic value from knowledge and use of the Trade Secrets; and

WHEREAS, PDA has taken and intends to take all reasonable steps to maintain the confidentiality and secrecy of the Trade Secrets; and

WHEREAS, PDA has granted Franchisee a limited right to operate a "Franchised Business" under and as defined in the Franchise Agreement made and entered into as of _September 15, 2011, ("Franchise Agreement") between PDA and Franchisee; and

WHEREAS, PDA and Franchisee have agreed in the Franchise Agreement on the importance to PDA and to the Franchisee and other licensed users of the PDA System of restricting use, access and dissemination of the Trade Secrets; and

WHEREAS, it will be necessary for Promissor to have access to and to use some or all of the Trade Secrets in the management and operation of the Franchised Business using the PDA System; and

WHEREAS, Franchisee has agreed to obtain from Promissor a written agreement protecting the Trade Secrets and the PDA System against unfair competition; and

WHEREAS, Promissor is a "Designated Person" (as defined in the Franchise Agreement); and

WHEREAS, Promissor wishes and needs to receive and use the Trade Secrets to effectively perform Promissor's services for Franchisee; and

WHEREAS, Promissor acknowledges that receipt of and the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants made by Promissor herein;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and obligations contained herein, the parties agree as follows:

## A. Confidentiality Agreement

1.      Promissor agree that both during and after the term of Franchise Agreement that: Promissor shall not either directly or indirectly, for Promissor, or through, on behalf of, or in conjunction with, any person or entity nor any of their affiliated companies, equity owners, officers, directors, managers, employees, trustees, beneficiaries, representatives, consultants, contractors, or agents use or duplicate in any way for Promissor's own account or for the account of any third party, any or all of the Trade Secrets in any manner whatsoever except in the direct operation of the Franchised Business as expressly authorized under the terms of the Franchise Agreement;

2.      Promissor shall at all times keep strictly confidential, and shall not at any time communicate, disclose, distribute, copy, record, or otherwise reproduce or transfer, in whole or in part, to any person or entity, all or any portion of the Trade Secrets without the prior written consent of PDA, except that Promissor may disclose to Franchisee's employees and Operating Principals that portion, but only that portion, of the Trade Secrets that such employees and Operating Principals need to know in order to fulfill the terms of the Franchise Agreement, and Promissor may disclose to the customers and clients of PDA and the Franchised Business that portion, but only that portion, of the Trade Secrets that such customers and clients have procured in connection with appraisal services performed under the PDA System in the ordinary course of the Franchised Business; and

3.      Promissor shall take all reasonable measures to protect the secrecy of and prevent disclosure and unauthorized use of the Trade Secrets, which steps shall include, without limitation, at least the most stringent precautions Promissor uses to protect its own confidential information, and shall also include, without limitation, any steps reasonably designated by PDA from time to time. Promissor shall not make any copies of the Trade Secrets unless the same are previously approved in writing by PDA. Promissor shall reproduce PDA's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Promissor shall immediately notify PDA in the event of any unauthorized use or disclosure of the Trade Secrets.

4.      PDA is the sole and exclusive owner of the Trade Secrets, including all copies of the Trade Secrets in Promissor's possession.  No license to the Promissor of any patent, copyright, trademark, mask work protection right or any other intellectual property right is either granted or implied by this Agreement or any disclosure hereunder, including, but not limited to, any license to make, use, import or sell any product embodying any Trade Secrets.  Promissor shall ensure that Promissor's copy of any Trade Secrets are kept current at all times and are kept in a secure place as designated by Franchisee or PDA.  Promissor agrees that any goodwill that may arise from Promissor's use of the Trade Secrets shall at all times remain the sole and exclusive property of PDA and shall inure to the sole benefit of PDA.

5.      At the request of PDA, Promissor shall disclose to PDA the names and addresses of any party having access to, or knowledge of, any of the Trade Secrets.  Promissor agrees to notify and instruct Promissor's employees, Franchisee's employees and Franchisee's Operating Principals regarding the confidential nature of the Trade Secrets.  Promissor agrees to promptly notify PDA in writing of any loss, theft, or unauthorized disclosure or use of any of PDA's Trade Secrets of which Franchisee has knowledge.  Promissor shall be liable for any loss or damage arising from a breach of this Agreement by Promissor, or Promissor's employees or agents.

6.      Franchisee shall require all Promissor's employees, independent contractors performing appraisal services on Promissor's behalf, or third parties performing services for Franchisee which provides access to the Trade Secrets, to execute a Confidentiality Agreement in the form provided by PDA, prior to any disclosure of Trade Secrets to such persons or entities.  Promissor shall ensure that any parties who execute such agreements act as required by such agreements.

7.     Promissor acknowledges and agrees that all right, title and interest in and to any and all copyrightable works prepared by Promissor or any of its employees within the scope of the Franchised Business or using any of the Trade Secrets shall be owned exclusively by PDA, and that PDA will be considered the author of all such works. If and to the extent that any jurisdiction should fail to deem any copyrightable work prepared by any such individual within the scope of the Franchised Business to be a work made for hire owned by PDA, Promissor hereby irrevocably assigns to PDA all rights, title and interest in and to such work. If Promissor or employee of Promissor jointly or solely develops, conceives, reduces to practice or otherwise produces any new concept, design, development, process or improvement in the operation or promotion of the Franchised Business (the "Inventions"), Promissor agrees to promptly and fully disclose the same to PDA and to provide PDA with all necessary related information. On behalf of itself and its employees, Promissor (1) agrees that any such Invention shall be the property of PDA; (2) grants, transfers and assigns to PDA all their rights, title and interest in and to such Inventions; (3) acknowledges that PDA may use or disclose such Inventions to other franchisees as it deems appropriate; and (4) waives and quitclaims to PDA any and all claims of any nature whatsoever that Promissor now or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions so assigned to PDA; all without compensation to Promissor.

8.     Promissor acknowledges that any failure to comply with the requirements of this Agreement shall constitute an Event of Default and will cause PDA irreparable injury for which no adequate remedy at law may be available, and Promissor hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Promissor in violation of the terms of this Agreement. Promissor agrees to pay all court costs and reasonable attorneys' fees incurred by PDA in obtaining specific performance of, or an injunction against a violation of, the requirements of this Agreement. Additionally, PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

9.     Promissor shall surrender the confidential Operations Manual and other material containing some or all of the Trade Secrets to the Franchisee or PDA, upon the earlier of request by Franchisee or PDA, or upon termination of employment by Franchisee, or upon conclusion of the use for which the Manual or other information or material may have been furnished to the Promissor.

10.    Promissor shall not, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the Trade Secrets and the PDA System.

**B. Covenants Not to Compete**

1.     Promissor covenants and agrees that during the Term of this Agreement and for a two-year period following the later of the date of termination or expiration of the Franchise Agreement, that Franchisee shall not, either directly or indirectly associated as an employee, proprietor, stockholder, partner, member, agent, officer, director, consultant, representative, manager, spouse, parent, or in any other capacity. with or through, on behalf of, or in conjunction with any person, corporation, partnership, trust, association, joint venture, other unincorporated business, or other legal entity or as an employee, investor, stockholder, principal, equity owner, officer, director, manager, employee, trustee, beneficiary, representative, consultant, contractor, agent, or in any capacity whatsoever in any entity, or in any other manner:

A.     Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of any PDA Franchised Business to any competitor of PDA's Franchised Business, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks, the PDA System or the Franchised Business.

B.     Employ or seek to employ any person who is at that time employed by PDA or by any other franchisee of PDA, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

C.     Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service, which provides appraisal services that is (i) located in the Marketing Area of the Franchised Business operated by Franchisee; or (ii) located or provides such services to customers or within twenty-five (25) miles of the perimeter of any marketing area of any other PDA Franchised Business operating under the PDA System.

2.     Promissor acknowledges that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Promissor.

3.     Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by PDA in connection with the enforcement of this Agreement.

4.     The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement. The two-year period referred to in Section B.1 above shall be tolled during any period of Promissor's noncompliance with the terms of this Agreement.

5.     Franchisee acknowledges that any failure to comply with the requirements of this Agreement would cause PDA irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this Agreement. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

6.     Promissor shall obtain and deliver to PDA agreements to be bound by covenants similar to those set forth in this Agreement (including covenants applicable upon the termination of a person's relationship with Franchisee) from all employees of Promissor, spouse of the Promissor, if such spouse participates in any manner in the Franchised Business whether as an employee or otherwise, and any other persons who are actively involved in a managerial or supervisory position with Promissor with respect to the Franchised Business. Each covenant required by this Agreement shall be substantially in the form provided by PDA. Failure by Promissor to obtain execution of an agreement required by this Agreement shall constitute an Event of Default.

## C. Miscellaneous

1.     Franchisee undertakes to use its best efforts to ensure that Promissor acts as required by this Agreement.

2.     Promissor agrees that in the event of a breach of this Agreement, PDA would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, PDA shall be entitled to enforce this Agreement and shall be entitled, in addition to any other remedies which are available to it at law or in equity, including the right to terminate the Franchise License Agreement, to a temporary and/or permanent injunction and a

decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.      Promissor agrees to pay all expenses (including court costs and legal fees) incurred by PDA and the Franchisee in enforcing this Agreement.

4.      Any failure by PDA or the Franchisee to object to or take action with respect to any breach of this Agreement by Promissor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Promissor.

5.      **EXCEPT AS STATED BELOW, PROMISSOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TARRANT COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION. PROMISSOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. PROMISSOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. EMPLOYEE FURTHER AGREES THAT THE EXCLUSIVE VENUE FOR ANY LEGAL OR EQUITABLE PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE STATE COURTS OF TARRANT COUNTY, TEXAS AND, THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (2) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, REAL PROPERTY, PDA MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

6.      The parties agree that each of the above covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which PDA is a party, Promissor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.      This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.      All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties.

If directed to PDA, the notice shall be addressed to:

> Property Damage Appraisers, Inc.
> P.O. Box 471909
> Fort Worth, Texas 76147
> Facsimile: 817-731-5550

If directed to the Franchisee, the notice shall be addressed to:

> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Attn: Brian K. Nygaard
> Facsimile: 925-634-6275

If directed to the Promissor, the notice shall be addressed to:

> Janice Garrin
> Property Damage Appraisers
> 1163 East March Lane, #447
> Stockton, California 95210
> Facsimile: 925-634-6275

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile, telegram or telex shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three (3) business days after the time of mailing. Any change in the above addresses shall be effected by giving fifteen (15) days written notice of such change to the other party. Business day shall be defined as any day other than Saturday, Sunday or any recognized U.S. national holiday.

9.     The rights and remedies of PDA under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of the Franchisee and the Promissor hereunder may not be assigned by the Franchisee or Promissor, as applicable, without the prior consent of PDA.

10.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall be binding upon the parties hereto when one or more counterparts hereof, individually or taken together, bear the signatures of all the parties hereto. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.
A Texas Corporation

By: _Katherine Slate_
Name: _____ Katherine Slate _____
Title: _____ VP of Franchise Relations _____
Executed: 12|28|11

FRANCHISEE:
BRIAN K. NYGAARD

By: _____
Name: _____ Brian K. Nygaard _____
Title: _____ Owner _____

PROMISSOR:
JANICE GARRIN

By: _____
Name: _____ Janice Garvin _____

# PROPERTY DAMAGE APPRAISERS, INC.
## FRANCHISE LICENSE AGREEMENT

## EXHIBIT N

### STATE LAW ADDENDA

**EXHIBIT N-1**

## 1. CALIFORNIA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the California Franchise Investment Law, CAL. BUS. & PROF. CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq., the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated ____September 15____,____2011____, (the "Agreement") agree as follows:

A.     Section 2 of the Agreement, "Term and Renewal," shall be supplemented with the following language which shall be considered an integral part of the Agreement:

> The Agreement requires you to sign a general release of claims upon renewal of the Agreement. California Corporations Code Section 31512 provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order is void. Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000-31516). Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code 20000-20043).

B.     Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the California Franchise Investment Law or the California Franchise Relations Act.

C.     Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

> California Business and Professions Code Sections 20000 through 20043 provide rights to the Franchisee concerning non-renewal of a franchise. If this Agreement contains a provision that is inconsistent with the law, the law will control.

D.     Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other

1

agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as the transferor may have that have arisen under the California Franchise Investment Law or the California Franchise Relations Act;

E.      Subsection B of Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

This Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C, Sec. 101 *et seq.*).

F.      Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

California Business and Professions Code Sections 20000 through 20043 provide rights to the Franchisee concerning termination of a franchise. If this Agreement contains a provision that is inconsistent with the law, the law will control.

G.      Section 14 of the Agreement, "Covenants," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

This Agreement contains a covenant not to compete which extends beyond expiration or termination of the franchise. This provision may not be enforceable under California law.

H.      Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

**THIS AGREEMENT REQUIRES APPLICATION OF THE LAWS OF TEXAS UNDER CERTAIN CIRCUMSTANCES. THIS PROVISION MAY NOT BE ENFORCEABLE UNDER CALIFORNIA LAW.**

I.      Section 18 of the Agreement, "Dispute Resolution," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

The Agreement requires binding arbitration. The arbitration will occur at the PDA's corporate headquarters in Fort Worth, Texas, before a sole arbitrator agreed to by the parties and selected from the panel of arbitrators of the American Arbitration Association, with the costs being borne by the losing party. This provision may not be enforceable under California law. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement restricting venue to a forum outside of the State of California.

J.      Sections 17 and 18 of the Agreement, "Miscellaneous" and "Dispute Resolution," shall be supplemented by the following paragraph which shall be considered an integral part of the Agreement:

To the extent this Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable under California law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-1 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

_Elizabeth Ingram_
Witness

By: _Katherine Slate_
Name: Katherine Slate
Title: VP Franchise Relations

FRANCHISEE:
BRIAN K. NYGAARD

ATTEST:

_Dan M Soatta_
Witness

By: _Brian K. Nygaard_
Name: Brian K. Nygaard
Title: Owner

## 2. HAWAII ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Hawaii Franchise Investment Law, Section 482E *et seq.*, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____,_____, (the "Agreement") agree as follows:

A. Under the Hawaii Franchise Investment Law, the following practices are prohibited, and to the extent the Agreement is inconsistent, Hawaii law shall control:

1. Restricting the right of the franchisee to join a franchisee association;

2. Imposing unreasonable requirements to purchase from the franchisor or other designated sources;

3. Unlawfully discriminating between franchisees;

4. Obtaining undisclosed benefits on account of franchisee purchases;

5. Requiring the franchisee to grant a prospective release from liability imposed by the Hawaii Franchise Investment Law, Section 482E.

6. Imposing any unreasonable and arbitrary standard of conduct;

7. Terminating or refusing to renew a franchise except for good cause, or unreasonably discriminating between franchisees in connection with termination or non-renewal. For purposes of this paragraph, good cause shall include, but not be limited to, the failure of the franchisee to comply with any lawful, material provision of the franchise agreement after having been given written notice thereof and an opportunity to cure the failure within a reasonable period of time;

8. Refusing to permit franchise transfers, except for good cause. For purposes of this paragraph, For purposes of this paragraph good cause shall include, but not be limited to:

(i) The failure of a proposed transferee to meet any of the franchisor's or subfranchisor's reasonable qualifications or standards then in effect for a franchisee or subfranchisor;

(ii) The fact that the proposed transferee or any affiliated person of the proposed transferee is a competitor of the franchisor or subfranchisor;

(iii) The inability or unwillingness of the proposed transferee to agree in writing to comply with and be bound by all lawful obligations imposed by the franchise, including without limitation all instruction and training obligations, and to sign the current form of franchise agreement used by the franchisor or subfranchisor; and

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor and to cure any default in the franchise agreement or other agreements with the franchisor existing at the time of the proposed transfer.

9.    Failing to compensate the franchisee for certain assets upon terminating or refusing to renew the franchise.

To the extent this Agreement is inconsistent with Hawaii law, such inconsistent provisions are superseded by Hawaii law and shall have no force or effect.

B.    Section 2.B.8 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Hawaii Franchise Investment Law, Section 482E.

C.    Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsections E and F which shall be considered integral parts of the Agreement:

1.    In the event PDA does not approve the renewal of this Agreement, PDA may be required to purchase for fair market value Franchisee's inventory, supplies, equipment and furnishings purchased from PDA or a supplier designated by PDA; provided that personalized materials which have no value to PDA need not be compensated for. If such non-renewal is for the purpose of converting the Franchisee's business to one owned and operated by PDA, PDA may be obligated to compensate the Franchisee for loss of goodwill. PDA may deduct all amounts due from Franchisee and any costs related to the transportation or disposition of items purchased against any payment therefor.

2.    To the extent that the above renewal provisions are inconsistent with the Hawaii Franchise Investment Law, Section 482E-6, such inconsistent provisions are superseded by the Law's requirements and shall have no force or effect.

D.    Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state,

and local laws, rules and ordinances; excluding only such claims as transferor may have that have arisen under the Hawaii Franchise Investment Law, Section 482E.

E. Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be considered an integral part of the Agreement:

To the extent the above termination provisions are inconsistent with the Hawaii Franchise Investment Law, Section 482E-6, such inconsistent provisions are superseded by the Law's requirements and shall have no force or effect.

F. Section 13.J of this Agreement, "Obligations Upon Termination or Expiration," shall be supplemented by the following Subsection J. which shall be considered an integral part of the Agreement:

PDA may be required under Section 482E-6 of the Hawaii Franchise Investment Law, to be exercised within thirty (30) days after termination or expiration, to purchase from Franchisee any or all of the furnishings, equipment, signs, fixtures, supplies or inventory of Franchisee related to the operation of the franchised business, at Franchisee's cost or fair market value, whichever is less or if required under Hawaii law, at fair market value. If PDA must exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee and any costs related to the transportation or disposition of items purchased against any payment therefor.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-2 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

_____          By:_____
Witness                               Name:_____
                                      Title:_____


FRANCHISEE:

ATTEST:

_____          By:_____
                                      Name:_____
Witness                               Title:_____

**3.    ILLINOIS ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987 (the "Act"), the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

The provisions of the Act shall supersede any provision of the Agreement which is in conflict with the Act.

A.    Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following paragraph which shall be considered an integral part of the Agreement:

> Notwithstanding anything to the contrary contained in this Agreement, if any of the provisions of this Section 2, concerning non-renewal, are inconsistent with Section 20 of the Illinois Franchise Disclosure Act of 1987, the provisions of the Act shall apply rather than the contrary provisions of this Section 2. As provided under Subsection 17.D hereof, however, each provision of this Agreement shall be considered severable, and if, for any reason, any provision of this Section 2 is determined to be invalid and contrary to, or in conflict with, Section 20 of the Act, such shall not impair the operation of, or have any other effect upon, such other provisions of this Section 2 as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto.

B.    Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be inserted following Subsection 12.D and shall be considered an integral part of the Franchise Agreement:

> Notwithstanding anything to the contrary contained in this Agreement, if any of the provisions of this Section 12, governing termination, are inconsistent with Section 19 of the Illinois Franchise Disclosure Act of 1987, the provisions of the Act shall apply rather than the contrary provisions of this Section 12. As provided under Subsection 17.D hereof, however, each provision of this Agreement shall be considered severable, and if, for any reason, any provision of this Section 12 is determined to be invalid and contrary to, or in conflict with, Section 19 of the Act, such shall not impair the operation of, or have any other effect upon, such other provisions of this Section 12 as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto.

C.    The first, second and fourth sentences of Section 18.D of the Agreement, "Dispute Resolution," shall be deleted in their entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

D.    Section 17 of the Franchise Agreement, "Miscellaneous," shall be supplemented by the following Subsection R which shall be inserted following Subsection Q and shall be considered an integral part of the Franchise Agreement:

> In accordance with Section 41 of the Act, no provision in this Agreement shall be construed as requiring Franchisee to waive compliance with any provision of the Act.

E.     Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD FOR TEXAS CHOICE OF LAW RULES); HOWEVER ILLINOIS LAW WILL GOVERN FRANCHISE AGREEMENT UNDER THE JURISDICTION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT.**

F.     The second and third sentences of Subsection F.1 of Section 17 of the Agreement, "Miscellaneous," shall be deleted in their entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

G.     Subsection F.3 of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall be of no force or effect with respect to any cause of action that is otherwise enforceable in Illinois.

H.     Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of Illinois, the Agreement and this Addendum shall be governed and construed in accordance with the Act.


IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-3 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____     Name:_____
Witness                                               Title:_____


FRANCHISEE:

ATTEST:

By:_____

_____     Name:_____
Witness                                               Title:_____

## 4. INDIANA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Indiana Franchise Disclosure Law and the Indiana Deceptive Franchise Practices Act, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE LICENSE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A. The laws of the State of Indiana shall supersede any provision of the Agreement which is in conflict with Indiana law.

B. The prohibition by Indiana Code 23-2-2.7-1(7) against unilateral termination of the franchise without good cause or in bad faith, good cause being defined therein as a material breach of the Agreement, will supersede the provisions of the Agreement in the State of Indiana to the extent they may be inconsistent with such prohibition.

C. No release, waiver, or estoppel language set forth in the Agreement will relieve PDA or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Indiana.

D. Any provision in the Agreement which limits litigation brought for breach of the Agreement, including waiver of the right to a trial by jury or the right to collect punitive damages, in any manner whatsoever is deleted from any Agreement in the state of Indiana.

E. Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Indiana Franchise Disclosure Law or the Indiana Deceptive Franchise Practices Act.

F. Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsection E, which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding renewal are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent renewal provisions will be superseded by the Act's requirements.

G. Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as the transferor may have that have arisen under the Indiana Franchise Disclosure Law or the Indiana Deceptive Franchise Practices Act.

H.      The second sentence of Subsection C.2 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash consideration offered by a third party, an independent appraisal mutually agreed upon by PDA and Franchisee shall be designated to determine such amount, and his determination shall be binding.

I.      Section 11.D of the Agreement, shall be supplement by the following language which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding the death of a Franchisee, is inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Acts requirements.

J.      Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding termination are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent termination provisions will be superseded by the Act's requirements.

K.      Section 13.G of the Agreement, "Rights and Duties Upon Expiration or Termination," is deleted in its entirety.

L.      Subsection A.3 of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Own, operate, maintain, engage in, participate in, become interested in, or have any interest in any business, other than the Franchised Business, which is the same or similar to the Franchised Business, including, but not limited to, a property appraisal business or a claims adjusting service which provides appraisal services to customers located within twenty-five (25) miles of the Marketing Area.

M.      Subsection H of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee acknowledges that a violation of the terms of this Section 14 would result in irreparable injury to PDA for which no adequate remedy at law may be available, and Franchisee agrees that PDA is entitled to apply for an injunction prohibiting any conduct

by Franchisee in violation of the terms of this Section 14. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement to otherwise.

N.      Section 14 of the Agreement, "Covenants," shall be supplemented by the following Subsection K which shall be considered an integral part of this Agreement:

To the extent that any of the above provisions regarding covenants not to compete upon expiration or termination of the Agreement are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

O.      Section 16 of the Agreement, "Independent Contractor and Indemnification," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

To the extent that any of the above provisions regarding covenants not to compete upon expiration or termination of the Agreement are inconsistent with the requirements of the Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

P.      Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

To the extent that any part of Section 17 of the Agreement is inconsistent with the requirements of the of Indiana Deceptive Franchise Practices Act, such inconsistent provisions will be superseded by the Act's requirements.

Q.      Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAW RULES); HOWEVER, TO THE EXTENT THAT TEXAS LAW IS INCONSISTENT WITH THE INDIANA FRANCHISE LAWS, INDIANA CODE 23-2-2.5 AND INDIANA CODE 23-2-2.7, THE INDIANA FRANCHISE LAWS WILL CONTROL.**

R.      Subsection A of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THE PARTIES AGREE TO FIRST SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (AND EXHIBITS) OR THE RELATIONSHIP CREATED BY SUCH AGREEMENT TO NON-BINDING MEDIATION PRIOR TO SEEKING ARBITRATION OR FILING SUCH CLAIM, CONTROVERSY OR DISPUTE, IF APPLICABLE, IN A COURT. THE MEDIATION SHALL BE CONDUCTED THROUGH EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATION SERVICES ORGANIZATION OR BODY AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION**

**(NOT TO EXCEED FIFTEEN (15) DAYS), THROUGH THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA") IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION. THE MEDIATION SHALL TAKE PLACE AT SUCH PLACE AS MUTUALLY AGREED UPON BY THE PARTIES. THE PARTIES AGREE TO KEEP THE PROCEEDINGS OF THE MEDIATION, ALL EVENTS LEADING UP TO THE MEDIATION, AND THE OUTCOME OF THE MEDIATION CONFIDENTIAL. NOTWITHSTANDING THE FOREGOING, THE PARTIES MAY BRING AN ACTION (1) FOR MONIES OWED, OR (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF IN A COURT HAVING JURISDICTION IN ACCORDANCE WITH SECTION 18.C BELOW, WITHOUT SUBMITTING SUCH ACTION TO MEDIATION.**

S.      Subsection D of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect.

T.      Indiana law prohibits waiver of a jury trial. All references in the Agreement to waiver of a jury trial are deleted in their entirety.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-4 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

**5.    MARYLAND ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law, MD. CODE ANN., BUS. REG. §§14-201 to 14-233 (2010 Rep.Vol.), the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

Section 2.B.8 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect in the state of Maryland.

A.    Section 11.B.3 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect in the state of Maryland.

B.    In recognition of the requirements of Section 14-216(c)(25) of the Maryland Franchise Registration and Disclosure Law the parties agree to the following:

C.    Section 17.E of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

> **THE FRANCHISE AGREEMENT REQUIRES APPLICATION OF THE LAWS OF TEXAS UNDER CERTAIN CIRCUMSTANCES. THESE PROVISIONS MAY NOT BE ENFORCEABLE UNDER MARYLAND LAW. FRANCHISEE IS PERMITTED TO BRING A LAWSUIT IN MARYLAND FOR CLAIMS ARISING UNDER THE MARYLAND FRANCHISE REGISTRATION AND DISCLOSURE LAW.**

D.    Section 17 of the Agreement, "Miscellaneous," shall be supplemented by the following language which shall be considered an integral part of the Agreement:

> Section 14-226 of the Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a prospective franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing a franchise. Any such representations in the Agreement are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

E.    **Maryland Law**. The laws of the State of Maryland shall supersede any provision of the Agreement which is in conflict with Maryland law. Additionally, the Agreement shall be supplemented by the following language which shall be considered an integral part of the Agreement:

> 1.    Any claims arising under the Maryland Franchise Registration and Disclosure Law, must be brought within three (3) years after the grant of the franchise.

> 2.    The limitation, in Section 18.F of the Agreement, on the period of time arbitration and/or litigation claims must be brought shall not act to reduce the 3-year statute of limitations afforded a franchisee for bringing a claim arising under the Maryland Franchise Registration and Disclosure Law.

3. Under COMAR 02.02.02.16L, the general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

4. Franchisees may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

5. The Franchise Agreement requires prospective franchisees to disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Maryland Franchise Registration and Disclosure Law in order to purchase a franchise. Such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

F. In recognition of the requirements of the federal bankruptcy law (11 U.S.C., Sec. 101 *et seq.*) the parties agree to the following:

G. The provision in the Agreement which provides for termination upon bankruptcy of the franchisee may not be enforceable under federal bankruptcy law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-5 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____   Title:_____

Witness

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____   Title:_____

Witness

## 6. MICHIGAN ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Michigan Franchise Investment Law, MCL 445.1501 *et seq.*, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

The State of Michigan prohibits certain unfair provisions that are sometimes in franchise documents. If any of the following provisions are in these franchise documents, the provisions are void and cannot be enforced against you.

A.   A prohibition on the right of a franchisee to join an association of franchisees.

B.   A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

C.   A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

D.   A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

E.   A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

F.   A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

G.   A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i) The failure of the proposed franchisee to meet the franchisor's then current reasonable qualifications or standards.

(ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

H.      A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

I.      A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services. If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee or subfranchisor until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

**ANY QUESTIONS REGARDING THIS NOTICE SHOULD BE DIRECTED TO THE OFFICE OF ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION, ATTN: FRANCHISE DEPARTMENT, 525 W. OTTAWA STREET, 670 LAW BLDG., LANSING, MICHIGAN 48933 (517) 272-7117.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-6 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____
Name: _____

Witness
Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____
Name:_____

Witness
Title:_____

## 7. MINNESOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the Minnesota Franchise Act, Minn. Stat. Section 80.01 *et seq.*, and of the Rules and Regulations promulgated pursuant thereto by the Commissioner of Commerce, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

Section 1 of the Franchise Agreement, "Grant of Franchise," shall be supplemented with the addition of the following Subsection E, which shall be considered an integral part of the Franchise Agreement.

A. The Minnesota Department of Commerce requires that PDA indemnify Minnesota franchisees against liability to third parties resulting from claims by third parties that the Franchise's use of the Proprietary Marks infringes trademark rights of the third party. PDA does <u>not</u> indemnify against the consequences of Franchisee's use of the Proprietary Marks except in accordance with the requirements of this Agreement, and, as a condition to indemnification, Franchisee must provide notice to PDA of any such claim within ten (10) days after the earlier of (i) actual notice of the claim or (ii) receipt of written notice of the claim, and must therein tender the defense of the claim to PDA. If PDA accepts the tender of defense, has the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

B. Subsection B.8 of Section 2 of the Franchise Agreement, "Term and Renewal," shall be deleted in its entirety and have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding only such claims as Franchisee may have that have arisen under the Minnesota Franchise Act or the rules and regulations promulgated thereunder by the Commissioner of Commerce.

C. Subsection B of Section 2 of the Franchise Agreement, "Term and Renewal," shall be supplemented by the following language which shall be an integral part of the Franchise Agreement:

Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes, Section 80C.14, subdivision 4 requires, except in certain specified cases, that franchisees be given written notice of a franchisor's intention not to renew 180 days prior to expiration of the franchise and that the franchisee be given sufficient opportunity to operate the franchise in order to enable the franchisee the opportunity to recover the fair market value of the franchise as a going concern.

D.     Section 11.B.3 of the Franchise Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect and the following shall be substituted in lieu thereof:

> The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding only such claims as Franchisee may have that have arisen under the Minnesota Franchise Act or the rules and regulations promulgated thereunder by the Commissioner of Commerce;

E.     Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Franchise Agreement:

> **WITH RESPECT TO FRANCHISES GOVERNED BY MINNESOTA LAW, THE FRANCHISOR WILL COMPLY WITH MINN. STAT. SEC. 80C.14, SUBDS. 3, 4, AND 5 WHICH REQUIRE, EXCEPT IN CERTAIN SPECIFIED CASES, THAT A FRANCHISEE BE GIVEN 90 DAYS NOTICE OF TERMINATION (WITH 60 DAYS TO CURE) AND 180 DAYS NOTICE FOR NON-RENEWAL OF THE FRANCHISE AGREEMENT.**

F.     Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection F. which shall be considered an integral part of the Franchise Agreement:

> Minnesota Rule 2610.4400J. deems it an unfair and inequitable practice for any person to require a franchisee to consent to liquidated damages, and any provisions requiring a franchisee to consent to liquidated damages shall no longer have any force or effect.

G.     Section 18 of the Franchise Agreement, "Dispute Resolution," shall be supplemented with the addition of the following paragraph.

> **MINN. STAT. SECTION 80C.21 AND MINN. RULE 2860.4400J PROHIBITS REQUIRING LITIGATION TO BE CONDUCTED OUTSIDE MINNESOTA. IN ADDITION NOTHING IN THE FRANCHISE AGREEMENT CAN ABROGATE OR REDUCE ANY OF YOUR RIGHTS AS PROVIDED FOR IN MINNESOTA STATUTES, CHAPTER 80C, OR YOUR RIGHTS TO ANY PROCEDURE, FORUM, OR REMEDIES PROVIDED FOR BY THE LAWS OF JURISDICTION.**

H.     Minn. Rule 2860-4400J prohibits waiver of a jury trial. All references in the Agreement to waiver of a jury trial are deleted in their entirety.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-7 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

_____
Witness

By:_____
Name: _____
Title:_____

FRANCHISEE:

ATTEST:

_____
Witness

By:_____
Name:_____
Title:_____

**8.     NEW YORK ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC.
FRANCHISE AGREEMENT**

In recognition of the requirements of the New York General Business Law, Article 33, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE LICENSE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A.      Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; provided, however, that all rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York General Business Law, Sections 687.4 and 687.5 be satisfied.

B.      Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; provided, however, that all rights enjoyed by the transferor and any causes of action arising in its favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York General Business Law, Sections 687.4 and 687.5 be satisfied.

C.      Subsection H of Section 14 of the Agreement, "Covenants," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

Franchisee acknowledges that a violation of the terms of this Section 14 would result in irreparable injury to PDA for which no adequate remedy at law may be available, and Franchisee agrees that PDA is entitled to apply for an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section 14. PDA may further avail itself of any other legal or equitable rights and remedies which it may have under this Agreement or otherwise.

D.    Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD TO TEXAS CHOICE OF LAWS RULES); EXCEPT THAT THE FOREGOING CHOICE OF LAW SHOULD NOT BE CONSIDERED A WAIVER OF ANY RIGHT CONFERRED UPON FRANCHISEE BY THE NEW YORK GENERAL BUSINESS LAW, ARTICLE 33.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-8 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

## 9.    NORTH DAKOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the laws of North Dakota and the policies of the office of the state of North Dakota Securities Commission, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____,_____,    (the "Agreement") agree as follows:

A.    Subsection B.8 of Section 2 of the Agreement, "Term and Renewal," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> Franchisee and all Designated Persons shall execute a general release, in a form prescribed by PDA, of any and all claims against PDA, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, representatives and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or any other agreement with PDA or any of its subsidiaries or affiliates or under federal, state or local laws, rules, regulations or orders; excluding any provision that requires a North Dakota Franchisee to sign a general release upon renewal of the franchise license agreement. The Commissioner has determined this to be unfair, unjust and inequitable within the intent of Section 51-19-05 of the North Dakota Franchise Investment Law.

B.    Subsection B.3 of Section 11 of the Agreement, "Transfer of Interest And Assignment Of This Agreement," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

> The transferor and any subsidiary or affiliate shall have executed a general release, in a form prescribed by PDA, of any and all claims against PDA and its subsidiaries and affiliates and their respective officers, directors, shareholders, employees, representatives, agents and independent contractors, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement between Franchisee and PDA or its subsidiaries or affiliates and federal, state, and local laws, rules and ordinances; excluding any provision that requires a North Dakota Franchisee to sign a general release upon renewal of the franchise license agreement. The Commissioner has determined this to be unfair, unjust and inequitable within the intent of Section 51-19-05 of the North Dakota Franchise Investment Law.

C.    Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E which shall be considered an integral part of the Franchise Agreement:

> Under Section 51.19.09 of the North Dakota Franchise Investment law, the Commissioner has determined it to be unfair, unjust and inequitable to require a franchisee to consent to liquidated damages. Any provisions requiring a franchisee to consent to liquidated damages shall not have any force or effect.

D.     Section 14 of the Agreement, "Covenants," shall be prefaced by the following paragraph which shall be considered an integral part of the Agreement:

Covenants not to compete during the term of and upon termination or expiration of the Agreement are enforceable only under certain conditions according to North Dakota Law. PDA does not know whether the obligations in Section 14 are enforceable under North Dakota Law.

E.     Subsection E of Section 18 of the Agreement, "Dispute Resolution," shall be deleted in its entirety and shall have no force or effect.

F.     Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of North Dakota, the Agreement and this Addendum shall be governed and construed in accordance with the North Dakota Franchise Investment Law, and any provision in the Agreement that is inconsistent with North Dakota law shall have no force and effect..

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-9 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness

Title:_____

**EXHIBIT N-10**

**10.   RHODE ISLAND ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Rhode Island Franchise Investment Act; Section 19-28.1-14, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

A.     Section 18 of the Franchise Agreement, "Dispute Resolution," is hereby amended by the addition of the following language which shall be considered an integral part of this Agreement:

Any provision in the Agreement restricting jurisdiction or venue to a forum outside of the State of Rhode Island or requiring the application of the laws of a state other than Rhode Island state is void with respect to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-10 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

Name: _____

_____
Witness                                 Title:_____

FRANCHISEE:

ATTEST:

By:_____

Name:_____

_____
Witness                                 Title:_____

1

## 11.    SOUTH DAKOTA ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the laws of South Dakota, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated _____, _____, (the "Agreement") agree as follows:

The laws of the State of South Dakota shall supersede any provision of the Agreement which is in conflict with South Dakota law.

A.    Section 12 of the Franchise Agreement, "Default and Termination," shall be supplemented by the following Subsection E. which shall be considered an integral part of the Franchise Agreement:

Any provision of this Agreement which requires a franchisee to consent to liquidated damages shall not have any force or effect.

B.    Notwithstanding any inconsistent provision in this Agreement, franchise registration, employment, covenants not to compete and other matters of local concern will be governed by the laws of the State of South Dakota.  As to contractual and all other matters, the Franchise Agreement will be and remains subject to the construction, enforcement and interpretation of the laws of the State of Texas.  Any provision in the Agreement which designates jurisdiction or venue, or requires the franchisee to agree to jurisdiction or venue, in a forum outside of South Dakota, is deleted from any Agreement issued in the State of South Dakota.

C.    No release language set forth in the Agreement shall relieve Franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of South Dakota.

D.    Termination provisions covering breach of the Agreement, failure to meet performance and quality standards, and failure to make royalty payments contained in the Agreement shall afford the Franchisee thirty (30) days written notice with an opportunity to cure said default prior to termination.

E.    Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of South Dakota, the Agreement and this Addendum shall be governed and construed in accordance with South Dakota law.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-11 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____     Name: _____
Witness                               Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____     Name: _____
Witness                               Title:_____

# EXHIBIT N-12

## 12. WASHINGTON ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT

In recognition of the requirements of the laws of Washington, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT dated_____, _____, (the "Agreement") agree as follows:

A. In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

B. In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Washington Revised Code Sections 19.100.010 *et seq.*, shall prevail.

C. Notwithstanding the provisions of Section 18 of the Agreement which designate jurisdiction or venue in a forum outside of the State of Washington, the Agreement and this Addendum shall be governed and construed in accordance with Washington law.

D. Subsection E of Section 17 of the Agreement, "Miscellaneous," shall be deleted in its entirety and shall have no force or effect, and the following shall be substituted in lieu thereof:

**THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY PDA IN THE STATE OF TEXAS, AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS THEREOF (WITHOUT REGARD FOR TEXAS CHOICE OF LAW RULES); HOWEVER WASHINGTON LAW WILL GOVERN THE FRANCHISE AGREEMENT UNDER THE JURISDICTION OF THE WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT.**

E. A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

F. Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

1

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-12 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____
Name: _____
Title:_____

Witness

FRANCHISEE:

ATTEST:

By:_____
Name:_____
Title:_____

Witness

**13.    WISCONSIN ADDENDUM TO PROPERTY DAMAGE APPRAISERS, INC. FRANCHISE AGREEMENT**

In recognition of the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135, the parties to the attached PROPERTY DAMAGE APPRAISERS, INC. Franchise Agreement _____,_____, (the "Agreement") agree as follows:

A.    Section 2 of the Agreement, "Term and Renewal," shall be supplemented by the following Subsection 2.E which shall be considered an integral part of the Agreement:

To the extent that the provisions in this Section 2 regarding renewal are inconsistent with the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135 (which, among other things, grants a Franchisee the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the renewal provisions shall be superseded by the Law's requirements and shall have no force or effect.

B.    Section 12 of the Agreement, "Default and Termination," shall be supplemented by the following Subsection 12.E which shall be considered an integral part of the Agreement:

To the extent that the provisions in this Section 12 regarding termination are inconsistent with the requirements of the Wisconsin Fair Dealership Law, Wisconsin Statutes, Chapter 135 (which, among other things, grants a Franchisee the right, in most circumstances, to 90 days prior written notice of termination and 60 days within which to remedy any claimed deficiencies), the termination provisions shall be superseded by the Law's requirements and shall have no force or effect.

C.    Section 17 of the Agreement, "Miscellaneous," shall be supplemented with the following language which shall be considered an integral part of the Agreement:

**TO THE EXTENT THAT ANY PROVISION OF THIS AGREEMENT CONFLICTS WITH THE WISCONSIN FAIR DEALERSHIP LAW SUCH PROVISION SHALL BE SUPERSEDED BY THE LAW'S REQUIREMENTS.**

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Exhibit N-13 to the Franchise Agreement on the day and year first above written in the Franchise Agreement.

PDA:
PROPERTY DAMAGE APPRAISERS, INC.

ATTEST:

By:_____

_____  Name: _____

Witness  Title:_____

FRANCHISEE:

ATTEST:

By:_____

_____  Name:_____

Witness  Title:_____